**VANGUARD JUSTICE SOCIETY, INC., et al.**

v.

**Harry HUGHES et al.**

**Barbara A. GUMPMAN et al.**

v.

**Harry HUGHES et al.**

**Guy V. BOSWORTH et al.**

v.

**Harry HUGHES et al.**

**Civ. Nos. 73–1105–K, 73–1106–K and K–74–71.**

United States District Court, D. Maryland.

March 20, 1979.

Kenneth L. Johnson, Baltimore, Md., Dorothy R. Fait, Silver Spring, Md., Ann F. Hoffman, Kenneth A. Reich, Anthony W. Robinson, Baltimore, Md., for plaintiffs.

Stephen H. Sachs, Atty. Gen. of Maryland, Millard S. Rubenstein, Asst. Atty. Gen., Baltimore, Md., for State defendants.

Benjamin L. Brown, City Sol., William Hughes, Associate City Sol., and Glenn Grossman and Alan Winik, Asst. City Sols., Baltimore, Md., for City defendants.

FRANK A. KAUFMAN, District Judge.

These three cases (*Vanguard, Gumpman* and *Bosworth*) involve challenges to alleged sex and race discrimination within the Baltimore City Police Department ("Department"). The sex issues are of two kinds: (a) height-weight requirement; (b) other. The height-weight issues are present in all three cases; the other sex issues are stated only in *Vanguard*. The race issues are present in *Vanguard* but not in *Bosworth* and *Gumpman*. The cases have been consolidated pursuant to Federal Civil Rule 42(a).[1] Defendants include the State of Maryland, the Governor of Maryland, the Police Commissioner of Baltimore

---

1. *See* Doc. No. 43 in *Bosworth*, Civil No. K–74–71. Some of plaintiffs in *Vanguard* and in *Gumpman* are also intervenors in *Bosworth*.

City (collectively referred to as "State Defendants"), the President of the Civil Service Commission of Baltimore City ("Commission"), two members of that Commission, the Mayor and City Council of Baltimore (collectively referred to as "City Defendants").[2]

Jurisdiction exists in these cases pursuant to 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3); the Fourteenth Amendment; 42 U.S.C. § 2000e *et seq.* (Title VII); and 28 U.S.C. § 1331.[3] The named plaintiffs seek, on behalf of themselves and the members of the classes they represent, declaratory and injunctive relief, back pay and attorneys fees.[4] A number of witnesses testified at trial, and an avalanche of written statements, depositions and other documents have been filed. Counsel have agreed that all such documents and indeed the entire record shall be considered as evidence in these cases.[5] Initially, as suggested by counsel, the cases were divided both on the basis of sex and race, and also on the basis of liability and relief, and proceeded first to trial on the liability phase of the sex issues. Thereaft-

er, however, because of possible overlap of the sex and race questions, this Court decided not to determine liability issues with regard to sex or race until it had received all liability evidence pertaining to both.[6] As of this date, trials on liability phases of both sex and race issues, have been completed. In this opinion, the merits of the sex and race liability issues are discussed, commencing *infra* 697. Before those merit issues are reached, a number of threshold questions require careful analysis. Issues of relief may still require further trial.[7]

### Class Certifications

Six plaintiff classes have been certified in these cases, two re sex, and four re race. In each instance, one or more of those of the named plaintiffs who raised the issue were named as class representatives. As to the sex claims, one class is comprised "of all female applicants for the position of police officer with the Baltimore City Police Department" from June, 1973 to April 23, 1974 "who were rejected because of their height * * *."[8] As to that class, this Court hereby confirms its certification.

---

2. Defendants are sued only in their official capacities.

3. Jurisdiction exists as to the race issues in *Vanguard* under 42 U.S.C. § 1981 and 28 U.S.C. § 1343(3). Section 1981 jurisdiction is not alleged by plaintiffs in *Gumpman* or *Bosworth*. Whether section 1981 jurisdiction exists as to the sex claims in *Vanguard* is an issue which this Court need not determine herein in view of the existence of other federal jurisdictional bases as to the sex claims and, in view of this Court's holdings, *infra*, that as to the height-weight sex claim, defendants have intentionally discriminated against plaintiffs and as to all other sex claims, defendants have not violated, intentionally or otherwise, any of plaintiffs' rights. *But see Runyon v. McCrary*, 427 U.S. 160, 167, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Vogel v. Torrence Bd. of Ed.*, 447 F.Supp. 258, 261 (C.D.Cal.1978); *Raether v. Phillips*, 401 F.Supp. 1393, 1396 (W.D.Va.1975); *Troy v. Shell Oil Company*, 378 F.Supp. 1042, 1046 (E.D.Mich.1974) *appeal dismissed*, 519 F.2d 403 (6th Cir. 1975); *League of Academic Women v. Regents*, 343 F.Supp. 636, 638–40 (N.D.Cal. 1972). For discussion of the reach of § 1981 in a case involving racial discrimination in employment, *see* n.57 *infra*.

4. Plaintiffs originally sought preliminary injunctive relief in each of these cases, but subsequently did not press for the same.

5. That agreement is subject to the understanding that pleadings and arguments are to be considered only as such.

6. During the trial on race issues, Commissioner Pomerleau testified that when he promoted certain black females within the Department, he had "picked up a double minority." (T.Tr. of 7/24/78 at 255).

7. *See* p. 752 *infra*.

8. *See* Doc. No. 29 in *Bosworth*, Civil No. K–74–71. Early during this litigation, counsel for State Defendants agreed to inform all subsequent female applicants for Police Officer who were under 5'7" tall of the pendency of the within litigation and to advise those applicants that they could file applications for employment to preserve their rights pending final judgment in these cases. Subsequently, plaintiffs' counsel indicated that they had been advised by one or more females less than 5'7" tall who had applied for positions with the Department during the pendency of this litigation that the Department had failed to follow those

The second sex class is comprised of all sworn female (uniformed) employees of the Department [9] on June 14, 1974. Shortly before final argument on the sex issues took place, all defendants sought to decertify that latter class, because thirty-six of the fifty class members had elected to "opt-out" pursuant to Federal Civil Rule 23(c)(2).

A class is not appropriate unless it "is so numerous that joinder of all members is impracticable." Federal Civil Rule 23(a)(1). A numerosity determination in any given case depends upon the facts of that case and is largely committed to the discretion of the district judge. *Roman v. ESB, Inc.*, 550 F.2d 1343, 1347–49 (4th Cir. 1976); *Barnett v. W. T. Grant Co.*, 518 F.2d 543, 546–47 (4th Cir. 1975); *Cypress v. Newport News General Non-Sectarian Hospital Association*, 375 F.2d 648, 653 (4th Cir. 1967). Defendants' decertification approach, as aforesaid, stressed lack of numerosity. However, there is also a question of adequacy of class representation, *see* Federal Civil Rule 23(a)(4), a question which in final preparation of this opinion looms large since Ms. Blackston, one of the five original individual named plaintiffs in *Vanguard*, is the only named plaintiff in these three cases who is or was a sworn female employee of the Department on June 14, 1974 or, as far as this Court has been informed, at any time thereafter. Ms. Blackston has herself, opted-out as a member of the sworn female class.[10] When Ms. Blackston so opted out, she became at that time an inadequate class representative. *Cf. East Texas Motor Freight System, Inc. v. Rodriquez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977); *Belcher v. Bassett Furniture Industries, Inc.*, 588 F.2d 904 at 906 n.2 (4th Cir. 1978); *Goodman v. Schlesinger*, 584 F.2d 1325 (4th Cir. 1978); *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1313 and n.53 (4th Cir. 1978); *Roman v. ESB, Inc., supra.* Because there never has been any other named plaintiff in these cases who qualifies as a representative of the non-height-weight sex class,[11] it is necessary, even as of this date, to decertify that class.[12] Otherwise, its members would be bound by an adverse decision herein without having been represented by an adequate representative. To permit that to occur would surely offend due process. "The binding effect of all class action decrees raises substantial due process questions that are directly relevant to Rule 23(a)(4). If the absent members are to be conclusively bound by the result of an action prosecuted or defended by a party alleged to represent their interests, basic notions of fairness and justice demand that the representation they receive be adequate

agreed upon procedures. Thereafter, plaintiffs and State Defendants agreed:

should the minimum height requirement be removed by the court, the Baltimore Police Department will appropriately advertise that persons who had applied for positions with the department during the pendency of litigation, but were less than 5'7" tall, can present themselves to the Personnel Division for further processing. Additionally, any applicant who can, by affidavit or other means, demonstrate that she attempted to apply to the department during the pendency of litigation but was not permitted to do so will have her application dated as of the date of her initial attempted application. (Letter dated July 10, 1975 from counsel for State Defendants to this Court, filed behind Doc. No. 63 in *Bosworth*, Civil No. K–74–71).

**9.** *See* Doc. No. 14 in *Vanguard*, Civil No. 73–1105K.

**10.** Blackston is the only named plaintiff in these cases who has exhausted administrative remedies as to the non-height-weight sex

claims. *See* the discussion at 686 *infra.* Blackston has not opted out as a member of the sworn race class. *See infra* at 677.

**11.** In these cases the applicant sex class representatives have seemingly concentrated exclusively on the height-weight issue. Even on a broad across-the-board approach, their representative adequacy would appear most questionable as to the non-height-weight sex questions. *See East Texas Motor Freight System v. Rodriquez, supra* 431 U.S. at 403–06, 97 S.Ct. 1891; *Roman v. ESB, supra* at 1348–49; *Doctor v. Seaboard Coast Line R. Co.*, 540 F.2d 699, 711–12 (4th Cir. 1976). *But see Barnett v. W. T. Grant Co.*, 518 F.2d 543, 547–48 (4th Cir. 1975).

**12.** *See Belcher v. Bassett Furniture Industries, Inc.*, 588 F.2d 904 at 906 *supra* " * * * there is no reason why it [the District Court] may not at any time reconsider [class action certification] * * *."

* * *." 7 Wright & Miller, Federal Practice & Procedure, § 1765, p. 617 (1972). However, in order not to deprive the members of the decertified non-height-weight sex class from having their day in court, the class action claims of that class will be retained as open claims in this case for a period of thirty days from the date hereof in order "to permit the presentation of any proper claims" for relief and for an adequate representative of that class to come forward. *See Goodman v. Schlesinger*, 584 F.2d 1331–33, and cases cited and discussed thereat; *Cox v. Babcock & Wilson Co.*, 471 F.2d 13, 15–16 (4th Cir. 1972).

The four classes certified as to race issues are the following:[13]

(1) All blacks "who have at any time since November 12, 1970, been applicants for employment with the Baltimore City Police Department as sworn uniform employees and who have not been employed and who assert a claim under the provisions of 42 U.S.C. § 1983."

(2) All blacks "who have at any time since March 24, 1972, been applicants for employment with the Baltimore City Police Department as sworn uniform employees and who have not been employed and who assert a claim under Title VII of the Civil Rights Act of 1964, as amended March 24, 1972, 42 U.S.C. § 2000–e [2000e]."

(3) All blacks "who are now employed as sworn uniform employees or who have at any time since November 12, 1970 been employed as sworn uniform employees or who will in the future be employed as sworn uniform employees with the Baltimore City Police Department and assert a claim under the provisions of 42 U.S.C. § 1983."

(4) All blacks "who are now employed as sworn uniform employees or who have at any time since March 24, 1972 been employed as sworn uniform employees or who will in the future be employed as sworn uniform employees with the Baltimore City Police Department and assert a claim under Title VII of the Civil Rights Act of 1964, as amended March 24, 1972, 42 U.S.C. § 2000–e [2000e]."[14]

The certifications of those four race classes are hereby confirmed.

### Title VII Exhaustion

Consideration of Title VII exhaustion questions necessitates a lengthy detour.

On August 13, 1973, the Vanguard Justice Society and Victor B. Dennis, Melvin P. Freeman and Earl I. Nesbit, all named plaintiffs in *Vanguard*, filed charges of *race* discrimination with the EEOC against the Baltimore City Police Department, Mayor and City Council of Baltimore, the Baltimore Civil Service Commission, and the Governor of Maryland. Thereafter, within the next several months, three persons who are individual plaintiffs in one or more of these cases filed charges with the EEOC of *sex* discrimination against only the Department based on the 5'7" height requirement: Paulette Nixon on September 4, 1973; Barbara Gumpman on September 13, 1973; and Linda Barksdale on November 9, 1973.[15]

On November 12, 1973, the Society, Paulette Nixon and others instituted in this Court the *Vanguard* case against the Governor, the Police Commissioner, the Civil Service Commission and the Mayor of Baltimore City, alleging both *race* and *sex* discrimination in the operation of the Police Department[16] and grounding their claims

13. *See* Doc. No. 41 in *Vanguard*, Civil No. 73–1105K.

14. At other places in this opinion the names of all persons who are original plaintiffs or intervenors are set forth, except for that of Ronald Miller, a black former employee of the Department who alleged that he was discriminatorily terminated. Miller was permitted to intervene in *Vanguard* on December 15, 1976. *See* Doc. No. 40 in *Vanguard*, Civil No. 73–1105K. He is seemingly a member of the third and fourth

classes certified as to race though the dates of his employment and termination are not set forth in the record.

15. Blackston filed other sex charges with the EEOC on October 13, 1973. *See* 686 *infra.*

16. The Baltimore City Police Department was not named as a Defendant in *Vanguard* although it was so named in the EEOC com-

upon 42 U.S.C. §§ 1981, 1983 and the Fourteenth Amendment but not upon Title VII. On that same date, i. e. November 12, 1973, Gumpman and Barksdale commenced the *Gumpman* case, naming the same defendants as were named in *Vanguard*, alleging height-weight sex discrimination, and relying on section 1983 and the Fourteenth Amendment but not Title VII.

Subsequently, on January 22, 1974, Bosworth, as a sole plaintiff, instituted her case in this Court, alleging sex discrimination based on the height-weight requirement and naming the Police Department's Director of Personnel, the State of Maryland and the Mayor and City Council of Baltimore as defendants in addition to the defendants named in *Vanguard* and *Gumpman*. Bosworth based her complaint on section 1983 and the Fourteenth Amendment but not Title VII.

On January 31, 1974, Bosworth filed a charge with the EEOC and named the Department, the State, the City of Baltimore, and the Civil Service Commission as respondents. A week later, her attorney wrote to the EEOC and requested that it issue to Bosworth a "right-to-sue" letter.[17] The EEOC relayed that request to the United States Department of Justice and on April 3, 1974, that Department issued Bosworth a "right-to-sue" notice.[18]

In the meantime, the Society, Nixon, Gumpman and Barksdale filed petitions on February 15, 1974 to intervene as plaintiffs in Bosworth's civil action in this Court. A few days later, on February 19, 1974, Bosworth filed an amended complaint in her case in this Court, restating her previous allegations and adding claims under Title VII.[19] At that time, i. e., on February 19, 1974, neither Bosworth nor any of the intervening plaintiffs had received a "right-to-sue" notice. Only 19 days had elapsed since Bosworth had initiated EEOC proceedings. The time periods which elapsed between the dates the other plaintiffs filed sex discrimination charges with the EEOC and commenced Title VII claims in this Court were somewhat longer: Nixon, 169 days; Gumpman, 160 days; Barksdale, 103 days.

Bosworth and Nixon were issued right-to-sue letters by the Department of Justice on April 3, 1974. Seemingly, neither Gumpman nor Barksdale ever received such a letter.

The Society received a right-to-sue letter well afterwards on November 1, 1974, with respect to its *race* discrimination claim. Messrs. Dennis, Freeman and Nesbit, three of the original seven plaintiffs in *Vanguard* also received their respective right-to-sue letters, with regard to race, from the Justice Department on November 1, 1974.

On July 19, 1974, the EEOC referred[20] all charges filed by any of the named plaintiffs in these cases to the Maryland Commission on Human Relations. That latter Commis-

---

plaints filed by the *Vanguard* plaintiffs. Seemingly, the Police Commissioner was named as a defendant in *Vanguard* in lieu of the Department. *See* 692–694 *infra,* for discussion of the effect of plaintiffs' failure to name certain persons or entities in one or more EEOC complaints.

**17.** The attorney's letter stated, in relevant part:
Inasmuch as Miss Bosworth would like to pursue her judicial remedies in this matter, and the EEOC has initial jurisdiction over these complaints, I hereby request a "right to suit" [sic] letter in connection with this matter for the reasons that I understand that the investigation to be conducted by the EEOC will be prolonged.

**18.** Only the Department of Justice can issue a right to sue letter against a governmental employer. 42 U.S.C. § 2000e–5(f)(1).

**19.** The only plaintiff named in the amended complaint was Bosworth. However, the Vanguard Justice Society, Nixon, Gumpman and Barksdale had all been permitted to intervene as plaintiffs in *Bosworth* on February 15, 1974, and thus were intervenors of record when the February 19, 1974 amended complaint was filed by Bosworth. Thereafter, intervenors in no way objected to that amendment of the complaint and apparently adopted it.

**20.** *See* 42 U.S.C. § 2000e–5(c) and *Love v. Pullman,* 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972). *See also General Insurance Co. of America v. EEOC,* 491 F.2d 133, 134–35 (9th Cir. 1974); *Donohue v. Shoe Corporation of America,* 337 F.Supp. 1357, 1358–59 (C.D.Cal. 1972); *Abshire v. Chicago & Eastern Illinois R. Co.,* 352 F.Supp. 601, 603 (N.D.Ill.1972).

sion terminated its proceedings and referred the complaints back to the EEOC, during August, 1974.[21]

On January 9, 1975, plaintiffs in *Vanguard* filed a proposed amended complaint in which Title VII issues were included for the first time in that case. Appended thereto were copies of "right-to-sue" letters issued to the Vanguard Justice Society and to the four individual plaintiffs in *Vanguard* on November 1, 1974.[22] By inadvertence, this Court did not, prior to trial, formally grant plaintiffs' said motion to amend their complaint. However, the Court and all parties have, at all times since shortly after January 9, 1975, treated these cases, insofar as the race issues are concerned, as having been brought under Title VII as well as under 42 U.S.C. §§ 1981, 1983 and the Fourteenth Amendment.[23] Accordingly, plaintiffs' motion to amend the complaint is hereby granted, effective as of January 9, 1975.

During an early stage of these cases, counsel for the City defendants raised various questions pertaining to plaintiffs' exhaustion of plaintiffs' administrative remedies under Title VII. This Court asked whether plaintiffs desired to refile their charges with the EEOC to include all the defendants named in their civil complaints and to avail themselves of conciliation procedures. However, plaintiffs declined to reinstitute administrative proceedings.[24]

The City defendants contend that plaintiffs prematurely stated their Title VII sex charges in these cases because plaintiffs failed to wait the requisite period of time after filing their administrative charges of sex discrimination with the EEOC before plaintiffs amended one or more of their complaints in these cases to include those allegations.[25] Title VII mandates that

---

**21.** *See Letter* dated July 12, 1976, and attached to Doc. No. 67 in *Bosworth*, Civil No. K–74–71, from the Executive Director of Maryland Human Relations Commission to Counsel for Plaintiffs and Doc. No. 81 in *Vanguard*, Civil No. 73–1105K.

**22.** Those letters related to race charges and/or to non-height sex charges. Nixon, a named plaintiff in *Vanguard*, did receive a right-to-sue letter, with regard to sex discrimination relating only to the height-weight issue, dated April 3, 1974. However, Nixon did not state her Title VII sex charges in *Vanguard* until January 9, 1975, well after the expiration of the 90-day period following receipt of her "right-to-sue" notice within which time period suit must be instituted in federal district court. *See* 42 U.S.C. § 2000e–5(f)(1). Prior to the 1972 amendment to Title VII, the period was 30 days, not 90 days.

**23.** At oral argument, counsel for both the City and the State defendants candidly stated that they would not have tried the case any differently if there had been no Title VII issues in this case.

**24.** On July 1, 1974, counsel for plaintiffs wrote to this Court:

Plaintiffs have no desire to reopen the administrative process on an artificial basis to deal with an imaginary problem. If [counsel for the city defendants] is pursuing his contention that Plaintiffs have not technically exhausted the administrative remedies under Title VII, Plaintiffs assume that he will insist that any charge filed with EEOC be left with-

in the administrative agency for a minimum of six months. Plaintiffs are optimistic that a final order will have been entered in this case in less time than that. As Plaintiffs will not be able to comply with the strict requirements of Title VII exhaustion, Plaintiffs choose not to initiate that process to name additional defendants who, they believe, are already encompassed within the original charges filed by individual plaintiffs within these cases.

As the record discloses, plaintiffs' optimism with regard to an early final order was not well founded.

**25.** None of the defendants seemingly make that contention as to the race discrimination charges in these cases. Nor could they meritoriously do so since those race charges were not brought until the applicable "cooling-off" periods had run. Herein, Title VII relief is granted with regard to certain of the race contentions. Title VII and also 1983 relief is granted insofar as certain of the sex claims are concerned. All other sex and race claims are denied because plaintiffs have not proved discrimination, purposeful or otherwise. As a result, if this Court's findings and holding herein are correct, nothing turns upon the resolution of the Title VII exhaustion issues which are analyzed exhaustively herein. Nonetheless, that analysis would appear required to set the record straight with regard to jurisdiction and procedure, and also to indicate why the only predicate for relief with regard to the height-weight sex issue is 1983's constitutional standard.

there be a 180-day "cooling-off" period between the filing of charges with the EEOC and the institution of a civil suit in court during which the EEOC may have an opportunity to pursue conciliation.[26] In *Bosworth* plaintiffs amended their complaint to include the Title VII sex discrimination allegations prior to the expiration of that period. The issue is thus whether the premature inclusion of Title VII claims of sex discrimination in *Bosworth*, with its accompanying negative effect on the potential for conciliation, deprives this Court of jurisdiction under Title VII.[27]

**26.** In cases, such as this one, in which the administrative charges are to be presented first to a state agency with jurisdiction over employment discrimination complaints, the conciliation period is enlarged to 240 days—60 days for the state agency and 180 days thereafter for the EEOC. *See* 42 U.S.C. § 2000e–5(c), (f)(1); *see also Patton v. Conrad Area School Dist.*, 388 F.Supp. 410, 415 & n.22 (D.Del.1975); *Byrd v. International Brotherhood of Electrical Workers*, 375 F.Supp. 545, 554 n.2 (D.Md.1974). The 240 day period did expire before plaintiffs, on January 9, 1975, in *Vanguard* sought to amend their complaint to include Title VII sex charges. It is immaterial whether a 180-day or 240-day period is applicable, since neither period expired before plaintiffs included their Title VII sex discrimination claims in *Bosworth*.

**27.** Section 706(f)(1) of Title VII, 42 U.S.C. § 2000e–5(f)(1) provides in part:

If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or *if within one hundred and eighty days from the filing of such charge * * *,* whichever is later, the Commission has not filed a civil action under this section * * * or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission * * * shall so notify the person aggrieved and within ninety days of the giving of such notice a civil action may be brought against the respondent named in the charge . . . .

Other parts of that section of the law provide that when the employer is a governmental agency, the Attorney General, as well as the EEOC, must be involved in the administrative processing of the charges of sex discrimination. See n.16 *supra*.

The EEOC has promulgated a number of regulations regarding the administrative processing of charges under Title VII. *See* 29 C.F.R. § 1601.1 et seq. Section 1601.25b, prior to amendment on September 23, 1977, when the regulations were reorganized and rewritten, read in relevant part:

 * * * * * *

(b) The Commission shall not issue a [right to sue notice] prior to a determination [of reasonable cause] or where reasonable cause has been found prior to efforts at conciliation with respondent, except as provided in paragraph (c) of this section.

(c) At any time after the expiration of one hundred and eighty (180) days from the date of the filing of a charge or upon dismissal of a charge at any stage of the proceedings, an aggrieved person may demand in writing [that a right to sue notice be issued] and the Commission shall promptly issue a notice, and provide copies thereof and copies of the charge to all parties.

Section 1601.28(a)(1) and (2), which became effective on September 23, 1977, provides:

(a) Issuance of notice of right to sue upon request. (1) When a person claiming to be aggrieved requests, in writing, that a notice of right to sue be issued and the charge to which the request relates is filed against a respondent other than a government, governmental agency or political subdivision, the Commission shall promptly issue such notice as described in § 1601.28(e) to all parties, at any time after the expiration of one hundred eighty (180) days from the date of filing of the charge with the Commission, or in the case of a Commissioner charge 180 days after the filing of the charge or 180 days after the expiration of any period of reference under Section 706(d) of Title VII as appropriate.

(2) When a person claiming to be aggrieved requests, in writing, that a notice of right to sue be issued, and the charge to which the request relates is filed against a respondent other than a government, governmental agency or political subdivision, the Commission may issue such notice as described in § 1601.28(e) with copies to all parties, at any time prior to the expiration of 180 days from the date of filing the charge with the Commission: *Provided*, that the District Director or the Director of the Office of Compliance Programs has determined that it is probable that the Commission will be unable to complete its administrative processing of the charge within 180 days from the filing of the charge and has attached a written certificate to that effect.

On September 22, 1977, the Commission stated as follows (42 Fed.Reg. 47,831 (1977)):

[of section 1601.28] One commentor suggested that the Commission has no authority for subsection (a)(2), which provides for the issuance of a notice of right to sue before the passage of 180 days when the appropriate Commission official determines that the Commission will be unable to complete its administrative processing of the charge within that time period. The statute permits issuance of notices of right to sue after the

There is nothing in the record in these cases indicating that the EEOC either made a determination of reasonable cause or dismissed the charges filed by plaintiffs. Thus, the named plaintiffs who alleged sex discrimination were not *entitled* to receive a right to sue letter under subsection (b) of the then existing regulation,[28] until the expiration of the conciliation period. Bosworth demanded, and received, apparently contrary to law, a right to sue letter prior to the expiration of 180 days. Although Nixon received her right to sue letter after the expiration of 180 days, her Title VII sex allegations were added to the complaint in *Bosworth* prior to the running of that period.[29]

A plaintiff must exhaust his administrative remedies before filing suit under Title VII. *See, e. g., Stebbins v. Nationwide Mutual Insurance Co.*, 382 F.2d 267 (4th Cir. 1967) *cert. denied*, 390 U.S. 910, 88 S.Ct. 836, 19 L.Ed.2d 880 (1968); *Mickel v. South Carolina State Employment Service*, 377 F.2d 239, 242 (4th Cir.), *cert. denied*, 389 U.S. 877, 88 S.Ct. 177, 19 L.Ed.2d 166 (1967). The Supreme Court has held that the filing of charges with the EEOC and the receipt of a right-to-sue letter are jurisdictional prerequisites to the institution of a Title VII action.[30] However, the issuance of a right-to-sue letter by the EEOC subsequent to the filing of a Title VII complaint which complaint was not filed until after the expiration of the 180 day period cures the jurisdictional defect in the original complaint. *See Henderson v. Eastern Freight Ways, Inc.*, 460 F.2d 258, 260 n.2 (4th Cir. 1972) (per curiam), *cert. denied*, 410 U.S. 912, 93 S.Ct. 976, 35 L.Ed.2d 275 (1973) and cases cited therein; *see also Berg v. Richmond Unified School District*, 528 F.2d 1208, 1212 (9th Cir. 1975) vacated and remanded on other grounds, 434 U.S. 158, 98 S.Ct. 623, 54 L.Ed.2d 375 (1977) (per curiam); *Black Musicians v. American Federation of Musicians*, 375 F.Supp. 902, 906-07 (W.D.Pa.1974) *aff'd. mem.*, 544 F.2d 512 (3rd Cir. 1976). Nevertheless, the question remains as to whether filing suit *before* expiration of the 180-day conciliation period constitutes a jurisdictional defect which is *not* cured by the subsequent receipt of a right-to-sue letter even if such letter is issued *after* the 180 day period.

In *Occidental Life Insurance Co. v. EEOC*, 432 U.S. 355, 97 S.Ct. 2447, 53

passage of 180 days. The Commission is willing to issue notices before 180 days when it is clear that the administrative process cannot be completed, based on the legal principle that a party is not required to perform a useless act, i. e., wait for the passage of 180 days when the passage of such time will not accomplish any purpose.

That 1977 amendment seemingly only confirmed previously existing EEOC practices. " * * * in cases such as the present one where investigation cannot be completed in 180 days in any event, the EEOC practice is to issue, upon request, a right-to-sue letter within the 180-day period." *Lewis v. F. M. C. Corp.*, 11 F.E.P.Cases 31, 34 (N.D.Cal.1975). In *Patton v. Conrad Area School District*, 388 F.Supp. 410, 415 (D.Del.1975), Chief Judge Latchum, writing before the 1977 amendment noted that it was "unclear whether a notice to sue letter may be issued by the Attorney General before the expiration of the 180 day period." Chief Judge Northrop of this Court, writing just before September 23, 1977 in *Scott v. Board of Education of Harford County, et al.*, Civil Action No. N-76-1513 (D.Md. 9/2/77), and Judge Miller of this Court, writing after September 23, 1977 and quoting the new Section 1601.28

in *Loney v. Carr Lowrey Glass Company*, 458 F.Supp. 1080 (D.Md.1978) concluded that 42 U.S.C. § 2000e-5(f)(1) does not permit the issuance of a right to sue letter before the expiration of the 180 day period. A copy of the unpublished opinion in *Scott* has been placed in the Court files in these cases.

28. *See* n.27 *supra*.

29. Arguably, Nixon's right to sue letter was also issued prematurely. A charge is not deemed filed with the EEOC until 60 days after it has been referred to the appropriate state agency. *See* former section 29 C.F.R. § 1601.-12(b)(1)(iv). *See also* present section 29 C.F.R. § 1601.28 which became effective September 23, 1977. The 180-day period would thus begin after the expiration of the 60-day period—a total period of 240 days. Only 211 days elapsed between the filing of charges by Nixon (as an intervening plaintiff in *Bosworth*) and her receipt of a right to sue letter (September 4, 1973 to April 3, 1974).

30. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

L.Ed.2d 402 (1977), the Supreme Court held that the 180-day conciliation period of section 706(f)(1) was not a limitation on the EEOC's power to institute a civil action based on an individual's charge. In reaching that conclusion, Mr. Justice Stewart construed the 180-day provision as only a limitation on the private right of action provided by Title VII. He wrote (at 361, 97 S.Ct. at 2452):

> * * * Rather than limiting action by the EEOC, [§ 706(f)(1)] seems clearly addressed to an alternative enforcement procedure: If a complainant is dissatisfied with the progress the EEOC is making on his or her charge of employment discrimination, he or she may elect to circumvent the EEOC procedures and seek relief through a private enforcement action in a district court. *The 180-day limitation provides only that this private right of action does not arise until 180 days after a charge has been filed.* Nothing in § 706(f)(1) indicates that EEOC enforcement powers cease if the complainant decides to leave the case in the hands of the EEOC rather than to pursue a private action.[31] [emphasis added]

*See also Johnson v. REA, Inc.,* 421 U.S. 454, 458, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975) in which Mr. Justice Blackmun noted that * * * "the claimant, after the passage of 180 days, may demand a right-to-sue letter and institute the Title VII action himself without waiting for the completion of conciliation procedures."

31. Mr. Justice Stewart (432 U.S. at 366, 97 S.Ct. at 2454) reiterated that analysis later in his opinion after reviewing the legislative history of Title VII:

> The legislative history of § 706(f)(1) thus demonstrates that the provision was intended to mean exactly what it seems to say: An aggrieved person unwilling to await the conclusion of extended EEOC proceedings may institute a private lawsuit 180 days *after* a charge has been filed. * * * [Emphasis added]

32. *See also Stebbins v. Nationwide Mutual Insurance Co.,* 382 F.2d 267, 268 (4th Cir. 1967) *cert. denied,* 390 U.S. 910, 88 S.Ct. 1061, 19 L.Ed.2d 880 (1968); *Mickel v. South Carolina State Employment Service,* 377 F.2d 239, 242

■ Although an individual claimant apparently should allow 180 days to pass so that the EEOC has an *opportunity* to conciliate his charge, *actual* conciliation efforts by the Commission are not a prerequisite to a private suit. *See Johnson v. Seaboard Air Line Railroad Co.,* 405 F.2d 645 (4th Cir. 1968), *cert. denied,* 394 U.S. 918, 89 S.Ct. 1189, 22 L.Ed.2d 451 (1969).[32] In *Johnson,* (at 652) the Fourth Circuit held "that the individual aggrieved may file a suit in the district court when he has received the statutory notice from the Commission and that he need not await an actual attempt by the Commission to achieve voluntary compliance." In *Johnson,* the statutory conciliation period (at that time, 30 days) had expired and each of the plaintiffs had received a right-to-sue letter prior to institution of the suit. Thus, the Court did not have to deal with the question presented in this case, namely, whether commencement of a Title VII action during the conciliation period and prior to issuance of right-to-sue notices affects the jurisdiction of the district court.

In circumstances similar to those in this case, several courts have held that there is jurisdiction over Title VII claims for preliminary relief to maintain the *status quo* pending a plaintiff's pursuit of administrative remedies. *See Berg v. Richmond Unified School District, supra* at 1211; *Drew v. Liberty Mutual Insurance Co.,* 480 F.2d 69, 72–76 (5th Cir. 1973) *cert. denied,* 417 U.S. 935, 94 S.Ct. 2650, 41 L.Ed.2d 239 (1974); *cf. Jerome v. Viviano Food Co.,* 489 F.2d 965 (6th Cir. 1974).[33]

(4th Cir.) *cert. denied,* 389 U.S. 877, 88 S.Ct. 177, 19 L.Ed.2d 166 (1967); *Chastang v. Flynn and Emrich Co.,* 365 F.Supp. 957, 962 (D.Md. 1973), *aff'd in part and rev'd in part on other grounds,* 541 F.2d 1040 (4th Cir. 1976).

33. *See also Eldredge v. Carpenters Joint Apprenticeship and Training Committee,* 440 F.Supp. 506, 516–17 (N.D.Cal.1977) and cases cited thereat; *see also Mead v. United States Fidelity and Guaranty Co.,* 442 F.Supp. 102, 107 n.1 (D.Minn.1977). *But see Troy v. Shell Oil Co.,* 378 F.Supp. 1042 (E.D.Mich.1974), *appeal dismissed,* 519 F.2d 403 (6th Cir. 1975).

In *Drew,* plaintiff filed a charge of discrimination with the EEOC against her employer, alleging that the day after she filed the charge,

The Second Circuit allowed an exception to the 180-day conciliation period when an earlier similar charge by the same party had already been before the EEOC the prerequisite period of time. *Weise v. Syracuse University*, 522 F.2d 397, 411–13 (2d Cir. 1975). In *Weise*, the EEOC issued a right-to-sue notice with respect to plaintiff's second charge of discrimination against defendant only three days after the charge was filed. Since plaintiff's first charge had already been pending before the Commission for more than 180 days without result, conciliation therefore appeared unlikely. "To require the EEOC to hold the second charge for 180 days would not have advanced the conciliation purposes of the Act and would only have served to delay the proceedings, contrary to the Act's policy of handling claims expeditiously." 522 F.2d at 412. The Court therefore held that, under those circumstances, the early issuance of a right-to-sue letter did not violate the procedural requirements of Title VII.

In *Milner v. National School of Health Technology*, 409 F.Supp. 1389 (E.D.Pa.1976), the EEOC, after concluding that conciliation was not possible, issued a right-to-sue letter only 150 days after it had assumed jurisdiction of plaintiff's charge. Judge Joseph Lord (at 1392), citing to *Weise*, construed the statutory language [34] to require issuance of such a letter within 180 days rather than to mandate a conciliation period of specific duration. In *Howard v. Mercantile Commerce Trust Co.*, 8 E.P.D. ¶ 9842, p. 6502 (E.D.Mo.1974) Judge Meredith refused to dismiss a complaint on grounds that the right-to-sue notice had been issued prematurely because: (1) the statutory words ("within 180 days") "connote some measure of flexibility" (at p. 6503); (2) the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), appeared to require only the filing of a charge with the EEOC and receipt of a right-to-sue notice as prerequisites to a Title VII complaint; [35] and (3)

she was fired. Shortly thereafter, before expiration of 180 days and receipt of a right-to-sue letter, she filed a civil action against her employer. Judge Tuttle (at 72) held that "in the limited class of cases, such as the present, in which irreparable injury is shown and likelihood of ultimate success has been established, . . . the individual employee may bring her own suit to maintain the status quo pending the action of the Commission on the basic charge of discrimination." The Court noted (at 73, n.5) that the 180-day conciliation provision of Title VII did not apply because the action brought by the plaintiff was one for temporary relief only pending action of the EEOC on her charge.

The Ninth Circuit reached a similar conclusion in *Berg* in a procedural setting almost as complicated as the settings in the instant cases. In *Berg*, a school district threatened to require a pregnant school teacher to cease working earlier than she and her doctor believed was necessary and to deny her the benefit of accumulated sick leave while she was not working. The teacher filed a charge of sex discrimination with the EEOC against the school district. Two months later, she requested a right-to-sue letter but, before receiving it, filed a civil action under Title VII as well as section 1983. Ultimately the EEOC did send her a right-to-sue notice. The Ninth Circuit held that the district court did have jurisdiction under Title VII to reach the merits of the preliminary injunction sought by plaintiff. "In a limited class of cases such as this one, in which there exist both a

high probability of the claimant's ultimate success on the merits and the threat of irreparable injury of the sort which the Act seeks to avoid, a Title VII claimant may personally bring suit to maintain the status quo pending *disposition* by the EEOC of the underlying charge of discrimination." 528 F.2d at 1211–12. The Ninth Circuit also held that the EEOC's later issuance of a right-to-sue letter cured any jurisdictional defect with respect to plaintiff's claim for permanent relief, *Id.* at 1212, citing, *inter alia*, *Henderson v. Eastern Freight Ways, Inc.*, *supra*.

In *Jerome v. Viviano Food Co.*, *supra*, plaintiff alleged that she had been denied employment by defendant because of her sex. Without awaiting administrative disposition of her charges or a right-to-sue notice, she filed suit. The Sixth Circuit upheld the district court's dismissal of the complaint. The Court distinguished *Drew* on the basis that there was no existing employment relationship between plaintiff and defendant. Therefore, unlike *Drew*, there was no need for preliminary relief to maintain the status quo.

34. 42 U.S.C. § 2000e–5(f)(1), set out *supra*, at 680 n.27.

35. In *McDonnell Douglas*, the Supreme Court was dealing with the question of whether a private civil action could be based on charges as to which the EEOC had not made a reasonable cause finding. The right-to-sue letter was issued several years after the filing of the

even if the EEOC had violated its own regulations with respect to issuance of right-to-sue notices,[36] private plaintiffs should not be penalized for the procedural errors of the Commission. Finally, since the EEOC had held the charge for 90 days and certified that it would not be able to process it within 180 days, there appeared no useful purpose in remanding the case to the EEOC. Judge Meredith warned, however, that, if the EEOC abused its discretion in issuing right-to-sue notices, a case could be remanded to the Commission. *See also Lewis v. FMC Corp.,* 11 F.E.P. Cases 31, 34–35 (N.D.Cal.1975). In that case, since the EEOC had stated that there was no possibility of investigating plaintiff's charge within 180 days, Judge Peckham concluded that there was no reason to require plaintiff to wait until the expiration of that period to file suit.

In *Jones v. Pacific Intermountain Express,* 10 F.E.P. Cases 914 (N.D.Cal.1975), Judge Schnacke dismissed the complaint for failure to observe the 180-day period, despite the apparent futility of sending the plaintiff back to the EEOC. He reasoned (at 915):

> (A)ll charges which are the basis of this action were filed with the EEOC less than 180 days before this action was commenced * * *. Plaintiffs' counsel requested issuance of the right to sue notices, some of which weren't issued until *after* the present action was commenced and all were issued less than 180 days after the charges were filed with the EEOC, in violation not only of the statutory scheme but also of EEOC regulations * * *.[37]

The purpose of requiring resort to EEOC machinery is to give that body an opportunity to settle disputes through conference, conciliation, and persuasion before the aggrieved party is permitted to file a

lawsuit. * * * That over 180 days have elapsed since all the plaintiffs filed charges with the EEOC is thus irrelevant, since the EEOC had much less than 180 days to deal with the charges before the matter was effectively taken away from it by the commencement of this action. Therefore, the claims under 42 U.S.C. § 2000e–2 will be dismissed * * *. This result comports with this Court's obligation, under the constitutional system of separation of powers, to interpret statutes as they are written, not as they might have been written. Plaintiffs argue that the 180-day deferral would serve no purpose here, but this argument should be addressed to Congress, not to this Court.

In *Budreck v. Crocker National Bank,* 407 F.Supp. 635 (N.D.Cal.1976), two plaintiffs had failed to defer filing their actions until 180 days after the Commission assumed jurisdiction of their charges. They subsequently received right-to-sue letters. Judge Renfrew first construed Title VII to establish two conditions precedent to a civil action: (1) passage of 180 days from filing of charges with the EEOC; (2) issuance of a right-to-sue letter. He thus concluded, as did Judge Schnacke in *Jones,* that under a literal reading of the statute the 180-day provision was a jurisdictional requirement. However, Judge Renfrew then examined the legislative history of the 1972 amendments to Title VII, which added the 180-day provision. He found that the provision was the result of a congressional attempt to accommodate two policies: "On the one hand, Congress was concerned that the vindication of legitimate claims not be excessively delayed, and, on the other, it was concerned that the preferred process of conciliation of disputes have an ample opportunity to work." 407 F.Supp. at 641. Judge Renfrew noted that while certain language

charges with the EEOC. Thus, the issue involved in these cases and in *Howard* was not before the Supreme Court in *McDonnell Douglas.*

**36.** *See* 29 C.F.R. 1601.25b, set out in part *supra* at n.27. *See also* (at n.27) 29 C.F.R. 1601.-

28(a)(2) promulgated several years after Judge Meredith authored his opinion in *Howard.*

**37.** The 1977 amendment set forth in n.27 *supra* had not yet been promulgated.

in *McDonnell Douglas* favor a restricted interpretation of the jurisdictional prerequisites of a Title VII action, statements by the Supreme Court in *Johnson v. REA, Inc., supra*, support the contrary approach. Judge Renfrew also rejected the reasoning of *Lewis* and *Howard* as inconsistent with the legislative history of the Act, noting (at 642–44) the "sharp division" in the case law "illustrated by a consideration of two opinions from this District," namely, *Jones v. Pacific Intermountain Express, supra*, and *Lewis v. FMC, supra*. As to *Lewis* and also as to *Howard v. Mercantile Commerce Trust Co., supra*, Judge Renfrew stated:

> [T]he *Lewis* and *Howard* decisions also fail to take into account certain policy considerations which support a jurisdictional interpretation of the 180-day provision despite the inability of the Commission to take any action during that period. The 180-day provision gives the employer an opportunity to make an investigation of the charge and to attempt to resolve the matter before positions become hardened by the onset of litigation. Congress undoubtedly expected most conciliation agreements to result from the efforts of the Commission but, even without the intervention of the Commission, informal conciliation may be possible in some cases. * * *
>
> [T]he filing of a law suit alters in a very significant way the posture of the parties and their ability to reach an informal settlement. It is not feasible for the courts to make a case-by-case determination of whether informal conciliation might be possible; the rule must be enforced on an across-the-board basis. The possibility of informal conciliation during the 180-day period further supports the Court's previous conclusion that a jurisdictional interpretation is appropriate.

Judge Renfrew subsequently qualified to some extent the views he expressed in *Budreck*, in a later opinion he authored in *Eldredge v. Carpenters Joint Apprentice-*

*ship and Training Committee*, 440 F.Supp. 506, 515–18 (N.D.Cal.1977) in which he again (at 515) noted "a sharp division in the authorities" illustrated on one side by *Budreck* and *Jones* and on the other side by *Lewis* and *Howard*.[38] In *Eldredge*, the EEOC, issued right-to-sue letters only 18 days after assuming jurisdiction over plaintiffs' charges, stating that it would be unable "to investigate, conciliate or file suit within 180 days." 440 F.Supp. *supra* at 513. Plaintiffs filed suit the following day. Citing *Budreck* Judge Renfrew wrote (at 515) that "the Court adheres to the view that compliance with the statutory waiting period is ordinarily a prerequisite to the assumption of jurisdiction." However, given that the EEOC had stated that it would be unable to reach the case within 180 days, that no administrative disposition of the quest for permanent relief could be expected during the statutory period, and that plaintiffs were already properly before the court in their quest for preliminary relief, Judge Renfrew concluded that the premature filing of a complaint for permanent relief was unlikely to impair the prospects for conciliation. "To hold that the action was barred by an EEOC error having no effect on statutory policy [of conciliation] would indeed be pointless." *Id.* at 517. Judge Renfrew also noted the lapse of 180 days between the EEOC's assumption of jurisdiction and the hearing on defendant's motion. Judge Renfrew viewed dismissal of the case, which he refused to grant, as a possible means of discouraging the EEOC from divesting itself of claims prematurely. "Where the backlog of cases prevents an administrative disposition in any case, however, this result has insufficient practical impact to justify the imposition of hardship in a particular case." *Id.* at 517–18.

In two opinions of this Court, *Loney v. Carr Lowrey Glass Company*, 458 F.Supp. 1080 (D.Md.1978) (Miller, J.) and *Scott v. Board of Education of Harford County, et*

---

**38.** For other cases, in addition to those discussed herein, in which the issue has been considered, *see Mead v. United States Fidelity and Guaranty Co.*, 442 F.Supp. 102, 107 (D.Minn.1977); *Lo Re v. Chase Manhattan Corp.*, 431 F.Supp. 189, 194, n.10 (S.D.N.Y. 1977).

*al.,* Civil Action No. N–76–1513 (D.Md. 9/2/77) (Northrop, C. J.), the *Budreck* approach was adopted and Judge Renfrew's opinion therein was cited and specifically relied upon by Judge Northrop in *Scott.*

■ The named plaintiff in *Bosworth* instituted that case on January 22, 1974, stating only non-Title VII claims. Thereafter, on January 31, 1974, Bosworth filed with the EEOC sex charges based on the height-weight requirement. On February 19, 1974, the complaint in *Bosworth* was amended to include Title VII claims. On April 3, 1974, before the expiration of the 180-day period, right-to-sue letters were issued to Bosworth and to Nixon, who had intervened in *Bosworth.* Thus, at the time the complaint was amended in *Bosworth,* this Court did not have jurisdiction of plaintiffs' Title VII sex claims. However, as was true in *Eldredge, supra,* plaintiffs in these cases originally sought both preliminary and permanent relief based on section 1983 and the Fourteenth Amendment. Plaintiff had a right to seek such relief without pursuing any of the administrative remedies provided by Title VII.[39] The injection of Title VII claims into these pending suits hardly retarded conciliation efforts more than the lawsuits themselves. Moreover, the EEOC had the full opportunity accorded by statute to attempt conciliation of Nixon's charges and the Attorney General specifically stated that the EEOC would not be able to conciliate Bosworth's claims within the requisite time period. Thus, no useful purpose would be served in these cases in forcing plaintiffs to return, insofar as their Title VII claims are concerned, to the administrative process, even if the approach espoused in *Budreck* and *Jones* rather than in *Howard* and in *Lewis* is adopted. Judge Renfrew's analysis and holding in *Eldredge* would so indicate.[40] Accordingly, this Court concludes that in *Bosworth* it has jurisdiction over the

individual claims of Bosworth and Nixon. That jurisdiction extends to the claims of other members of the sex class certified as to the height-weight requirement, whether or not other class members individually or otherwise exhausted their own EEOC remedies with regard to the height-weight requirement. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414 n.8, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Boyd v. Ozark Air Lines,* 568 F.2d 50, 54 n.5 (8th Cir. 1977); *Troy v. Shell Oil Co.,* 378 F.Supp. 1042, 1045 (E.D.Mich.1974), *appeal dismissed,* 519 F.2d 403 (6th Cir. 1975), and cases cited thereat.

■ There remain, however, certain other exhaustion issues which require consideration. One of them is present in *Gumpman,* in which the only two named plaintiffs are Gumpman and Barksdale. Neither of them ever received a "right-to-sue" letter with regard to their sex claims stated in *Gumpman* under Title VII and based on the height-weight requirement. Thus, those Title VII sex claims, stated by them as individuals, must be and hereby are dismissed. But that dismissal is of little or no practical import because the claims of the members of the applicant class with regard to the height-weight sex issue are in any event before this Court. *See* the authorities cited *supra* on this page.

An additional exhaustion issue with regard to the non-height-weight sex issues is present in *Vanguard.* Only Blackston exhausted her administrative remedies with regard to those issues. Blackston opted out of the sworn female class in these cases. Thus, the class originally certified in these cases with regard to the non-height-weight issues is today being decertified because of a lack of adequate class representation.[41] However, since these cases were tried on the basis that there were in existence all

**39.** *See Johnson v. REA, Inc.,* 421 U.S. 454, 461, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).

**40.** This result enables Title VII's statutory language to be interpreted to further "the benevolent purposes of the Act," *Weise v. Syracuse University, supra* at 413, and to insure that "procedural niceties should not be employed to

impede a Title VII claimant from obtaining a judicial hearing on the merits." *Berg v. Richmond Unified School District, supra* at 1212. *See also McDonnell Douglas Corp. v. Green, supra* at 798–99.

**41.** *See* pp. 676–677 *supra.*

classes certified prior to today's decertification of the non-height-weight issue class, the merits of all claims—race, height-weight, and non-height-weight sex alike— are discussed *infra* and findings with regard to the non-height-weight sex issues are made on a conditional basis so that if this Court's within decertification of the non-height-weight sex class is determined, on appeal, to be erroneous, no further trial on remand will seemingly be required for that reason alone.[42] As to Blackston's individual claims, she, on February 28, 1975, requested exclusion from the sworn-employee female class and stated, using the form sent to her by the Clerk: "I understand that by this request, I will not be entitled to share in the benefits of the judgment if it is favorable to the Plaintiffs and that I will not be bound by the judgment rendered in this case if it is adverse to the Plaintiffs." Accordingly, if Blackston hereafter desires to assert her individual non-height-weight sex claim, she must do so subject to whatever limitations and/or laches bars she may encounter.

### Naming Proper Respondents in EEOC Charge

In *Mickel v. South Carolina State Employment Service*, 377 F.2d 239 (4th Cir.), *cert. denied,* 389 U.S. 877, 88 S.Ct. 177, 19 L.Ed.2d 166 (1967), Judge Boreman wrote (at 241):

It seems clear from the language of the statute that a civil action could be brought against *the respondent named in*

*the charge* filed with the Commission only after conciliation efforts had failed, or, in any event, after opportunity had been afforded the Commission to make such efforts. * * *

But in *Mickel* the defendant not named as respondent in the EEOC proceeding was the alleged offending employer and was not as herein, an important official of an entity named in the administrative charge. In *Mickel*, the naming requirement was not substantially met.[43] That is important because the failure of a plaintiff to name a defendant in an EEOC charge "does not bar the maintenance of a subsequent court action if the purposes of the naming requirement were substantially met." *Langsner v. Morgan State College*, Civil No. HM–74–1359 (D.Md. 1/9/76) (Murray, J.), and cases cited at slip op. pp. 13–15; *see Van Gerrell v. Maryland State Highway Administration*, Civil No. B–74–121 (D.Md. 1/5/76) (Blair, J.), and cases cited at slip op. pp. 6–7.[44]

In *Evans v. Sheraton Park Hotel*, 164 U.S.App.D.C. 86, 503 F.2d 177 (1974), the question arose as to whether an international union which had not been named as a respondent in plaintiff's EEOC charge was properly joined by the District Court as a party to plaintiff's subsequent federal suit. The Court's answer (164 U.S.App.D.C. at 92, 503 F.2d at 183) was "Yes":

* * * Where, as here, the chartering International was an obscure party, requiring court action to determine whether or not its presence in the action was

---

**42.** Cf. *Phoenix Savings and Loan, Inc. v. The Aetna Casualty and Surety Company*, 427 F.2d 862, 873–74 (4th Cir. 1970) (Craven, J.).

**43.** In that connection, Judge Boreman's comments (at 241) are illuminating:

If we correctly understand plaintiff's contention, it is that the State Employment Service was Exide's agent and that the filing of a charge with the Commission against the agent was sufficient under the statute to charge Exide, as principal, and to set in motion the conciliation machinery. On the facts of this case, we find this contention utterly lacking in merit. There is no indication, by affidavit or otherwise, that the State Employment Service acted as Exide's agent to implement an Exide purpose of invidious discrimi-

nation. Ordinarily, the primary function of a state employment service is to assist applicants in securing employment, rendering a screening service for employers, and put employer and employee into contact. The employer then interviews the applicant and does its own hiring. Nothing else appearing, we think such a relationship falls short of that of principal and agent. But we do not hold that there could never be a set of facts or circumstances under which a state instrumentality could become the agent of a private corporation so as to make the latter responsible for violation of the federal statutes by the state agency.

**44.** Copies of those opinions have been placed in the Court files in these cases.

necessary for complete relief among those already parties, to deny joinder under 19(a) would cripple the rights of the charging party as well as those of the party charged. Further, dismissal of the action under 19(b) would frustrate the intent of Congress in this type of case. Surely the means devised cannot be more important than the end envisioned.

We do not believe that the procedures of Title VII were intended to serve as a stumbling block to the accomplishment of the statutory objective. To expect a complainant at the administrative stage, usually without aid of counsel, to foresee and handle intricate procedural problems which could arise in subsequent litigation, all at the risk of being cast out of court for procedural error, would place a burden on the complainant which Congress neither anticipated nor intended.

Appellant Evans filed a Charge of Discrimination with the EEOC against the Hotel which was her employer, Waitresses Local 507, and the Joint Board alleging violations of the Civil Rights Act of 1964.[4]

[4] The record indicates that although Waiters Local 781 and International were not formally charged before the EEOC, they had actual notice of the charges and subsequent Commission investigation.

She was timely advised by the Commission of its failure to obtain voluntary compliance and of her right to file suit. She then brought this action, naming the same parties as those charged before the EEOC in her complaint. It is our conclusion that appellant Evans exhausted her administrative remedies as anticipated by Congress.

In *Glus v. G. C. Murphy Co.*, 562 F.2d 880, 888 (3d Cir. 1977), the Third Circuit suggested certain factors to be considered when a defendant has not been named in a plaintiff's complaint to the EEOC. In so doing, Judge Biggs wrote:

Factors which we believe the district court should look to are 1) whether the role of the unnamed party could through

reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party. Consideration of these factors should be initially in the hands of the district court. The goal of conciliation without resort to the already overburdened federal courts is of great importance and should not be lost. However, equally important is the availability of complete redress of legitimate grievances without undue encumbrance by procedural requirements especially when demanding full and technical compliance would have no relation to the purposes for requiring those procedures in the first instance. In our view the district court should evaluate the failure to name the party before the EEOC by consulting the four factors discussed *supra*.[45]

In this case, plaintiff Bosworth named as respondents in her EEOC charge the State of Maryland, City of Baltimore, and the Civil Service Commission of Baltimore. Plaintiff Nixon named as respondent only the Baltimore City Police Department. Accordingly, in this consolidated proceeding, in which each of the individual defendants has been sued only in his or her official capacity, it would appear that the only defendants in this proceeding not specifically named in EEOC proceedings are defendants Pomerleau and Rowlett. It has not been asserted that either of those defendants lacked actual notice of plaintiffs' charges filed with the EEOC, or that the

**45.** *See also Canavan v. Beneficial Finance Corp.*, 553 F.2d 860, 864–65 (3d Cir. 1977); *Chastang v. Flynn and Emrich Co.*, 365 F.Supp. 957, 961–64 (D.Md.1973) (Miller, J.), *aff'd in part and rev'd in part on other grounds*, 541 F.2d 1040 (4th Cir. 1976).

EEOC's actions with regard to conciliation of those charges were in any way affected by plaintiffs' failure to have named such defendants. Indeed, it is rather clear that both Pomerleau and Rowlett knew of the EEOC proceedings.[46] Accordingly, plaintiffs' failure to name each of defendants in their initial EEOC charges does not deprive this Court of jurisdiction over plaintiffs' claims against those defendants.

*Definition of Employer Under Title VII*

Whether plaintiffs are entitled, in any event, to relief under Title VII against any of the defendants hinges upon whether the latter have allegedly committed an "unlawful employment practice for an *employer*" [emphasis added] as those words are used in 42 U.S.C. § 2000e–2(a) and 42 U.S.C. § 2000e(b).[47]

None of the parties to this litigation have disputed that by all conventional indicia of control the State of Maryland is an "employer" of the employees of the Baltimore City Police Department, for purposes of Title VII. However, the City Defendants have raised the question of whether they have exercised, or should have exercised, sufficient *control* over the Department's hiring and promotion practices to qualify any of the City Defendants as an "employer" under Title VII.

The Department, as established by section 16–2 of the Baltimore City Public Local Laws (the "Code"), is "an agency and instrumentality of the State of Maryland." Supervising its "affairs and operations," Code § 16–4, is a Police Commissioner. At the time these suits were instituted in 1973 and 1974, the Baltimore City Police Commissioner was, pursuant to Code § 16–5, "appointed by the Governor of Maryland for a term of six years" and could be removed for "official misconduct, malfeasance, inefficiency or incompetency, including prolonged illness . . ." However, in 1976, the Maryland Legislature amended the Baltimore City Local Laws to transfer those appointive powers to the Mayor and City Council of Baltimore. 1976 Md.Laws Ch. 920. Under the amended version of Code § 16–5, the Mayor appoints the Police Commissioner subject to confirmation by a majority of the City Council. The amendment also transferred the Governor's removal powers to the Mayor. The 1976 legislation specifically provided that the amendment was not to affect the term of the then current Commissioner which was to expire on July 1, 1978. *Id.* Ch. 920, § 2.[48]

In *Mayor & City Council of Baltimore v. Silver,* 263 Md. 439, 283 A.2d 788 (1971), *appeal dismissed,* 409 U.S. 810, 93 S.Ct. 38,

---

**46.** Rowlett died during the pendency of these cases. Since he is sued herein only in his official capacity, his successor, Donald E. Woods, has been substituted as a party defendant pursuant to Federal Civil Rule 25(d).

**47.** 42 U.S.C. § 2000e–2 provides:
 (a) It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
 Section 2000e(b) provides:

 (b) The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any *agent* of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5), or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26, except that during the first year after March 24, 1972, persons having fewer than twenty-five employees (and their agents) shall not be considered employers.

**48.** The Mayor and City Council recently exercised their appointment power to reappoint defendant Pomerleau as Police Commissioner.

34 L.Ed.2d 65 (1972), Judge Finan, quoting from *Upshur v. Baltimore,* 94 Md. 743, 51 A. 953 (1902), set forth (at 263 Md. 447–48, 283 A.2d at 792–93) an historical explanation of the State's control over the Baltimore City Police Department:

"* * * For some years prior to the adoption of the Act of 1860, ch. 7, and, therefore, during a period when the police force was wholly under the control of the municipality, the city authorities failed to suppress the disorder and lawlessness which prevailed to an alarming extent, and the riots and blood-shed which invariably accompanied a general or local election. The law was defied; the public peace was disturbed; the constabulary were powerless, if not in sympathy with the mob, and reputable citizens were driven by violence from the polls. Relief from the intolerable conditions which existed was finally sought by an appeal to the General Assembly, and the Act of 1860, ch. 7, completely separating the police department from the city government, was the result. The Police Board was created and its members and the force enrolled by them were made state officers and the city was denied, in the most positive manner, any right to interfere with or control the policemen. The underlying purpose was to deprive the city of all power over the police * * *." 94 Md. at 756, 51 A. at 958.

An informative and entertaining account amply documenting the reasons for "The Police Reform Bills" is found in an article by H. H. Walker Lewis, "The Baltimore Police Case of 1860," 26 Md.L.Rev. 215 (1966). [Footnote omitted.]

Pursuant to Code § 16–7,[49] the Police Commissioner's authority over the opera-

---

**49.** 16–7. Police Commissioner; powers and duties.

In directing and supervising the operations and affairs of the Department, the Commissioner shall, subject to the provisions of this subtitle, and subject to the provisions of Article VI and Sections 4–14 both inclusive, of Article VII of the Charter of Baltimore City (1964 Revision) as amended from time to time, be vested with all the powers, rights and privileges attending the responsibility of management, and may exercise the same, where appropriate, by rule, regulation, order or other departmental directive which shall be binding on all members of the Department when duly promulgated. In the event of a conflict between the provisions of Article VI and Sections 4–14, both inclusive, of Article VII of the Charter, and the provisions of this subtitle, the provisions of Article VI and Sections 4–14 of Article VII shall control. The authority herein vested in the Police Commissioner shall specifically include, but not be limited to, the following:

(1) To determine and establish the form of organization of the Department.

(2) To create bureaus, divisions, districts, sections, units, squads or other subordinate organizational subdivisions or segments within the Department, including departmental boards and commissions, and to determine and define the functions, duties and responsibilities of each.

(3) To appoint without examination and to serve at his pleasure during satisfactory performance, Deputy Commissioners and other ranks and positions above the rank of Captain which the Commissioner has determined require the experience of a police officer as a prerequisite in order to insure the effective and efficient staffing and operation of the major functional sub-divisions of the Department.

(4) To assign, reassign, allocate and reallocate members of the Department to those duties, and to those organizational subdivisions of the Department as the Commissioner in his judgment may deem necessary to best serve the interests of the public and the Department.

(5) To determine and establish classifications of ranks, grades and positions for Police Officer within the Department as he may deem appropriate; to prescribe the uniform insignia for all ranks; to define and designate the authority, responsibility, duties, assignments, rights and privileges for each rank, grade or position, to establish the order of succession to positions of command within the Department, including the order of succession to the position of Acting Police Commissioner, as provided for in Section 16–6 of this subtitle.

(6) To determine and establish, with consent of the Civil Service Commission of Baltimore, those civil service ranks within the Department for civilian employees as he may deem necessary and appropriate.

(7) To appoint, promote, reduce in rank, grade or position, reassign, reclassify, retire and discharge all members of the Department in the manner prescribed by law.

(8) To regulate attendance, conduct, training, discipline and procedure for all members of the Department and to make all other

tions of the Department is plenary, with two exceptions, only one of which is relevant in this case.[50] That exception appears in Article VI of the Charter of Baltimore City which establishes a Board of Estimates for Baltimore City and entrusts to that Board responsibility for formulating the fiscal policy of Baltimore City.[51]

In accordance with § 16–8 of the Code,[52] the Police Commissioner is required to submit his anticipated budget requirements to the Board of Estimates, which thereafter is generally required to treat that proposal in the same way as any other budgetary request submitted by a municipal agency of Baltimore City and, upon final approval of the same, to incorporate it in a proposed ordinance known as the ordinance of estimates. The latter, in turn, is delivered to the President of the City Council for introduction before the City Council. Subsequent to approval by the City Council with appropriate changes, if any, and after approval by the Mayor, the proposed ordinance of estimates is known as the "Ordinance of Estimates for the fiscal year

---

rules, regulations and orders as may be necessary for the good government of the Department and of its members.

(9) To institute a system of periodic performance evaluation for all members of the Department through the rank of Captain.

 * * * * * *

(14) To suspend, amend, rescind, abrogate or cancel any rule, regulation, order or other department directive adopted by him or by any former Police Commissioner and to adopt all other reasonable rules, regulations and orders as he may deem necessary to enable the Department effectively to discharge the duties imposed upon it by this subtitle.

 * * * * * *

**50.** Article VII of the Charter which includes, *inter alia,* provisions relating to City purchasing and procurement practices, would not seem relevant to any of the issues posed herein.

**51.** That provision states, in pertinent part:

1. Board of Estimates—*Organization.* There shall be a Board of Estimates composed of the Mayor, President of the City Council, Comptroller, City Solicitor, and Director of Public Works, none of whom shall receive any additional salary as members of said Board. The President of the City Council shall be President of the Board, and one of the members shall act as Secretary. The Board may employ such clerks and assistants as may be necessary to discharge its duties; their number and compensation shall be fixed in the Ordinance of Estimates. The first meeting of the Board in every year shall be called by notice from the Mayor or President of the City Council personally served upon members of the Board. Subsequent meetings shall be called as the Board may direct.

2. Board of Estimates—*Budget.* (a) The Board of Estimates shall be responsible for formulating, determining, and executing the fiscal policy of the City to the extent and in the manner provided for in this section and elsewhere in the Charter.

**52.** That section provides, in pertinent part:

16–8. Departmental budget.

(a) *Estimates; contingent fund.* It shall be the responsibility of the Commissioner to estimate annually the sum of money which will be necessary for the next ensuing fiscal year to enable the Department to meet the obligations and discharge the duties imposed upon it by this subtitle. In preparing such estimate, the Commissioner shall, under procedures established by the Board of Estimates, cooperate with the Director of Finance of the City of Baltimore in the same manner as provided for other municipal agencies of the City of Baltimore by the Charter of Baltimore City (1964 Revision) as amended from time to time. Thereafter, such estimate shall be considered by the Board of Estimates of the City of Baltimore in the preparation of the annual proposed ordinance of estimates in the same manner and subject to the same provisions as for other municipal agencies of the City of Baltimore. Provided, however, anything contained herein to the contrary notwithstanding, there shall be included annually in the said ordinance of estimates a sum of $100,000 which may be used during the fiscal year as a contingent fund by the Department in case of an emergency or necessity for the expenditure of money in excess of or other than the appropriations regularly passed for the Department; provided further that no part of said contingent fund shall be used as compensation for overtime or for court appearances; provided, however, that the Commissioner, in the event that any expenditure is authorized to be made from such fund, shall promptly transmit a report to the Board of Estimates, which shall contain a description of the amount of money expended, the purpose of the expenditures, and the nature of the emergency which necessitated same.

_ _ _ _ _." Article VI, §§ 2(b), (g) of the Charter of Baltimore City, 1964 Revision.[53]

Section 2(g) of Article VI of the Charter of Baltimore City empowers the City Council to make its budgetary allocations to the Department subject to certain contingencies. That provision states, in part:

> * * * If the carrying out of a particular program, purpose, activity, or project depends upon action by some private or governmental body other than the City, the City Council may insert a specific provision in the proposed ordinance of estimates making the appropriation for the particular program, purpose, activity or project contingent upon such action.
> * * *

Article II, § 27 of the Charter of Baltimore City delineates the authority of the Mayor and City Council as follows:

> To have and exercise within the limits of Baltimore City all the power commonly known as the Police Power to the same extent as the State has or could exercise said power within said limits; provided, however, that no ordinance of the City or act of any municipal officer shall conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner,
> * * *.

In the *Silver* case, Judge Finan (263 Md. at 450–51, 283 A.2d at 794) described the effects of the City's power over the police department's budget:

> However, an appreciation of the relationship between the City and the police department cannot be fully grasped unless it is understood that the City is the agency responsible for appropriating money for the operation of the police department and that the police commissioner must annually appear before the Board of Estimates of the City to defend his budgetary requests. * * * Certainly, although this in itself could not be construed as a method of indirect control over the police department by the City,

nonetheless one would be overly naive not to think that such a situation would provide the occasion for the flow and exchange of communications, accommodations and cooperative action between the City and the police commissioner.

At the time these suits were instituted, the Police Commissioner was required under § 16–9 of the Code, to make annual reports, and such special reports as might be requested, to both the Governor and to the Mayor and City Council concerning the operations of the Department. That provision was amended in 1976 to eliminate the requirement that reports be made to the Governor. 1976 Md.Laws Ch. 920.

Section 16–10 of the Code describes the role of the Civil Service Commission of the City of Baltimore and the Police Commissioner in the establishment of entrance and promotional qualifications. That section reads in part:

> 16–10. Members; qualifications, appointments, promotion, probation.
>
> (a) *Examinations.* The [Civil Service Commission] shall ascertain the relative qualifications for all candidates for appointment at the entrance level to the department and for promotional appointment within the department by competitive examinations and such other tests as in its judgment may be necessary. The examinations shall be public and of such character as to test fairly the relative capacity and fitness of the candidates to discharge the duties of the position for which they are seeking to qualify. In preparing said examinations the examining authority shall consult with and may be guided by a nationally recognized policy agency or testing group as designated by the police commissioner. The examining authority shall prepare graded lists of qualified candidates determined from the written examinations and other tests established by the examining authority.

---

**53.** Pursuant to Article IV § 5 of the City Charter, the Mayor possesses the authority to veto a proposed ordinance. In the event of such a veto, the proposed ordinance is referred back to the City Council. A vote of three-fourths of that body's members is required to override such veto.

(b) *Appointments at the entrance level.* Those applicants for appointment to the department at the entrance level who possess the minimum qualifications and meet the other eligibility criteria established by the commissioner after consultation with examining authority, as determined by the tests and procedures administered pursuant to subsection (a) shall be included on an eligible list prepared by the examining authority setting forth the names of the successful applicants listed in order from the highest to lowest qualifying score. When making appointments to the department, the commissioner shall be required to make such appointment from those applicants who place within the top or highest five positions on the eligible list. When an applicant is so appointed, the commissioner shall be required to fill the next vacancy in the department, if any, from a list of applicants composed of the remaining and available four highest candidates on such list, plus the next or sixth highest scoring available applicant appearing on the eligible list. The procedure herein established for appointment to the department shall be known and designated as the "Rule of five" and all subsequent appointments shall be made only in accordance with this procedure until the eligible list is exhausted by such appointments. * * *

(c) *Promotional appointments.* Those applicants for promotional appointments within the department who possess the minimum qualifications and meet the other eligibility criteria established by the commissioner after consultation with the examining authority, as determined by the tests and procedures administered pursuant to subsection (a) shall be included on an eligible list prepared by the examining authority setting forth the names of the successful applicants listed in order from the highest to lowest qualifying score. When making a promotional appointment within the department, the

commissioner shall be required to make such appointment from those applicants who place within the top or highest five positions on the eligible list. When an applicant is so appointed, the commissioner shall be required to fill the next vacancy in the department, if any, from a list of applicants composed of the remaining and available four highest candidates on such list, plus the next or sixth highest scoring available applicant appearing on the eligible list. The procedure herein established for promotional appointment within the department shall be known and designated as the "Rule of five" and all subsequent promotional appointments shall be made only in accordance with this procedure until the eligible list is exhausted by such appointments. * * *

(d) *Appointments without examination.* Notwithstanding any provisions of this section, or of this subtitle, the Commissioner may make any appointment to the Department above the rank of Captain, without examination, except that no such position shall be filled by a police officer within the Department of a rank less than Lieutenant, and where any such appointment is made the police officer so appointed shall, upon the termination of his service in such position, be returned to the rank from which he was elevated, or to such higher rank as he became eligible to serve in during his appointment.

In *Boire v. Greyhound Corp.*, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964), in reversing a determination by the Fifth Circuit that Greyhound Corporation was as a matter of law not an "employer" of certain porters, janitors and maids at four Florida bus terminals,[54] Mr. Justice Stewart stated (at 481, 84 S.Ct. at 898–899):

* * * The respondent points out that Congress has specifically excluded an independent contractor from the definition of "employee" in § 2(3) of the Act. It is said that the Board's finding that Grey-

---

**54.** A second corporation, Floors, Inc., had contracted with Greyhound to provide cleaning and maintenance services at those terminals, and apparently exercised considerable control in fact over the employees in question.

hound is an employer of employees who are hired, paid, transferred and promoted by an independent contractor is, therefore, plainly in excess of the statutory powers delegated to it by Congress. This argument, we think, misconceives both the import of the substantive federal law and the painstakingly delineated procedural boundaries of Kyne.

Whether Greyhound, as the Board held, possessed sufficient control over the work of the employees to qualify as a joint employer with Floors is a question which is unaffected by any possible determination as to Floors' status as an independent contractor, since Greyhound has never suggested that the employees themselves occupy an independent contractor status. And whether Greyhound possessed sufficient indicia of control to be an "employer" is essentially a factual issue, unlike the question in Kyne, which depended solely upon construction of the statute. * * * [footnote omitted]

The reasoning of Mr. Justice Stewart, expressed in a National Labor Relation Act context, has subsequently been adopted by the EEOC, see, e. g., Decision No. 72–0679, 4 F.E.P. Cases 441 (12/27/71); Decision No. 72–1301, F.E.P. Cases 715 (3/8/72), and seemingly by the few federal Courts which have had occasion to consider the meaning of the word "employer" under Title VII.

In Puntolillo v. New Hampshire Racing Commission, 375 F.Supp. 1089, (D.N.H. 1974), plaintiff, a driver-trainer of harness horses, sued "the New Hampshire· Racing Commission * * *, the regulatory agency which is responsible for horse racing activity in New Hampshire, and the New Hampshire Trotting and Breeding Association, Inc., * * * which conducts the harness racing activities at Rockingham Park, Salem, New Hampshire," 375 F.Supp. at 1090, asserting that those defendants had deprived him of employment opportunities because of his Italian national origin. In rejecting defendants' contention that the employment relationship between plaintiff and defendants required by Title VII was lacking, Judge Bownes, then a District Judge, wrote (at 1091–92):

The first issue for consideration is whether the relationship between driver-trainers and the defendants is one contemplated by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Admittedly, the relationship here is not the traditional one. Nonetheless, the statutory language is broad.

\* \* \* \* \* \*

Throughout the Act and the applicable federal regulations, an intent to deal with more than the conventional employer-employee situation is indicated. This intent is demonstrated by the specific prohibition against discrimination by employment agencies and labor organizations, and by the prohibition of discrimination against individuals (as opposed to employees who are defined as "individual[s] employed by an employer.") See generally Sibley Memorial Hospital v. Wilson, 160 U.S.App.D.C. 14, 17–18, 488 F.2d 1338, 1341–1342 (1970); and see 29 C.F.R. § 1600 et seq. Congress' concern with the "prevalence of discriminatory employment practices" and its desire to deal with the problem in an effective and thorough manner is further supported by the legislative history surrounding the Civil Rights Act of 1964 and the Equal Employment Act of 1972. 1964 U.S.Code Cong. and Admin.News p. 2355; 1972 U.S.Code Cong. and Admin.News p. 2137.

More specifically, the Act is aimed at providing equal employment opportunities. Its purpose is to "achieve equality of employment opportunities and remove barriers that have operated in the past" in a discriminatory fashion. Griggs v. Duke Power Co., 401 U.S. 424, 429–430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) [Emphasis added.] * * *

The courts have consistently recognized that "Title VII of the Civil Rights Act of 1964 should not be construed narrowly." [citations omitted]

Like the court in Sibley, which considered the very question in issue here, I am impressed with the fact that

the Act has addressed itself directly to the problems of interference with the direct employment relationship by labor unions and employment agencies— institutions which have not a remote but a highly visible nexus with the creation and continuance of direct employment relationships between third parties. 488 F.2d at 1342.

Moreover, the 1972 amendments to Title VII clearly indicate an intent to "include State and local governments, governmental agencies and political subdivisions within the definition of an 'employer' under Title VII." 1972 U.S.Code Cong. and Admin.News pp. 2137, 2152.

Defendants here are certainly employers within the meaning of 42 U.S.C. § 2000e(b); and they certainly "control . . . access to [plaintiff's] job market." *Sibley, supra,* [160 U.S.App.D.C. 14] 488 F.2d at 1341. Plaintiff has alleged discriminatory actions which fall within the purview of 42 U.S.C. § 2000e–2(a), and I cannot say that these alleged actions fall completely without the scope of activities sought to be prohibited by Title VII. *Sibley, supra* [160 U.S.App. D.C. at 18], 488 F.2d at 1342. [footnote omitted]

In *Sibley Memorial Hospital v. Wilson,* 160 U.S.App.D.C. 14, 488 F.2d 1338 (1973), faced with the question of whether a hospital, certain supervisory nurses of which had allegedly refused to refer a male private duty nurse's name to female patients who had requested private nursing services, was an "employer" of that private duty nurse within the meaning of Title VII, Judge McGowan wrote (160 U.S.App.D.C at 16–17, at 1340–41):

Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for an employer to engage in certain enumerated forms of discrimination on the basis, *inter alia,* of sex. For purposes of the Act, an "employer" is, with certain exceptions not here relevant, defined as a "person engaged in an industry affecting commerce who has twenty-five or more employees." That appellant falls within this definition is not disputed.

Appellant takes the position, however, that, since no direct employment relationship between itself and appellee was ever contemplated by either of them, it is not an employer under the Act with respect to him.

The Supreme Court has said that the Congressional objective in Title VII is "plain from the language of the statute," and that it is "to achieve *equality of employment opportunities* . . ." (Emphasis supplied). *Griggs v. Duke Power Co.,* 401 U.S. 424, 429, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1969). In prohibiting discrimination in employment on the basis of sex, "one of Congress' main goals was to provide equal access to the job market for both men and women." *Diaz v. Pan American World Airways, Inc.,* 442 F.2d 385, 386 (5th Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). Control over access to the job market may reside, depending upon the circumstances of the case, in a labor organization, an employment agency, or an employer as defined in Title VII; and it would appear that Congress has determined to prohibit each of these from exerting any power it may have to foreclose, on invidious grounds, access by any individual to employment opportunities otherwise available to him. To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited. [footnote omitted]

In *Smith v. Dutra Trucking Co.,* 410 F.Supp. 513 (N.D.Cal.1976), *aff'd mem.,* 580 F.2d 1054 (9th Cir. 1978), the plaintiff ran a trucking business with her husband. They entered into a "subhauling" agreement with the defendant trucking company to provide plaintiff's customers with transportation service. The agreement specified that the subhauler was an "independent

contractor." Plaintiff alleged that the president of the defendant trucking company refused to let her drive on jobs for defendant solely on the basis of her sex. Judge Renfrew held that the plaintiff was not the trucking company's "employee" within the meaning of Title VII. He distinguished *Sibley* and *Puntolillo* on the grounds that (1) both of those cases concerned interference with creation of direct employment relationships; (2) in each of those cases the defendant exercised greater control over the plaintiff's job market than did the defendant in *Dutra.*

In *Curran v. Portland Superintending School Committee,* 435 F.Supp. 1063 (D.Me. 1977), a school teacher sued the City of Portland, the local school committee, and numerous city and school officials alleging sex discrimination in the recruitment, hiring, and promotion of school employees. Judge Gignoux (at 1073) held that the city exercised sufficient control to be deemed an "employer" under Title VII:

> The City argues strenuously that it is not *plaintiff's* "employer" under Title VII, since it has no connection with the actual employment of teachers and other school personnel. It is true that the School Committee and the Superintendent are given the responsibility and authority for the employment of teachers and other personnel, 20 M.R.S.A. §§ 161(5), 473, and the City is not permitted by its charter to become involved in the actual administration and management of the School System. *See* The Charter of the City of Portland, Art. I § 2 and Art. III § 4. The authority of the School Committee is limited, however, by the role of the City in appropriating funds for the support of the public school system, including salaries of personnel. *Sawin v. Town of Winslow,* 253 A.2d 694, 699 (Me.1969); Charter, Art. III § 4. In such circumstances, it cannot seriously be

doubted that the City is sufficiently involved, and, in fact, necessary to, the total employment process that it must be considered plaintiff's employer for purposes of jurisdiction under Title VII. *Cf. Puntolillo v. New Hampshire Racing Commission,* 375 F.Supp. 1089 (D.N.H. 1974); *Sibley Memorial Hospital v. Wilson,* 160 U.S.App.D.C. 14, 488 F.2d 1338 (1974). *But cf. Smith v. Dutra Trucking Co.,* 410 F.Supp. 513, 517–18 (N.D.Cal. 1976).

*Cf. United States v. South Carolina,* 445 F.Supp. 1094, 1109–10 (D.S.C.1977) (three-judge court), *aff'd mem.,* 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (1978), raising, but not reaching, the question of whether a state and state agencies which "certify" but do not "select" teachers, are each an "employer" of teachers hired, paid, and discharged by local school boards; *Patterson v. Ramsey,* 413 F.Supp. 523, 530 (D.Md.1976) (Young, J.), *aff'd,* 552 F.2d 117 (4th Cir. 1977), holding in the context of an Eleventh Amendment issue, that the Baltimore City Board of School Commissioners, a "hybrid" creature of both the city and the state, was a city agency for Eleventh Amendment purposes.

The rationales of *Sibley, Puntolillo,* and *Curran* indicate that the term "employer," as it is used in Title VII, is sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an "employer" of an aggrieved individual as that term has generally been defined at common law. Despite its concededly limited role in the hiring process, the Baltimore City Civil Service Commission exercised substantial authority and discretion in the area of testing of applicants for entry level positions with the Department.[55] The budgetary control over

---

55. Ms. Hilda Ford, who became the City's Director of Personnel in March, 1977, included in her statement (City defendants' exhibit Number 7) with regard to the entry level Police Department exam (*i. e.,* the PPA examination) the following remarks:

\* \* \* It has come to my attention that at certain times the Civil Service Commission suggested to the Personnel Director of the Police Department that the PPA examination be modified and updated. This suggestion, like others regarding the use of oral examina-

the Department has already been noted. Accordingly, the City defendants as well as the State defendants fall within Title VII's use of the word "employer."

### Merit Issues

Plaintiffs' substantive contentions relate to (1) sex; (2) race; and as to sex, (a) height-weight; (b) other; as to race, (a) entry level and promotion tests; (b) other.

tions by the Police Department, went unheeded.

When confronted with that statement on cross-examination, Commissioner Pomerleau stated, in part (T.Tr. 7/24/78, pp. 299–300): I am not aware of Ford's position in that respect. She did not bring that to my attention, but the record should reflect clearly that long before Hillary [sic] Ford arrived on the scene in Baltimore that the City of Baltimore was working to validate the entrance level test and this commenced at our initiative in writing to Commissioner Joseph Kaplan who was the Chairman of the Civil Service Commission, and it—they worked along with the then personnel director of the City and were making tremendous progress. Hilda Ford, to the best of my knowledge she has made no significant contribution to the validation study, although she has made other significant contributions to resolving my problem. She has been very helpful. She took over what had already been done on this test. Now, for her to pontificate that PPA ought to be this or that, it seems rather—well, the timing on it is of extreme interest to me. She never brought it to my attention. I am the decision making authority over there.

If she wants to change the PPA, she has to bring it to me. My personnel director does not have that authority. We don't have anything to do with the testing. The City handles it all. Miss Ford handles it all, and her predecessor. She can come up with any kind of entrance level test she wants to so long as she announce is [sic] it and tells the people her reference material. It is her responsibility and her predecessors in office responsibility to validate it. That is her business. Why didn't she do it? She is negligent in her responsibilities, I guess. * * *

**56.** As to plaintiffs' § 1981 sex claims, *see* n. 3 *supra.* As to plaintiffs' § 1981 race claims, *see* n. 65 *infra.*

**57.** That subsection reads as follows:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

The legal bases are Title VII and § 1983 [56] and also 42 U.S.C. § 2000d. But that last mentioned statutory provision proscribes only discrimination on the basis of *race, color,* or *national origin* in programs receiving federal financial assistance. Accordingly, it seemingly is not a basis for the grant of relief as to any of plaintiffs' sex claims.[57] Plaintiffs also base their claims for relief, with regard to the height-weight requirements, under certain LEAA guidelines.[58]

Plaintiffs' apparent argument that the *failure* of § 2000d to *proscribe* sex discrimination is itself invidious discrimination authored by the Congress and barred by *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), would not appear to have merit.

**58.** Those guidelines provide:

Effect on Minorities and Women of Minimum Height Requirements for Employment of *Law Enforcement Officers.*

1. *Purpose.* This guideline is issued to assist in the elimination of discrimination based on national origin, sex, and race caused by the use of restrictive minimum height requirements criteria where such requirements are unrelated to the employment performance of law enforcement personnel.

2. *Scope.* The provisions of the guideline apply to all recipients of LEAA funds. This guideline is of concern to all State Planning Agencies.

3. *Background. The use of minimum height requirements as criteria for employee selection, assignment, or similar personnel action may tend to disqualify disproportionately women and persons of certain national origins, and races.* Discrimination on the ground of race, color, creed, sex, or national origin is prohibited by the Department of Justice regulations concerning employment practices of State agencies or offices receiving financial assistance extended by the Department (28 CFR Part 42, Subpart D).

4. *Requirement. The use of minimum height requirements, which disqualifies disproportionately women and persons of certain national origins and races, such as persons of Mexican and Puerto Rican ancestry, or oriental descent, will be considered violative to this Department's regulations* prohibiting employment discrimination.

5. *Exceptions. In those instances where the recipient of Federal assistance is able to demonstrate convincingly through the use of supportive factual data such as professionally validated studies that such minimum height requirements used by the recipient is an operational necessity for designated job categories, the minimum height requirement will not be considered discriminating.*

## LEAA Guidelines

The LEAA height guidelines are considered herein in connection with plaintiffs' claims of invalidity of the Department's height-weight requirements. Those LEAA guidelines may be binding upon the *federal* government as a self-imposed regulation.[59] Thus, those statutory and regulatory provisions may perhaps establish a basis for a suit by one or more of plaintiffs to force the LEAA to terminate its aid to the Department. *See, e. g., Handy v. Leonard,* 7 F.E.P. Cases 1095 (N.D.Cal.1974). No discovered authority affirmatively indicates that those provisions were authorized by the Congress or intended by the LEAA as an independent basis for invalidation of a height-weight requirement. Nevertheless, there is no need to decide that issue herein, since together and/or separately, § 1983 and Title VII are available as platforms for all relief sought herein regardless of the additional availability of the LEAA regulations.

## Title VII Standards

■■■ The standards under Title VII governing allegedly discriminatory but facially neutral employment qualifications have been formulated on a number of occasions by the Supreme Court. *See, e. g., Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). A Title VII plaintiff bears the initial burden of making out a prima facie case of discrimination. To es-

tablish such a prima facie case, a plaintiff need only show that facially neutral standards have a disproportionate impact on members of a protected group. A statistical showing of a significant discrepancy between the percentage of members of a protected group who qualify and their percentage in the relevant labor market is sufficient to establish a prima facie case of discrimination. *See Dothard v. Rawlinson, supra,* 433 U.S. at 329–30, 97 S.Ct. 2720; *Hazelwood School District, et al. v. United States,* 433 U.S. 299, 307–09, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Patterson v. American Tobacco Co.,* 586 F.2d 300, 304–05 (4th Cir. 1978). Once a plaintiff has made out a prima facie case, the burden shifts to the employer to show, by a preponderance of the evidence that the job requirement has a "manifest relationship" to the job. *Griggs v. Duke Power Co., supra* 401 U.S. at 432, 91 S.Ct. 849. If the employer demonstrates that the requirement is job related, the plaintiff may overcome that demonstration of job relatedness by showing by a preponderance of the evidence that other selection criteria would serve the employer's legitimate purposes without a similar discriminatory effect. *See Albemarle Paper Co. v. Moody, supra* at 425, 95 S.Ct. 2362.

In *United States v. City of Chicago,* 549 F.2d 415 (7th Cir. 1977), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1978) the Seventh Circuit held that evidence of the disproportionate impact of a written entry level examination for police officers was sufficient to shift to the defendants in that case the burden of proof to show that

---

6. *Definition.* a. The term operational necessity as used in this guideline shall refer to an employment practice for which there exists an overriding legitimate operational purpose such that the practice is necessary to the safe and efficient exercise of law enforcement duties; is sufficiently compelling to override any discriminatory impact; is effectively carrying out the operational purpose it is alleged to serve; and for which there are available no acceptable alternate policies or practices which would better accomplish the operational purpose advanced, or accomplish it equally well with a lesser discriminatory impact.

b. The term law enforcement as used in this guideline is defined at section 601(a) of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, and means all activities pertaining to crime prevention or reduction and enforcement of the criminal law. *Effective date.* This Guideline shall become effective on March 9, 1973. 38 Fed.Reg. 6415 (3/9/73) [Emphasis added]

59. *See United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *United States v. Heffner,* 420 F.2d 809 (4th Cir. 1969); *Usery v. Baltimore County Board of Education,* 462 F.Supp. 535 (D.Md. 1978).

the tests were job related under Title VII. Judge Swygert observed (at 428):

> The district court first looked at comparative success on the 1971 patrolman's examination and found that blacks and Hispanics failed at twice the rate of white applicants. Defendants contend that this evidence is insufficient to show discrimination because plaintiffs failed to show that the disproportionate failure rate resulted from racial factors. This argument misconceives the legal standard to be utilized in determining whether a prima facie case of discrimination exists within the meaning of Title VII. Plaintiffs did not need to show that the examination was devised with the intent to exclude racial minorities or that a direct causal relationship exists between an applicant's race and his performance. Rather, plaintiffs needed only to show that the examination had an adverse impact on minority applicants as a group; at that point, the burden would be on the City to demonstrate that the examination in fact tested job-related qualifications. *See Griggs*, 401 U.S. at 431–32, 91 S.Ct. 849, 28 L.Ed.2d 158; *Albemarle*, 422 U.S. at 425, 95 S.Ct. 2362, 45 L.Ed.2d 280; *Stewart*, 542 F.2d [445] at 450. *See also Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). [footnote omitted]

Similarly, in *Firefighters Institute for Racial Equality v. City of Saint Louis*, 549 F.2d 506 (8th Cir. 1977), *cert. denied*, 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1978) the Eighth Circuit applied the *Griggs-Albemarle* standard and required the defendant city to prove the job relatedness of a written exam for fire captain after plaintiffs' statistical evidence of the exam's discriminatory impact had been introduced and had been found sufficient to establish a prima facie case under Title VII. Judge Ross noted (at 509–10):

It is not disputed here that the 1974 written exam for the fire captain's position adversely affected black candidates as a whole. The district court concluded that the statistical evidence presented established that the test had a disparate impact on blacks.

It is a distinguishing feature of a Title VII cause of action that discriminatory impact suffices to establish a prima facie showing of discrimination. The recent case of *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) establishes that a law or other official act is not unconstitutional solely because it has a racially disproportionate impact regardless of whether it reflects a racially discriminatory purpose. However, Congress' statutory standard for Title VII, where discriminatory purpose need not be proved, is unshaken by the *Washington* decision. *Id.* at 246–47, 96 S.Ct. 2040.

\* \* \* \* \* \*

Once a racially adverse impact is demonstrated, the burden of proof shifts to the employer to prove the job relatedness of the exam he has utilized. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). \* \* [footnotes omitted][60]

To be sure, attacks on the continuing vitality of the *Griggs-Albemarle* standards under Title VII, which do not require plaintiff to prove discriminatory intent, have been mounted in cases in which governmental employees are involved, and such attacks are repeated by defendants in the instant cases. Such challenges largely rest on the proposition that since the Supreme Court in *Washington v. Davis* limited the constitutional reach of equal protection to instances of intentional discrimination, the Congress, acting pursuant to the Fourteenth Amendment, could not by 1972 amendments to Title VII subject a govern-

---

**60.** *See also United States v. South Carolina*, 445 F.Supp. 1094, 1111–1112 (D.C.S.C.1978) (three judge court) *aff'd mem*, 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (1978); *Ass'n. Against Discrimination in Employment, Inc., et al. v. City of Bridgeport*, 454 F.Supp. 751 (D.Conn.1978); *Bridgeport Guardians, et al. v. Bridgeport Police Department, et al.*, 431 F.Supp. 931 (D.Conn.1977); *Dickerson, et al. v. United States Steel Corp.*, 439 F.Supp. 55 (E.D. Pa.1978). A copy of that opinion has been placed in the Court files in these cases.

mental entity such as the Department to Title VII liability unless intentional discrimination is proved. In *United States v. City of Chicago,* 573 F.2d 416 (7th Cir. 1977), a suit instituted by the United States challenging certain employment practices of the Chicago Fire Department relating to blacks and Hispanics, the Seventh Circuit rejected the defendant-appellees' contentions that the holdings of *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) and *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) require a showing of discriminatory purpose in a suit under Title VII by state and local governmental employees as opposed to private sector employees and that, in addition, in any event, the Tenth Amendment so requires. Chief Judge Fairchild pointed out (at 421):

> In *Washington v. Davis,* . . . the Supreme Court held that a showing of discriminatory purpose is necessary to establish a violation of the Fourteenth Amendment. However, the Court made clear that a showing of discriminatory purpose was not required in Title VII suits:
>
> \* \* \* \* \* \*
>
> Thus *Washington v. Davis* expressly refutes the contention of appellees that discriminatory purpose or intent must be demonstrated in a Title VII case.
>
> *General Electric Co. v. Gilbert* is no more helpful to appellees' argument. In *Gilbert,* the Court held that a plan which provided nonoccupational sickness and accident benefits to all employees but excluded disabilities arising from pregnancy did not violate Title VII. The touchstone of *Gilbert* was that there was no showing

of discriminatory effect—no evidence was introduced to suggest that men received more benefits from the plan than did women: \* \* \*

And (at 423–24), Judge Fairchild added:

> \* \* \* It is undisputed that the 1972 Amendments to Title VII are an enactment to enforce the anti-discrimination prohibitions of the Equal Protection Clause and are "plainly adapted to that end." Indeed, the whole purpose of the 1972 Amendments was to give public employees the same protections against discrimination as those enjoyed by employees in the private sector. *Cf. Chandler v. Roudebush,* 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976). It was well within congressional authority to weigh the competing policy considerations and determine that public employees required the safeguards against discrimination given to private employees by the *Griggs* standard. *Cf. Katzenbach v. Morgan, supra* at 653, 86 S.Ct. 1717. Thus, since the 1972 Amendments are clearly rationally related to and consistent with "the letter and spirit" of the Fourteenth Amendment, and the means chosen were not in themselves unconstitutional, we conclude that Congress could constitutionally incorporate the *Griggs* test into the 1972 Amendments.

Because Congress relied on § 5 of the Fourteenth Amendment, Judge Fairchild concluded (at 424) it was not apposite to argue that "as a matter of federalism under the Tenth Amendment, it is necessary for a plaintiff bringing a Title VII action against a governmental unit to prove intentional discrimination."[61]

---

**61.** *But see* to the contrary *Blake v. City of Los Angeles,* 435 F.Supp. 55, 63–64 (C.D.Cal.1977); *Scott, et al. v. City of Anniston, Alabama,* 430 F.Supp. 508, 514–15 (N.D.Ala.1977). On the other hand, *see also* the very recent case of *Commonwealth of Pennsylvania Club Valiants, et al. v. Rizzo, et al.,* 466 F.Supp. 1219 (E.D.Pa. 1979), in which (at 1226) Judge Bechtle wrote:

> It is clear that Congress was aware of the *Griggs* standard at the time of the amendment, S.Rep.No.92–415, 92nd Cong., 1st Sess., pp. 10, 14, and we must conclude,

therefore, that Congress approved of it. Furthermore, it is equally clear that Congress intended to extend to government employees "the same benefits and protections in equal employment as the employees in the private sectors of the economy." S.Rep.No.92–415, 92nd Cong., 1st Sess., p. 9. We must, therefore, conclude that Congress intended to mandate the application of the *Griggs* standard to employment practices in disparate impact cases brought against municipal employers.

In *Friend v. Leidinger,* 446 F.Supp. 361, 385–86 (E.D.Va.1977) *aff'd* 588 F.2d 61 (4th Cir. 1978), Judge Warriner held that proof of discriminatory intent is required to establish a prima facie case of race discrimination in employment under Title VII where the defendant is either a State or a subdivision of a State.[62] Subsequently in *United States v. Virginia,* 454 F.Supp. 1077, 1083–85 (E.D.Va.1978), upon consideration of *United States v. Chicago,* 573 F.2d 416 (7th Cir. 1978), and *United States v. South Carolina,* 445 F.Supp. 1094, 1111–12 (D.S.C.) (three-judge court composed of Chief Judge Haynsworth, Judge Russell and Judge Simons), *aff'd mem.* 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (1978), Judge Warriner wrote (at 1084):

> These [two] cases lead the Court to believe that Congress has the power under § 5 of the Fourteenth Amendment to apply the impact standard of employment discrimination to the States in Title VII cases.

That conclusion would appear correct. In 1977, in *Dothard v. Rawlinson, supra* at n.14, Mr. Justice Stewart stated, though not in the specific context of disparate impact vs. intent, that in enacting "the 1972 amendments extending Title VII to the States as employers * * * Congress expressly indicated the intent that the same Title VII principles be applied to governmental and private employers alike * * *."[63]

■ In *Friend v. Leidinger,* 588 F.2d *supra* at 67, the Fourth Circuit, in affirming Judge Warriner's non-Title VII violations determinations, stated that it did not need to reach, in *Friend,* "the question of whether a governmental employer is liable under Title VII without a showing of purposeful discrimination." Herein, however, because this Court finds only non-intentional race discrimination on the part of defendants, it is necessary to reach that question. Accordingly, reaching it, this Court answers the question in the affirmative. That answer would appear required in order to effectuate what the Congress intended by its 1972 amendments to Title VII. Nor is such an interpretation constitutionally impermissible. The Supreme Court in *Washington v. Davis,* in the course of establishing the constitutional reach which it ascribed to equal protection, in no way suggested that the power of the Congress pursuant to the Fourteenth Amendment is so circumscribed that the Congress itself may not apply the same Title VII standards to all employers, private and governmental alike.

### Constitutional Standards

■ Unlike Title VII, intentional discrimination must be shown in order to establish the *unconstitutionality* of employment practices. Although a number of federal courts, in cases brought directly under the Fourteenth Amendment and/or 42 U.S.C. §§ 1981 and 1983, once rejected that view,[64] the Supreme Court has since spoken to the contrary. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Therein, Mr. Justice White wrote (at 238–39, 96 S.Ct. at 2047):

> As the Court of Appeals understood Title VII, employees or applicants proceeding under it need not concern themselves with the employer's possibly discriminatory purpose but instead may focus only on the racially differential impact of the challenged hiring or promotion practices. This is not the constitutional rule. We have never held that the constitutional standard for adjudicating claims of invidious racial discrimination is

---

**62.** In so doing Judge Warriner relied heavily on the *Scott* case (*see* n.61 *supra*) and, as had the *Scott* court, disagreed with the contrary views expressed in *Harrington v. Vandalia-Butler Board of Education,* 418 F.Supp. 603, 607 (S.D. Ohio 1976).

**63.** *And see* Mr. Justice White's seeming assumption in *Washington v. Davis, supra* at 247–48, 96 S.Ct. 2040 (quoted at p. 702 *infra*), that the more "rigorous" Title VII standard which does not require discriminatory purpose is applicable in Title VII cases of "public employment."

**64.** *See Washington v. Davis,* 426 U.S. 229, 244 n.12, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

identical to the standards applicable under Title VII, and we decline to do so today.

The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. It is also true that the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884, 53 Ohio Ops. 331 (1954). But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact.

\* \* \* \* \* \*

And (at 247–48, 96 S.Ct. at 2051, 2052), the Justice also stated:

Under Title VII, Congress provided that when hiring and promotion practices disqualifying substantially disproportionate numbers of blacks are challenged, discriminatory purpose need not be proved, and that it is an insufficient response to demonstrate some rational basis for the challenged practices. It is necessary, in addition, that they be "validated" in terms of job performance in any one of several ways, perhaps by ascertaining the minimum skill, ability or potential necessary for the position at issue and determining whether the qualifying tests are appropriate for the selection of qualified applicants for the job in question. However this process proceeds, it involves a more probing judicial review of, and less deference to, the seemingly reasonable act of administrators and executives than is appropriate under the Constitution where special racial impact, without discriminatory purpose, is claimed. We are not disposed to adopt this more rigorous standard for the purposes of applying the Fifth and the Fourteenth Amendments in cases such as this.

A rule that a statute designed to serve neutral ends is nevertheless invalid, absent compelling justification, if in practice it benefits or burdens one race more than another would be far-reaching and would raise serious questions about, and perhaps invalidate, a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white.

Given that rule, such consequences would perhaps be likely to follow. However, in our view, extension of the rule beyond those areas where it is already applicable by reason of statute, such as in the *field of public employment,* should await legislative prescription. [Emphasis added; footnotes omitted.] [65]

Mr. Justice White's specific reference in *Washington v. Davis* to "public employ-

---

**65.** Subsequent to the Supreme Court's opinion in *Washington v. Davis,* the Fifth and Ninth Circuits have reached different conclusions as to whether intent must be shown to gain relief against a public employer for constitutional violations pursuant to 42 U.S.C. § 1981. *See Davis v. County of Los Angeles,* 566 F.2d 1334 (9th Cir. 1977), *cert. granted,* 437 U.S. 903, 98 S.Ct. 3087, 57 L.Ed.2d 1132 (1978), answering that question in the negative, and *Williams v. DeKalb County,* 577 F.2d 248, *modified on reh'g,* 582 F.2d 2 (5th Cir. 1978), in which the majority of the panel answered that question in the affirmative. *See also Ensley Branch of the NAACP v. Seibels,* 13 E.P.D. ¶ 11,504 n.9 (N.D. Ala.1977) (raising but not answering the question). *And see also Scott v. City of Anniston, Alabama,* 430 F.Supp. 508, 515 (N.D.Ala.1977), reaching the same result as in *DeKalb County.*

Because the relief granted herein under 1983 as to the height-weight sex issue is based upon a finding of intentional discrimination and the relief granted herein under Title VII with regard to some of the racial issues is based upon the discriminatory impact of certain examinations, those holdings herein would in no way be affected by resolution of the conflict under 1981 between the Ninth and the Fifth Circuits. As to all other sex and race allegations herein, no discrimination is found to exist, purposeful or otherwise. Accordingly, the issue which is presently before the Supreme Court in *Davis* need not be determined in this opinion with regard to either sex or race claims. For discussion of whether 1981 applies, in any event, to sex claims, *see* n.3, *supra.*

ment" in a public employment case would appear clearly to establish the applicability of the "rigorous" less-than-intent standard in a Title VII case against governmental employees, as contrasted with the intent standard applicable in a case in which constitutional principles are alone at stake in the absence of congressional enactment. Judged in the light of that latter standard, all of the 1983 race claims of plaintiffs fail. As to some of them, plaintiffs have shown no discrimination. As to others, i. e., certain tests and examinations, the challenged practices are facially neutral. With regard to them, plaintiffs have shown discriminatory impact but not purposeful discrimination. Nor are any of the classifications established by defendants and challenged by plaintiffs on racial grounds lacking in rational bases. As to the non-height-weight § 1983 sex claims stated by plaintiffs, they also fail since with regard to them plaintiffs have not proven any discrimination and/or lack of rationality. The opposite is true of plaintiffs' height-weight § 1983 sex claims.

With regard to them, plaintiffs have shown intentional discrimination which, in this Court's opinion, is gender based, fails to "serve important governmental objectives" and is not "substantially related to the achievement of * * * [such] objectives," *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976). Thus, it is not necessary to reach the issue of whether the "strict scrutiny" test or the "mid-level scrutiny test" applies to the height-weight standards since, under either test, plaintiffs are entitled to section 1983 relief with regard thereto.[66]

### Departmental History re Females

The principal sex attack relates to applications for the position of police officer with the Department. Plaintiffs, however, also alleged other acts of discrimination against women.[67]

Counsel have stipulated, in part, as follows: [68]

---

**66.** The so-called "mid-level" scrutiny under the equal protection clause has been developed over the past eight years by the Supreme Court in a series of cases involving alleged sex discrimination. *See Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *Frontiero v. Richardson,* 411 U.S. 677, 688, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 651–52, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *Califano v. Goldfarb,* 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977). In *Frontiero,* Mr. Justice Brennan, writing for himself and three other Justices, held (at 688, 93 S.Ct. at 1771) that statutory classifications based on sex "are inherently suspect, and must therefore be subjected to strict judicial scrutiny." Four other Justices concurred in the judgment. Three of them specifically did not join in the above quoted language in Mr. Justice Brennan's plurality opinion and "reserve[d] for the future" the question of whether "sex" should be added "to the narrowly limited group of classifications which are inherently suspect." Powell, J., concurring in the judgment (at 691–92, 93 S.Ct. at 1773). Subsequently, the majority of the Supreme Court has specifically withheld decision as to whether gender classifications are inherently suspect. *See Stanton v. Stanton,* 421 U.S. 7, 13, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975). *See also Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Woods v. Mills,* 528 F.2d 321, 324 (4th Cir. 1975) (Merhige, J.).

**67.** Thus, *inter alia,* plaintiffs charge, the Department with:

(a) failing to recruit female applicants for employment;

(b) establishing height and weight requirements not job related and discriminatorily impacting upon female applicants;

(c) establishing educational requirements discriminating against female applicants for employment;

(d) maintaining sexually segregated units;

(e) utilizing a seniority system for the purpose and with the effect of perpetuating the effects of past sexual discrimination;

(f) utilizing a subjective arbitrary rating system which has the effect of discriminating against female employees;

(g) discriminating against female employees in initial assignments, promotions, and transfers to higher level and more desirable jobs within the Police Department;

(h) utilizing tests which discriminate against females as a condition precedent to their employment and promotion to higher jobs, supervisory positions, and acceptance into training programs;

(i) using formal and informal practices which thwart promotion of female employees;

(j) substantially excluding female employees from administrative, executive and supervisory positions.

**68.** All footnotes and headings in the stipulation are omitted.

"The Baltimore Police Department was organized in 1784 when the unpaid citizen's watch was replaced by a corps of paid watchmen established by act of the General Assembly [of Maryland]. Administration of the watch force was placed in the hands of Court of Oyer and Terminer in 1793 when the City-run force was unable to curb crime. The Department grew under the direction of the justices of Oyer and Terminer, but no major changes occurred until 1857 when the watch system was replaced with a force of policemen, directed by sergeants, lieutenants and captains, with the entire force under the direction of a marshal and a deputy marshal. At this time, control of the Police Department had again been vested in the City's Mayor. In 1860, rioting became common in Baltimore and, with the Police Department apparently unable to control the situation, the State Legislature reasserted its control over the Department. At first the State-run City Police Department was headed by a Board of Police Commissioners elected by the General Assembly. In 1920, the General Assembly substituted a single commissioner to be appointed by the Governor.

"The Baltimore City Police Department's sworn personnel were all male until 1912 when the General Assembly created a women's division of the Department with full police powers. The number of policewomen in the Department did not rise above six, the original authorized strength, until 1946 when the General Assembly dropped the five-person limitation. The largest number of policewomen in the Department at one time prior to 1974 was 53 in 1969. In that year, the total authorized strength of the uniformed ranks of the Baltimore City Police Department was 3,483 and the actual strength was 3,438 individuals. As of April, 1974, there were 3,482 sworn males in the Baltimore City Police Department and 44 females, fifteen of the latter designated as "police officers" as opposed to policewomen.

"The police officer classification was established in 1973 for males and females in first level patrol positions. One policewoman applied for transfer to the position of police officer. She was not advised of any action taken on her application until her affidavit was introduced into these proceedings; she then declined the transfer.

"Recruiting by the Department is conducted by its Personnel Division and involves the circulation of printed brochures and flyers and appearances by recruiters at military bases, shopping centers, the State Employment Service, ballparks and other locations and organizations where large groups of potential applicants may be found. No women were recruited between 1967 and 1973. A recruiting brochure in use until mid-1973, although corrected to reflect new salary levels, was not altered to indicate that women could join the Department and pictured no women serving in the Department. The Department presently [69] uses only a one-page announcement to advertise the police officer position.

"In the year 1965, the Baltimore City Police Department established the position of Police Cadet, a civilian position designed to 'train potential patrolmen while the cadet performs certain departmental job duties which will offer a career opportunity in the police service upon the cadets reaching age 21.' Until July 1, 1973, the position of cadet was open to males only.

"Several factors go into the hiring of sworn Police Department personnel. The first hurdle an applicant must surpass is passage of a test selected several years ago and administered by the Department and the Baltimore City Civil Service Commission staff. The examination used is the so-called PPA test, prepared by the Public Personnel Association of Chicago, Illinois, a professional organization of Civil Service Directors.

"Those who pass the test file lengthy applications. Applicants are then given physical examinations by the Police Department. In addition to the medical qualifications listed on the back of the police officer announcement, the police physician must certify that an applicant is emotionally sta-

---

**69.** The stipulation in these cases was filed on May 8, 1975.

ble and free from abnormal physical conditions. Applicants are also subjected to full field background checks. Generally speaking, the Department will not hire a person convicted of a felony or a number of misdemeanors which indicate immaturity or irresponsible conduct. Neither is a person employed who has used hard drugs or who is using pep pills or marihuana. As a general rule, no one with a discharge from the Armed Forces under conditions other than honorable is employed. As of September 2, 1974, applicants must finally be recommended for appointment by Psychology Consultants Associated. Prior to admission to the Department, applicants are examined by a three-person interview board, consisting of officers within the Department. A female sergeant is always a member of this Board if a female applicant is being interviewed. The factors considered by the oral boards are appearance, manner and bearing, speech, alertness, judgment, attitude and suitability.

"Since Commissioner Pomerleau and Personnel Director Rowlett joined the Department, no individual who has passed all of the tests hereinabove described has been rejected from the Police Department. The Department maintains no sex-based records of applicants' progress through the application process; the records have reflected race of applicants only since 1972.

"The women's division of the Police Department established by the General Assembly in 1912 had full police powers. Early policewomen received the same training as policemen at the Police Academy, including pistol and judo training, with the exception of 'the more rugged physical conditioning.' Policewomen who joined the Department in the 1960's received training identical to that given policemen, including self-defense and pistol training. Policewomen prior to 1973 were not assigned to routine patrol duties but were given specialized kinds of duty. As one policewoman recounted in 1944, 'Our chief work is look over girls and try to keep them from going wrong.' The female officers specialized in work with juveniles and women and in limited detective duty and investigatory work

in connection with 'delicate' crimes such as rape.

"Policewomen's duties today include guarding female prisoners after arrest and prior to trial, investigating and processing cases involving sexual perversion and rape, juvenile cases, domestic disputes, child neglect and abuse cases, insanity cases and 'crank' complaints.

"Policewomen are not issued uniforms but wear their own clothes while on duty regardless of the nature of the duty but are given a uniform allowance. Police officers wear uniforms unless they are assigned to plainclothes detective work.

"Policewomen were not issued guns until 1970 and at that time received 32 caliber revolvers while male officers carry 38 caliber revolvers. Women received 38 caliber revolvers in 1973 or 1974. Policewomen were not issued handcuffs until 1969. They do not now have nightsticks.

"Policewomen are not assigned to patrol cars but must ask policemen or police officers for rides in motor pools or district cars if transportation is necessary for performance of their duties.

"The Baltimore City Police Department is organized into 16 divisions: Personnel, Community Relations, Education & Training, Internal Investigation, Fiscal Affairs, Traffic, Youth, Patrol, Criminal Investigation, Communications, Laboratory, Property, Central Records, Planning & Research, Public Information and Inspectional Services. Until 1973, women served only in the Inspectional Services, Personnel, Youth, Community Relations, Criminal Investigation and Patrol Divisions. As of this date, women are serving only in the Patrol, Youth, Personnel, Planning & Research, Inspectional Services, Internal Investigation, Community Relations, Criminal Investigation and Youth Divisions. Women in the Criminal Investigation Division do not have detectives' badges while men do.

"The first sergeant of policewomen was appointed in 1945 and the second sergeant of policewomen was not named until ten years later. The first sergeants-policewom-

en were appointed to their posts whereas males who were promoted from patrolmen to sergeants were selected through promotional examinations. The first examination for promotion to sergeant-policewoman was administered in 1961. In 1966, the first woman was promoted to the rank of lieutenant-policewoman. Until 1973, no examination for captain was administered to a woman, and no women in the Department were permitted to rise above the rank of lieutenant. To date no woman has been promoted above the rank of lieutenant. Officers above the rank of captain and all deputy commissioners are appointed by the Police Commissioner without examination and serve at his pleasure during satisfactory performance. No woman has ever served in such appointed position above the rank of captain.

"Prior to September of 1973, identical examinations were given at different times of the year to candidates for promotion to the position of sergeant and sergeant-policewoman. On the 1968 sergeant-policewoman list, Joan Barnard and Bessie Norris scored higher than 13 male candidates on the sergeant list who were promoted and Mercedes Rawlings scored higher than 20 promoted males, but those women were not promoted on the basis of their 1968 scores. Similar comparisons can be made for the sergeant's and sergeant-policewoman's lists in 1969, 1970 and 1972, and the first sergeant-policewoman examination taken by women in 1973." [70]

### Height-Weight

At the time of Pomerleau's appointment as Police Commissioner in September, 1966, non-civilian positions in the Department fell into two categories: "policemen" and "policewomen." Policemen performed traditional law enforcement tasks, while policewomen performed such specialized activities as working with juveniles, serving as meter-maids and acting as detectives in areas in which there existed "no requirement for strength" or "for dignity of demeanor." [71] In view of the fact that the position of "policewomen" involved activities requiring limited physical prowess, no physical qualifications were set for applicants for that position. Pomerleau phrased it in this way (Pomerleau Deposition, p. 30):

Now, they were hiring without any standards, height or weight standards, because those women were perfectly capable, and are capable today—a midget, female or male, can do many of these positions. There is no requirement for strength, there is no requirement for dignity of demeanor which, in and of itself, may get the individual to acquiesce to a lawful order. They were very successful and they are functioning very effectively today. So there weren't any standards per se concerning height and weight. [72]

By 1973, Pomerleau had decided to eliminate any job distinction between male and female employees and to create a single position designated "Police Officer," to be filled without regard to the sex of an applicant and demanding equivalent duties of both males and females. (Pomerleau Deposition, p. 31). Thereafter, Pomerleau participated in a series of discussions concerning the institution of a height-weight requirement for Police Officers. Those discussions included communications between Pomerleau and the other Police Chiefs of the twenty-nine largest cities in the United

70. End of quotation from stipulation.

71. Pomerleau Deposition, pp. 27–30. Herein, from page 706 through page 715, inclusive, citation to "Pomerleau Deposition" is to Doc. No. 36 in *Bosworth,* Civil No. K–74–71; citations to trial transcript are to the transcript of proceedings held on May 9, 1974, Doc. No. 53 in *Bosworth;* and citations to exhibits are to the exhibits admitted at that said May 9, 1974 proceeding. *See* n.94 *infra.*

72. Pomerleau's Director of Personnel, defendant Rowlett, now deceased, stated that at the time he assumed his position in 1967, there were in force minimum height requirements of 5′8″ for policemen and 5′2″ for policewomen. (Rowlett Deposition, pp. 3, 16). Pomerleau has seemingly indicated that *no* height-weight standards for women were instituted until May, 1973. (Pomerleau Deposition, pp. 30–31, 44–45). That testimonial difference is not, however, significant with regard to the resolution of any of the issues posed herein.

States. Pomerleau's discussions with those officials, who apparently met as a body entitled the "Major City Police Administrators," came in the aftermath of one or more decisions of the LEAA regarding the invalidity of height requirements imposed upon female applicants by one or more police departments throughout the country. The Major City Police Administrators were in general accord that there existed a correlation between height proportioned to weight and effectiveness as a police officer, and believed it necessary for police departments to maintain minimum height-weight requirements. (Pomerleau Deposition, pp. 32–36). That shared belief stemmed from the Administrators' "intuitive feeling," (Pomerleau Deposition, pp. 33, 36) and in Pomerleau's case did not arise out of any scientific studies he or his staff conducted (Pomerleau Deposition, pp. 40–44), although Pomerleau, at that time, was apparently aware of one height study conducted in San Diego (Pomerleau Deposition, p. 42).

While final imposition of a height-weight requirement for applicants was under consideration, Pomerleau received from the Office of Civil Rights Compliance of the United States Department of Justice a letter containing several recommendations concerning Baltimore City Police Department administrative policies and suggesting, *inter alia,* that the Department open its ranks to women. (Pomerleau Deposition, pp. 45–50). Thereafter, Pomerleau engaged in discussions with one or more members of his staff to determine how best to comply with that latter recommendation. Involved in such discussions were Pomerleau's legal counsel, Rowlett, the Deputy Commissioner of the Administrative Bureau, and also the Director of Personnel for Baltimore City. (Pomerleau Deposition, pp. 46–49). Thereafter, Pomerleau instructed Rowlett that no reference to any height-weight requirement should be made in the Police Department Brochure distributed to potential applicants. (Pomerleau Deposition, p. 50). Pomerleau

further instructed Rowlett that no applicant under 5'7", whether male or female, should be employed until further notice, and instructed Rowlett so to inform his subordinates.[73]

Subsequently, in an effort to reach a final decision as to the desirability and/or validity of a height-weight requirement, Pomerleau asked Rowlett to canvas the entrance requirements of several other cities' police departments and obtain reports concerning the average heights of both males and females in the United States. Rowlett himself, at or about that time, suggested, on the basis of entrance requirements imposed by the women's branch of the United States Marine Corps, that a 5'6" height requirement be established. (Rowlett Deposition, p. 31).

In September, 1973, Pomerleau reached a final decision to impose upon all applicants for the position of Police Officer the requirement that they be at least 5'7" in height, with weight in proportion to height. That requirement, while seemingly never inserted into any job specification, was apparently first advertised by means of a job flier on September 3, 1973. (Rowlett Deposition, p. 35).

On or about July 10, 1973 plaintiff Bosworth had applied for employment as a Police Officer with the Baltimore City Police Department. Bosworth passed the physical and mental tests required for applicants and was given a probationary appointment as a Police Officer on or about July 23, 1973.

Following her probationary appointment, Bosworth was informed by the Department that a background check was being done to determine whether she could be admitted to Baltimore City's Police Academy. On or about September 5, 1973 Bosworth received a letter from defendant Rowlett informing her that: "[a] determination has recently been made, after careful study of information available that a police officer who is

---

**73.** It has not been disputed that Rowlett "failed to communicate [that decision] effectively with his subordinates" (Pomerleau Deposition, p. 51), who "got the impression" that there were no height standards and may have communicated that view to female applicants including plaintiff Bosworth. (Pomerleau Deposition, p. 51).

not at least 5'7", with weight in proportion to height, may at times experience difficulties in carrying out certain street duties when a high level of physical strength is required. Therefore, it is with regret that I must inform you that you do not meet the physical requirements of the Department." (Exhibit B to Plaintiff's Complaint in *Bosworth*). Similar occurrences were experienced by other members of the applicant class.[74]

### Non-Height-Weight Sex Discrimination

One past female member and one present female member of the Department have presented evidence of alleged sex discrimination unrelated to height-weight requirement. One of them, Mary F. Stout is a policewoman employed by the Department since July 11, 1968. She claims that the Department discriminated against her and other female police officers solely because of her sex. Stout, in an affidavit, states that she has been "frequently on call to divisions other than my own on my free time and on weekends" while to her knowledge no "male officers had similar duty"; that female police officers are not issued standard equipment and do not have a car at their disposal; that when she was interviewed for the position of police sergeant, a three-man interview committee asked her "some pretty stupid questions," including what she would do if she "saw a partner doing a striptease on the block"; that she was required to take the written test for police sergeant twice in 1973; and that when she applied in August of 1973 for transfer to the position of police officer, her application was ignored by her superiors.

In response to Stout's allegations, C. Jared Glauser, Deputy Commissioner of the Administrative Bureau of the Department, stated in an affidavit that "Officer Stout was assigned on the basis of need within the department and was not assigned on a discriminatory basis," and that both male and female officers "are often called upon to perform duties in addition to those normally assigned within a work week" and are compensated for the same by the payment of overtime.

Stout has also asserted that no female employees are assigned police cars. Responding, Glauser has further stated:

> While all policewomen are not assigned a car to have at their disposal at all times, such is similarly true of male officers assigned to various duties within the Baltimore City Police Department. From an operational standpoint, it is impossible to assign a car to every working member of the Baltimore City Police Department. Transportation is provided to perform duties operational requirements dictate. There exists no policy, plan or practice to systematically deprive policewomen of needed transportation; * * *.

Glauser has not sought to controvert Stout's claim that she was required during 1973 to take two examinations. Glauser has however explained the circumstances surrounding the examination as follows:

"Prior to 1973, the Baltimore City Police Department maintained a dual promotional register, that is, one promotional register for male police officers and one promotional register for policewomen. Thus, prior to 1973, Officer Stout, in attempting to obtain promotion, competed against other policewomen alone for vacancies in a supervisory policewoman position. Thus, in 1972, when Officer Stout complains of her failure to obtain the rank of Sergeant, she was competing only against other policewomen and certainly was not discriminated against by virtue of her sex.

"In 1973, two (2) promotional exams were given for policewomen. The first such exam was given under the old existing practice as described above whereby policewomen competed only with policewomen for promotion to supervisory policewomen ranks. However, following said exam, the Baltimore City Police Department ceased maintaining a dual promotional register as

---

74. There is no evidence that male applicants were not required to meet the height-weight requirement.

described above. The policy then became to maintain a single promotional register. This change occurred simultaneously with the decision of the Baltimore City Police Department to discontinue the classification of policewoman at entrance level and to accept applications from all aspirants for police duties, both male and female, on an equal basis. Thus it was decided that any policewoman could either maintain her position as a policewoman or request transfer to patrol duties within the agency, thereby requesting permission to be treated exactly as their male counterparts. Any policewoman wishing promotion would compete against all males and females for supervisory positions in the agency. Thus, another exam was given where policewomen competed with their male counterparts for promotion. Officer Stout failed the second examination; * * *."

Finally, Glauser has stated that Stout's requested transfer was not implemented "[s]trictly through an administrative oversight" as a result of which that request, despite approval by all necessary authorities, "remained in Officer Stout's personnel file without implementation." Glauser further has indicated that upon discovery of the above administrative oversight, Millard S. Rubenstein, counsel for the State defendants herein,

> "advised your Affiant to immediately implement Officer Stout's request. When contacted Officer Stout stated that she did not wish to transfer to the Patrol Division, and did not wish to take regular duties * * * *. Officer Stout was in no way pressured, coerced, or induced to execute this memorandum. Officer Stout was free to elect transfer to the Patrol Division. Every other policewoman was similarly free to transfer to the Patrol Division and assume regular police duties."

Debra Hoblik, a former Baltimore City police officer, in an affidavit, contends that in the month following the beginning of her duties as a police officer after she had injured her leg and been sick with the flu, the latter for a total of eight days, she was urged to resign for "personal reasons" rather than be terminated for "physical reasons." Hoblik has also stated that "other probationary officers have became [sic] sick and have not been fired because of it," and that in her opinion the Department in fact had decided to terminate her because of a conflict between her and a male employee, one Floyd Robinson, and preferred to retain a male officer in the event of such a conflict between officers of two sexes. Hoblik has further written under oath that after her resignation the Department provided, to one or more employers from whom she sought employment, a report which stated that she was not "physically fit to be a police officer."

In response to Ms. Hoblik's allegations, Glauser has stated under oath as follows:

"Debra J. Hoblik was appointed a Probationary Police Officer with the Baltimore City Police Department on May 22, 1974, and was assigned to the Personnel Division pending commencement of an entrance level training class as is done with all new police officers. On June 13, 1974, Ms. Hoblik was unavailable for work due to a swollen right knee and a swollen left elbow, which incapacity continued until June 19, 1974. On June 26, 1974, she was unavailable for work due to an upper respiratory infection which continued until July 10, 1974. On June 27, 1974, Dr. Daniel Wilfson, Chief Physician of the Baltimore City Police Department, advised the Director of the Personnel Division that Ms. Hoblik was not physically qualified to be a police officer. * * *

"Based upon Dr. Wilfson's determination, Lieutenant William Bowen of the Personnel Division, in company with Sergeant Albert Doda and Policewoman Mary Jean Knott, went to the home of Ms. Hoblik and advised her that the Chief Physician had determined that she did not meet the qualifications of the department. She was advised that she could resign if she wished, but that if she did not resign, her employment would be terminated due to her medical disqualifications. Ms. Hoblik stated that she wanted to discuss the matter with her attorney and

would advise the department of her decision by telephone by 4:00 p. m. on July 9, 1974. Ms. Hoblik telephoned at 3:15 p. m. and stated that she would sign a resignation on July 10, 1974. * * *

"Ms. Hoblik, while a probationary member of the department, was requested to take a polygraph examination consistent with departmental policy. The reason for such a polygraph examination is as follows:

On June 4, 1974, Police Officer Floyd A. Robinson of the Southeastern District, came to see Lieutenant William Bowen at the recommendation of his Commanding Officer. Officer Robinson expressed concern that Ms. Robinson (his wife) was about to reveal certain information which she had received from Ms. Hoblik about Officer Robinson, which was of concern to Officer Robinson. Succinctly, Officer Robinson felt that Ms. Hoblik, while she was assigned to the Personnel Division, improperly and without permission or necessity reviewed Officer Robinson's medical file in an attempt to obtain damaging information about a physical condition that Officer Robinson may have had. If the facts were as alleged by Officer Robinson, then Ms. Hoblik may well have violated the rules and regulations of the department. It is the policy of the Baltimore City Police Department in investigating internal complaints against police officers accused of violating departmental rules and regulations to utilize a polygraph examination in furthering an investigation. Accordingly, Ms. Hoblik was requested to take a polygraph examination. Ms. Hoblik initially agreed to take said examination. She later refused to take such polygraph examination. Thus, the examination was not conducted because of Ms. Hoblik's resignation as indicated above;

"Ms. Hoblik was afforded the opportunity to resign because of the medical opinion of

Dr. Wilfson that she was unqualified for police service. The opportunity to resign was not afforded in any way because of discriminatory practices. The opportunity to resign was not afforded Ms. Hoblik because of her sex. Any information to be given to prospective employers is furnished for male officers in the same manner as female officers. No difference in the manner or type of information provided is made because of the sex of the employee involved."

Neither Stout nor Hoblik is a named plaintiff in any of these cases. Accordingly, since this Court has decertified the non-height-weight sex class,[75] their claims are not before this Court for decision. But if they were, they would not succeed. Noting the factual differences and assessing all of the evidence, this Court is not persuaded that either woman was discriminated against because of her sex in connection with her employment by the Department.

*More re Height-Weight*

Returning to the height-weight issue, the initial question is whether or not the height-weight requirements have a disproportionate impact upon female applicants. Those requirements exclude from consideration for employment 95 percent of the female population between the ages of 18 and 79 and only 32 percent of the male population of the same age; and in the age group 18–34 years, those requirements exclude 81.8 percent of the female population and only 25.1 percent of the male population.[76] Given the disparate effect of the height requirement on men and women, plaintiffs have demonstrated a prima facie case of sex discrimination under Title VII. Pomerleau's own testimony indicates that his decision to promulgate the disputed height-weight requirement was primarily motivated by concern about having short

---

**75.** *See supra* pp. 676–677.

**76.** *See Weight, Height and Selected Body Dimensions of Adults United States*—1960–1962 (plaintiffs' exhibit 7) at 27; Note, *Height Standards in Police Employment and the Question of Sex Discrimination: The Availability of Two*

*Defenses for a Neutral Employment Policy Found Discriminatory Under Title VII*, 47 S.Cal. L.Rev. 585, 588 (1974) [hereinafter referred to as "Height Standards"]; Plaintiffs' Exhibit No. 12.

women serve as police officers. The Commissioner's own words disclose his intent.[77] In their light, even if plaintiffs' claims are considered under the standards of § 1983 which require a showing of discriminatory purpose, plaintiffs have made the requisite showing of intent. Accordingly, the burden devolves upon defendants to show that the height-weight requirements are job-related. The parties have introduced various documents and adduced expert testimony upon the relationship of those physical requirements to the performance of a police officer's duties, including the following description of the position of a Baltimore City Police Officer which was issued by the Department on July 11, 1973:

*CLASS TITLE:* POLICE OFFICER

*CHARACTERISTICS OF THE CLASS:* Under general supervision, is responsible for enforcing laws within Baltimore City in accordance with the rules and regulations of the Police Department; and does related work as required.

*EXAMPLES OF DUTIES:* Patrols the city to prevent and discover the commission of crime and to enforce traffic and parking regulations; answers calls and complaints and takes necessary police action at scene of a crime or disturbance including maintaining order, gathering evidence, locating witnesses, and making arrests; investigates person suspected of engaging in criminal activity; interviews suspects, prisoners, complainants, and witnesses to obtain information about crimes; checks the operation of places of public accommodation for compliance with laws and ordinances; investigates juvenile crimes and discusses such crimes with juveniles, parents, and others; consults with parents, teachers, and others in an attempt to resolve juvenile problems and assists in the operation of boys' clubs; appears in court to present evidence and testify against person accused of crimes; performs police related duties in the offices of the department.

*MINIMUM QUALIFICATIONS:*

*Training and Experience:* Graduation from a recognized high school or certificate of high school equivalency.

*Knowledge and Skills:* Ability to learn laws, ordinances, and police rules and reg-

---

**77.** Thus the Commissioner candidly stated in his deposition:

> I said, [to defendant Rowlett] what is the average height of a woman in the United States? So he starts to acquire his data and he submits to me various reports, U.S. Department of Health, et cetera, and he tells me that the average height of a woman in the United States is five-foot-three, and an average height of a male is five-foot-eight. Now, the height reductions for males is under the current rhetoric of today and yesterday, so that we can take in minority groups. Well, this is a fallacy to the uninformed. Black or white, it makes no difference, the average height of the American male is five-foot-eight, black or white.
>
> So they said, now, this is for Mexican-Americans and anybody that says you have to reduce height standards below five-foot-eight to recruit Mexican-Americans doesn't know what he's talking about either, because the average height of a Mexican-American is also five-feet-eight. The only ethnic group height reductions will assist are Puerto Ricans. So New York has its problems and Lindsay said, okay, no height requirements.
>
> Where it really has the application are to what I refer to as the little balls of fluff, those things we hold near and dear to our hearts, that do—do we want to take this little, luscious ball of fluff, five-foot-two, weighing 92 pounds, or my wife, five-foot-three, that I consider to be a nice, little, soft ball of fluff, and 116 pounds, and make a copy out of her and put her on the street? Now, she's quite capable, very capable, but I am worried about—I am concerned about her personal safety. I am concerned about the safety of her brother officers. * * *

(Pomerleau Deposition, at pp. 52–53)

Further, when questioned as to the basis for his final decision to adopt a 5'7" height requirement, Pomerleau replied:

> That's interesting. I don't know that I can really recall. Rowlett—Major Rowlett had submitted to me, he said, you know, you are going to have to make a decision on this height. I said, I know that, and I said, how many women do we have waiting? And he showed me a list, three at this, and four at this, so many—no names, as I recall. I said, well, if it's five-foot-eight, how many do we get? If it's five-foot-seven, how many would we get, and we looked at the list, five-six, six and a half, and you start to weigh these problems and I said, well, leave it with me. * * *

(Pomerleau Deposition, at p. 55)

ulations; ability to cope with situations firmly, courteously, tactfully, and with a respect for the rights of others; ability to analyze situations quickly and objectively to determine a proper course of action to be taken; ability to understand and carry out oral and written instructions; ability to write and speak effectively; ability to develop skill in the use and care of firearms; good general intelligence and emotional stability.

Plaintiffs' Exhibit S–5.

Commissioner Pomerleau expects each Baltimore City Police Officer to be able to perform all police duties. Thus, no special standards are used to hire personnel to fill specialized jobs within the Baltimore City Police Department. (Tr. at 231–233).

Defendants contend that that height requirement survives constitutional and statutory scrutiny for the following reasons:

It is the position of these Defendants that inherent in urban police work exists an element of physical capability—one that must be recognized by any rational approach to the problem. Certainly, it is clear that police officers are, on a daily basis, called upon to use force in arresting suspects, in preserving the public peace, and in protecting the citizens they serve. Also obvious is the knowledge that police officers, in exercising their daily func-

tions, are resisted by a significant proportion of arrested persons. Evidence will be presented to show the extent of assaults upon police personnel. The Defendants will argue that by the very nature of police work, and the dangers inherent ' therein, the physical stature of police officers becomes significant. Even without empirical data, it will be urged that persons, small in stature, will have greater difficulty in exercising their sworn duties than persons of greater stature. Certain empirical data will be presented evidencing that assaults upon police officers and difficulty in effecting arrests increases as size of these police officers decreases. This argument will be buttressed by presentations by persons expert in the field of law enforcement that a general opinion exists within the law enforcement community that difficulty in properly exercising police functions increases as size of a police officer decreases.[78]

Defendant's position that physically capable personnel are vital to the functioning of an urban police force is, of course, sound. The fact that the use of force by policemen may be infrequent does not mean that selection criteria relevant to the capacity of a police officer to exert necessary force are invalid.[79] Nonetheless, it would not appear

---

**78.** *See* letter dated January 23, 1974 from counsel for state defendants to this Court.

**79.** One law review commentator has written:

The common conception of police patrol is that it is a dangerous job, one fraught with risk to the officer and others. The Los Angeles Police Department has based its justification for the unisex height standard on this concept. In its "Height Minimum Analysis" the Los Angeles Police Department defended its height minimum in large part on the basis of a study it undertook of the danger of police patrol work. It concluded that "the routine job of a police officer is one which contains a vast majority of dangerous or latently dangerous situations (78%)."

However, aside from the questionable value of the study's task categorizations, its conclusion is at variance with a number of patrol task studies which show that only a small portion of police patrol work is concerned with fighting crime. Fatality statistics show that law enforcement is a safer

occupation than mining, construction, agriculture, or transportation, with on-duty policemen approximately six times more likely to kill than to be killed.

Nevertheless, although use of force by police may be infrequent, this does not necessarily suggest that physical capacity is not important for patrolmen. While

[i]t must be emphasized . . . that the conception of the centrality of the capacity to use force in the police role does not entail the conclusion that the ordinary occupation routines consist of the actual exercise of this capacity, . . . what matters is that police procedure is defined by the feature that it may not be opposed in its course, and that force can be used if it is opposed.

Thus, while the capacity to use physical force is only one of many capabilities required of patrolmen, it is a significant one.

*Height Standards, supra,* at pp. 610–611.
[Footnotes omitted]

that the height-weight requirement challenged herein bears a "manifest relationship," see *Griggs v. Duke Power Co., supra,* 401 U.S. at 432, 91 S.Ct. 849, to the physical capabilities of a Police Officer or to other qualifications necessary for successful performance of that position.

In his deposition of April 10, 1974, Pomerleau testified, in support of the challenged height-weight requirement, (at 35–36) that he and the other members of the Executive Committee of the International Association of Chiefs of Police "have that intuitive feeling that as height decreases, in what we represent there, in the uniform force, that the problems then of the community increase, meaning as the height of the officer decreases, the number of assaults on that individual increase. As I say, we can't validate that, but we all feel that way and I'll give you the names of all the chiefs that feel that way." *See also* Pomerleau's Affidavit dated February 14, 1974. Commissioner Pomerleau also stated (at 36): "We also feel that as the height of the officer decreases, so does the element of force used by the officer in effectuating lawful arrest, and that we have then internal investigative cases, or IID cases increasing, that we have to go out and get citizens' complaints, the guy used a stick or used Mace or used a gun butt on me to effectuate this arrest."

Defendants have maintained that Commissioner Pomerleau's "intuitive feeling" regarding the necessity of a 5'7" height minimum is confirmed by a study of the San Diego Police Department. *See* R. Hoobler & J. McQueeney, "A Question of Height," *The Police Chief,* p. 42, (Nov. 1973). (Defendant's Exhibit 1) That study of a police force utilizing a 5'7" minimum height requirement concluded, *inter alia,* that police personnel below 69 inches in height were assaulted more frequently than taller officers and that "shorter officers" had significantly more equipment accidents than "taller officers," and found that officers within the traffic division who were 69

inches or taller made significantly more arrests than officers of lesser height. The authors thus questioned "the feasibility of eliminating the minimum height requirement" and stated that "[a]ny modification of current standards should be thoroughly investigated prior to their elimination." John A. McQueeney, a co-author of that study, testified at trial in this case that police departments in Portland, Oregon and Los Angeles, California had conducted studies which had led them to impose a 5'9" height requirement. McQueeney stated that persons shorter than 5'9" may develop a so-called "Napoleonic complex," [80] and may be more disposed to leave police department employment than individuals of greater height. (Tr. at 155–58, 178).

McQueeney additionally testified that during World War II certain height limitations were imposed within the Navy (Tr. at 165–167). However, McQueeney was unable to point to the existence of any military studies relating height to injuries, to ability to handle oneself in battle, or ability to police an area.

Finally, McQueeney acknowledged that he did not believe it was possible to predict the performance of an officer under 5'7" by studying only policemen over 5'7" as had been done in the San Diego Study, and that he did not know whether the performance of females could be predicted by studying males. (Tr. at 184).

In further support of the validity of the challenged height-weight requirement, defendants have pointed to a consent decree entered into between the United States Department of Justice and the Maryland State Police, in which it was agreed that the Maryland State Police could continue to apply minimum height requirements of 5'6" to both men and women "so long as such minimum height requirements do not operate disproportionately to exclude females" and that pursuant to that decree, the Maryland State Police were allowed a one year

---

**80.** (Tr. at 155–58, 178). McQueeney did admit, however, that he had never heard of a short woman with a Napoleonic complex. (Tr. at 180).

period within which validation studies of the 5′6″ requirement might be conducted.[81]

Richard C. Nelson, a physical fitness authority from Penn State University, called to testify at trial by plaintiffs stated that height was not a good predictive factor as to physical performance either as to men or as to women. (Tr. at 29–30). Nelson conceded that among extreme mesomorphic body types, height might well bear some minimal correlation to strength and to running speed. (Tr. at 41–47). Nelson testified, however, that the concept of "weight in proportion to height" was not a scientific one, (Tr. at 85) and noted that the relation of muscle to body fat could vary markedly among individuals of the same height and weight. Nelson further testified that a 5′7″ height requirement would eliminate 60% of Olympic weight lifters, 45% of Olympic wrestlers, and 75% of Olympic gymnasts. (Tr. at 28).

The authors of a study [82] conducted by the Urban Institute for the Police Foundation involving males and females on patrol of the Metropolitan Police of the District of Columbia concluded as follows:

*Height*

Generally speaking, the taller an officer was, the more likely he or she was to be rated poorly on performance. The taller women were more likely to have been rated on the Chief's Survey as not suitable for retention in the department, and more likely to have comparatively poor average ratings on the Official's Survey. Taller men were given lower overall performance ratings by the department and lower ratings on the Chief's Survey on their general ability to patrol. They were less likely than shorter officers to have received favorable comments from the public, and they were observed to evoke comparatively poor reactions from victims. The only favorable relationship found between height and performance was that tall men were observed to receive more favorable reactions when they handled arguments inside residences.

In 1967, in *Task Force Report: "The Police,"* (Plaintiffs' Exhibit No. 4) the President's Commission on Law Enforcement and Administration of Justice, after discussing the importance of such personnel selection standards as advanced education, emotional stability, common sense and integrity, physical courage, stamina, and agility, wrote (at 130):

*Physical Requirements.* Any police officer working in the field must possess physical courage, stamina and agility. These qualities may help to save his own life or the lives of others. But existing requirements on physical stature and condition in many departments are unduly restrictive, with the result that many ap-

---

81. A copy of that decree has been placed in the official Court file herein. The significance of that consent decree would, however, appear to be limited, in as much as in this case the challenged 5′7″ height requirement has been shown disproportionately to affect women. Further, this Court has at no time been referred by any of defendants to any complete studies by the Maryland State Police validating a 5′6″ requirement. Indeed, in that latter regard, at one point in his deposition defendant Commissioner Pomerleau stated:

Our defense on this is going to be time. We want time because I don't think any—I don't think the shorties can validate their position and I don't think those who feel that you have to be big and masculine and even feminine, but big, can validate that position and we're going to ask for time. So it's after these kinds of things, and there was some other input, that I was kind of pushed by my Director of Personnel, make a decision.

82. P. Bloch & D. Anderson, Police Women on Patrol: Final Report, 60, (1974) (Plaintiffs' Exhibits 19A; 19B). In his deposition taken in this case, Peter B. Bloch, one of the authors of that report, reiterated (at 13) the conclusion of that report that "height proved to be of particularly doubtful value for selecting people." Bloch did acknowledge, however, that the sampling used in the study was of men and women all of 5′7″ or taller, and conceded (at 20) that that "report sheds very little light on the issue involved in this case." Nevertheless, he did conclude:

I just don't think that there is any evidence that indicates that shorter people are more likely to be injured than taller people. And I haven't seen any data that persuades me there are any other performance differences that way either.

plicants, who may otherwise have exceptional qualifications, are summarily rejected because of height, weight, or vision. For example, in 1956, a survey conducted by the International Association of Chiefs of Police revealed that nearly 85 percent of the police departments surveyed had a mandatory height requirement of 5'8" or higher.

All departments should eliminate inflexible mandatory physical requirements. While physical characteristics and conditions such as freedom from disabling diseases or physical handicaps should be carefully considered in the selection process, factors such as height should be considered along with other attributes of the candidate, rather than be automatically disqualifying.

Height, like age, is a factor which must be evaluated in terms of the full abilities of the candidate. It should not be used as a hurdle with a fixed standard except to eliminate persons below normal standards lacking other compensation qualities. Physical stature is a single factor which should not deprive the police service of individuals who are capable of physically defending themselves. The police image is not likely to suffer any severe damage if fully capable men are employed despite their lack of height. [Footnotes omitted]

Subsequently (at 171) the Commission's report includes the following observations:

Selection Standards. Certain selection standards may have the unintended effect of arbitrarily barring large numbers of minority group applicants who could adequately perform police work. For example, minimum height restrictions prevent many Puerto Ricans, Mexican-Americans, and Orientals from joining police forces. The minimum height requirement was recently changed in Chicago from 5 feet 8 inches to 5 feet 7 inches, in part because of the need to recruit Puerto Ricans. Similarly, restrictions on flat feet and other physical defects have barred many Negroes; eyesight problems, many Oriental-Americans. In the review of traditional physical requirements which the Commission has recommended, an important factor should be the extent to which inflexible standards tend to interfere with the recruitment of members of minority groups. [Footnote omitted]

An unpublished study by the State of Wisconsin conducted in October, 1971 on minimum height requirements utilized in various law enforcement jurisdictions throughout the United States concluded, inter alia:

1. There appears to be no proven rationale which is used to "justify" any specific minimum height requirement.

2. There does not appear to be any significant facts to support the hypothesis that a smaller officer invites attack or is more likely to have a physical confrontation than a larger officer.

3. There does not appear to be any evidence to indicate that lowering the minimum height requirement will in and of itself attract more minorities.

4. There does appear to be a general trend to lower the physical requirements, including the height requirement, for law enforcement positions.

5. Progressive enforcement agencies appear to be emphasizing technique, human and cultural understanding, and arrestee empathy on the part of the officer as being more important than the physical size of the officer.

Accordingly, Wisconsin eliminated any then existing minimum height requirement for law enforcement positions in Wisconsin State Service.[83]

Likewise, the Attorney General of the State of Pennsylvania on August 9, 1973, in Official Opinion No. 57,[84] concluded that a 5'6" minimum height requirement main-

83. Plaintiffs' Exhibit 6, at p. 2.

84. A copy of that Official Opinion has been placed in the official Court file herein as an attachment to Doc. No. 20 in Bosworth, Civil No. K–74–71.

tained by State Police disproportionately disadvantaged female and Spanish-surnamed applicants, and should be suspended pending validation of the same. The Pennsylvania Attorney General found as unsupported arguments that smaller officers were more likely to be attacked, that smaller officers were less likely to be visible and thus to be effective, and that the cost of maintaining equipment inventories for smaller officers was prohibitive.

The capacity of a woman 5'7" or smaller to perform successfully the position of Police Officer is also discussed in *Women in Policing* (1972).[85] Therein, in a Police Foundation report, Catherine Milton asserted (at 17) that women "three to four inches below" a 5'7" minimum were as of 1972 patrolling in Miami, Florida, and Peoria, Illinois.

The Board of Appeals and Review of the United States Civil Service Commission concluded that no "rational relationship, or * * * showing of relevancy" was "established or demonstrated between performance in the position of Park Police Officer [of the National Park Service], and the [5'8"—145 lbs.] height/weight requirement" which had been applied by the National Park Service. *See In the Matter of Shirley Long,* November 13, 1972.[86] *See also Moore v. City of Des Moines Police Department and City of Des Moines Civil Service Commission,* CP # 881 (Iowa Civil Rights Commission—July 11, 1973) (holding invalid a 5'9"—149 lbs. minimum height-weight requirement for the positions of patrolman or policewoman until such time as those requirements could be validated).

Plaintiffs herein, as noted *supra,* have challenged the height-weight requirement as violating both Title VII and also constitutional standards.

In *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), one of plaintiffs challenged a 5'2" height requirement and a 120 lb. weight requirement for prison guards in Alabama. Those physical qualifications excluded over 40% of the female population, but only less than 1% of the male population (433 U.S. at 329–30, 97 S.Ct. 2720). Mr. Justice Stewart held (at 330–31, 97 S.Ct. 2720) that plaintiffs' showing of disproportionate impact based upon national statistics was sufficient to constitute a prima facie case of sex discrimination under Title VII. Noting that state defendants had failed to adduce any evidence in justification of its standards, the Supreme Court affirmed the District Court's holding (at 331–32, 97 S.Ct. 2720) that the height-weight requirements violated Title VII.

In *Boyd v. Ozark Air Lines,* 568 F.2d 50 (8th Cir. 1977), a 5'2" woman asserted that the defendant airline's 5'7" height requirement for pilots violated Title VII. Since the height requirement excluded 93% of females aged 18–34 but only 25% of the males in that age bracket, the District Court held that plaintiff had made out a prima facie Title VII case. However, that Court also concluded that defendant airline had shown the physical qualification to be a business necessity because the safe and efficient operation of a plane depended on the pilot's ability to operate all the instruments and still reach the "design eye reference point" (*id.* at 53)—a factor related to height. On appeal, the Eighth Circuit affirmed.

In *Davis v. County of Los Angeles,* 566 F.2d 1334, 1337, 1341–42 (9th Cir. 1977), *cert. granted,* 437 U.S. 903, 98 S.Ct. 3087, 57 L.Ed.2d 1132 (1978), the District Court determined that there existed violations of Title VII unrelated to the fire department's 5'7" height requirement. In ordering accelerated hiring of blacks and Mexican-Americans by the fire department, the District Court concluded that a 5'7" requirement was valid and took it into account in determining the proportions of various minority groups to be hired. The fire department did not introduce any scientifically approved test demonstrating the job-relatedness of the height requirement, which ef-

---

85. Plaintiffs' Exhibit 2.

86. A copy of which has been placed in the Official Court file as an attachment to Doc. No. 20 in *Bosworth,* Civil No. K–74–71.

fectively excluded 41% of Mexican-Americans. A fire chief testified that a smaller man might have difficulty "removing long ladders and other equipment and might have a slower reaction time in climbing on and off equipment," (*id.* at 1342). However, that fire chief conceded that shorter firemen functioned without impairment during World War II. On appeal, the Ninth Circuit held that such testimony fell short of establishing that "the height restriction was manifestly related to employment by the Fire Department" (*id.* at 1342) and thus of validating the height requirement under the standards stated by the Supreme Court in *Dothard* (which had not been decided when the District Court filed its opinion in *Davis*). Therefore, the Ninth Circuit reversed the District Court's finding in *Davis* of job-relatedness.

 Nor have defendants herein established job-relatedness of the height-weight requirement. Defendants, principally through the Commissioner's testimony, have shown fears and concerns, but have not borne their Title VII burden. Accordingly, plaintiffs, having established the discriminatory impact of those requirements, are entitled to prevail as to their Title VII challenge thereto.

There remains plaintiffs' constitutional attack on those requirements. In *Fox v. Washington,* 396 F.Supp. 504 (D.D.C.1975), Judge Bryant held that a 5'7" height requirement imposed by the District of Columbia Fire Department bore no rational relationship to job performance, and thus violated a federal Civil Service Employment Practice regulation [87] which required a "rational relationship" between "performance" and "employment practice" and "a showing that the employment practice was professionally developed" 396 F.Supp. *supra* at 505. Judge Bryant wrote (at 507) that the

regulation required the District of Columbia to show "a significant, substantial governmental interest in its height requirement" and that the District had not so done.[88] Judge Bryant wrote (at 507) that any merit to the arguments that taller firemen would receive greater respect and be less subject to physical injury were "obviated by the [District of Columbia] police department's recent action in lowering the height requirement to 5'0"."[89]

In *Castro v. Beecher,* 459 F.2d 725 (1st Cir. 1972), in upholding a determination by Judge Wyzanski that in the absence of any evidence of discriminatory purpose or any facially discriminatory practice, at 5'7" height requirement had not been shown to violate the Equal Protection rights of Spanish-surnamed persons, Judge Coffin wrote (at 734):

Even were an insistence upon a minimum height of five feet seven inches made clear, however, the record would be infirm in another respect. Quite simply, the plaintiffs have failed to demonstrate that a minimum height requirement has a disproportionate impact on Spanish-surnamed persons. Nor can a court employ a rigorous standard of review on the basis of a mere supposition that a classification has such an impact. While one Spanish-surnamed plaintiff had standing to raise the claim, having shown that he was less than five feet seven inches tall, no data was presented concerning the average of Spanish-surnamed males as compared with other males, either for any city, for Massachusetts, or even for the nation. Superintendent Sullivan testified that from his personal observation the average height of Spanish-surnamed males in Boston was, indeed, five feet seven inches, while another bit of testimony was that

---

**87.** 5 C.F.R. § 300.103(b) (1974).

**88.** Judge Bryant stated (at 505) that he therefore did not need to reach plaintiff's claims that that requirement violated the federal Constitution.

**89.** With regard to the abandonment by the Metropolitan Police of Washington, D.C. of the

5'7" height requirement, *see also* deposition of Peter B. Bloch (at 18). This Court also notes that as of May 9, 1974 the San Diego Police Department, according to McQueeny's testimony, decided, at least on an experimental basis, to utilize a 4'6" height standard in lieu of its former 5'7" requirement. Tr. of May 9, 1974 at 181–82.

Spanish-surnamed males seemed smaller than stateside Americans. The only other evidence was an equally inconsequential summary of a police conference report indicating that one person present was of the opinion that Puerto Ricans could not meet the requirement and a two-line excerpt from an unreported opinion of the Equal Employment Opportunities Commission regarding the average height of Puerto Ricans. This simply does not suffice. In the absence of a showing of prima facie discriminatory impact, the standard of review is, as we have indicated, a relaxed one, which a minimum height requirement for policemen clearly meets.

In *Smith v. City of East Cleveland,* 363 F.Supp. 1131 (N.D.Ohio 1973), *reversed sub nom. Smith v. Troyan,* 520 F.2d 492 (6th Cir. 1975), *cert. denied,* 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976), Judge Lambros concluded that a 5′8″ height requirement was unrelated to a valid state interest. In so doing, Judge Lambros rejected (at 1140–44) the arguments that the occasional need for " 'brute force' " justified the challenged height requirement, or that that requirement was "related to physical fitness as required for the police officer," to running or agility skills required by a police officer, to the ability of an officer to see and be seen in crowds, drive a car, utilize one's arms in connection with restraining techniques and/or self-defense techniques; absorb body blows; or to deter attacks upon himself.

On appeal to the Sixth Circuit, *sub nom., Smith v. Troyan,* 520 F.2d 492 (6th Cir. 1975), Judge Peck wrote as follows (at 496–97):

We think the district court erred in finding no "rational support" for the height requirement. If East Cleveland's height requirement lacks "rational support," so do height requirements elsewhere. Plaintiff's own exhibits demonstrate that forty-seven of forty-nine state highway patrols and police forces and twenty-nine of twenty-nine municipal police departments surveyed have, or at least then had, height requirements (ranging from five feet, six inches to six feet). See Note, Height Standards in Police Employment & the Question of Sex Discrimination; the Availability of Two Defenses for a Neutral Employment Police Found Discriminatory Under Title VII, 47 So.Calif.L.Rev. 585, 586–9 (1974) [hereinafter Height Standards]. That certain government entities, including the Wisconsin highway patrol, the Pennsylvania state police (2 CCH Empl.Prac.Guide ¶ 5177 [1973]) and the Law Enforcement Assistance Administration (33 Fed.Reg. 6415 [March 9, 1973]), no longer utilize or favor height requirements cannot rebut the nearly universal use of height requirements in hiring police. Such widespread use, of course, does not compel a finding of constitutionality, but "is plainly worth considering" in determining the "rationality" and constitutionality of height requirements. *Manning v. Rose,* 507 F.2d 889, 892 (6th Cir. 1974), quoting *Leland v. Oregon,* 343 U.S. 790, 798, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952).

Moreover, at least three East Cleveland Police officials testified uncontradictedly and adamantly to the need for the height requirement. The chief of detectives, with twenty-six years' police experience, testified to the psychological advantage of a taller officer; a shift commander, with over seventeen years' experience, testified to the advantage of height in effecting arrests and emergency aid; and, the police chief testified similarly. Though plaintiff's expert witnesses discounted the importance of height and though the district court accepted that discounting, 363 F.Supp. at 1140–4, noteworthily, no expert had police experience.

The district court also discounted certain "functions claimed to be related to height and weight [because those functions] actually took only a small portion of the average patrolman's time and . . [because] traffic-related matters accounted for more than three-quarters of the patrolman's working time." That an occupational function consumes a *de minimis* proportion of one's workday, however,

does not necessarily diminish the need for selecting one who can best perform that function. A lifeguard may well spend all but fifteen minutes of an entire summer observing swimmers and keeping the beach free of litter, but in those fifteen minutes swimming ability to rescue a drowning swimmer becomes vitally crucial. See Height Standards, *supra,* at 611.

Even if plaintiff's experts were correct, and even if modern police practices discount the importance of height, there would still be "rational support" for the height requirement. The equal protection clause requires nothing greater than "rational support." As Mr. Justice Stewart has written,

> "[The Fourteenth Amendment no longer gives courts] power to strike down state laws 'because they may be unwise, improvident, or out of harmony with a particular school of thought.' That era long ago passed into history." *Dandridge v. Williams,* 397 U.S. 471, 484–85, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (citations omitted).

On the other hand the Sixth Circuit (at 497) affirmed Judge Lambros' invalidation on constitutional grounds of a 150 pound weight requirement as having no correlation either to physical or psychological job prerequisites.

In *Mieth v. Dothard,* 418 F.Supp. 1169 (M.D.Ala.1976) (three-judge court), *aff'd in part and vacated in part on other grounds sub nom. Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), two women challenged Alabama's height requirement for state trooper and prison guard respectively. One of plaintiffs, who had applied for a position as state trooper, Brenda Mieth, had apparently not pursued

her administrative remedies under Title VII.[90] Therefore, her suit arose only under section 1983 and the Fourteenth Amendment and the District Court (at 1179) considered it only in that context. The Alabama Department of Public Safety had required that all applicants for state trooper be at least 5'9" in height and weigh at least 160 lbs. Alabama state troopers spend most of their time on traffic enforcement, especially patrolling the rural highways of the state. The District Court stated (at 1173) that "[u]nquestionably, the job is hazardous." The Department of Public Safety did not actively recruit women and the director of the Department was personally opposed to employing women as troopers. There were no female troopers employed at the time of suit. *Id.* at 1173, 1178. The Court, noting (at 1180) that under *Washington v. Davis,* the constitutional test "is not one of impact but one of intent," but that "evidence of disproportionate impact is relevant to this question of intent," that the director of the department testified that he did not believe women should be troopers, and that "the statistics * * * show that almost all women are excluded by the 5 ft. 9 in., 160 pound physical qualifications," concluded that the height-weight requirements "were intended to be discriminatory." *Id.* at 1180. Further, after reviewing expert testimony similar to the testimony in this case, the Court stated (at 1181) that "women do not need protectors; they are capable of deciding whether it is in their best interest to take unromantic or dangerous jobs" and held (at 1182) that the height-weight requirements were "not rationally related to any legitimate state interest and therefore violate the Equal Protection Clause . . . ."[91] No appeal was filed from that holding in favor of Mieth.[92]

---

**90.** The plaintiff who had applied for a position as prison guard, Diane Rawlinson, had perfected the procedural steps necessary to institute a court suit under Title VII. The three-judge district court's analysis of her Title VII claim was eventually reviewed by the Supreme Court in *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), discussed *supra.*

**91.** *See also Officers for Justice v. San Francisco Civil Service Com'n,* 395 F.Supp. 378 (N.D.

Cal.1975) cited and seemingly favorably viewed in *Mieth* (at 1181), in which Judge Peckham (at 381) wrote: "While the data tends to indicate that the height of officers is inversely related to the frequency and severity of resistance to their arrest attempts, it is too inconclusive and inconsistent to support a finding for either position."

**92.** *Dothard v. Rawlinson,* 433 U.S. *supra* at 324, n.4, 97 S.Ct. 2720.

This Court has carefully noted Judge Peck's analysis of the rationality of the police height requirement in *Smith v. Troyan, supra* and like the three-judge court in *Mieth* (at 1182), "respectfully differs" with the Sixth Circuit and agrees with the *Mieth* court that "[o]ne lesson the women's rights movement has taught us is that many long-held conceptions concerning the sexes have been found to be erroneous when exposed to the light of empirical data and objectivity" (at 1182). In the within cases, the totality of the evidence reveals that the 5'7" height requirement of the Baltimore City Police Department has been shown to be neither "rationally related" to the position of Police Officer, nor fairly and substantially related to performance of the duties of that said position. Therefore, plaintiffs are entitled to prevail herein, on the issue of the height-weight requirement, not only in connection with their Title VII challenge but also because of violation of their constitutional rights. That is true, with regard to the constitutional challenge, whether the "mid-level" or the "strict scrutiny" test is applied.

### Race Issues

While the race discrimination allegations of plaintiffs are not confined to examinations and tests, they are the core of plaintiffs' racial challenge in these cases. Accordingly, they are analyzed herein before other racial issues are considered.

### Entry-Level Examinations

Entry-level police officers in the Department are hired pursuant to a process which has several components.[93] As discussed *supra*, the Commission and the Department have joint responsibility for the hiring process. The Commission's responsibility is generally limited to the administration and, after 1977, the formulation of the written test. (CDX 7).[94] Failure to pass the written examination disqualifies the applicant from further consideration for employment.[95]

As discussed *supra* at 689–697, because of the state-city nature of the Department, the Department does not operate under the same set of personnel rules which govern the City's agencies, and the Commission does not have the same degree of control over the Department's personnel procedures as the Commission has over those procedures within City agencies. (CDX 7). As to entry-level applicants prior to 1977, the Commission's role was limited to the administration of the entry-level written examination and to the transmission to the Department of a list of eligibles who passed that examination. (CDX 7). Beginning in 1974, the Commission, in general, played a more expanded role within those confines and finally, in 1977, in the formulation and administration of the entry-level examination.

From about 1967 (PX 152) through 1976, the Commission, in conjunction with the

---

**93.** Until 1977, an applicant was required to have a high school diploma or its equivalency and successfully to pass muster under (1) a written examination, (2) a physical examination, (3) a "cursory records check," (4) an oral interview conducted by a panel of police supervisors, (5) an orthopedic qualification (*i. e.,* back x-ray), (6) a background investigation and (7) a psychological test (PX 75).

In 1977, it appears that successful applicants (*i. e.,* those given appointments) were required successfully to complete, in addition to the written and oral examinations, a background investigation, a physical examination (including a vision test, back x-ray and height and weight measures) and a psychological evaluation. Determinations with respect to all factors, other than the written and oral tests, were performed

by the Department without input from the Commission (CDX 4 at 9; App. I).

**94.** Herein, from page 93 through page 156, inclusive, citations to trial transcript are to the transcript of proceedings which were held on July 24 and 26, 1978; all exhibit references are to exhibits admitted during that said proceeding. CDX is herein sometimes used as a short reference to City defendants' exhibit; PX to plaintiffs' exhibit; and SDX to State defendants' exhibit.

**95.** The Department's Personnel Division is in charge of the hiring process once an applicant passes the written examination.

Department administered "Test No. 10," a commercially available paper-and-pencil test consisting of four different written examinations, respectively titled, Policeman Test "(10–A)," "(10–B)," "(10–C)" and "(10–D)." (PX–25–27). The parties have treated the four variations of Test No. 10 as one exam. Except for the fact that each of the four variations contains different actual test items, the tests are seemingly identical in their subject matter and testing methodology. All four variations consist of 120 multiple-choice items, which test memory, reading comprehension and skill in verbal analogies, basic mathematics and general knowledge. In the past, Test No. 10 was widely used for the selection of entry-level police officers in police departments.[96]

Plaintiffs allege that the use of Test No. 10 from 1974 through 1976 violated plaintiffs' Title VII and constitutional rights, contending that the test had an adverse impact upon black applicants and that defendants have not shown job relatedness of the test.[97]

Plaintiffs advance similar assertions with respect to the test which the Department first began to use on December 15, 1977. That 1977 examination was constructed as a part of a major criterion-related validation study which was apparently undertaken by the Department and the Commission in April 1974. (CDX 4). The project included a job analysis of the position of Baltimore City police officer and the development of written and oral examinations and job performance measures. (CDX 4).

The 1977 written test is a multiple choice examination containing 105 items: 35 items designed to measure "language skills"; 35 to measure "observational skills"; and 35 to measure "reasoning ability."[98] A "passing point" on the written component was established prior to its administration.[99] If an applicant passed the written examination given on December 15, 1977, he went on to the oral group examination[100] which was "used to determine an applicant's standing on the final list of eligibles." (CDX 4 at 6). Section 16 of the Code of Local Laws of Baltimore City requires the Commission to list successful examinees in order of their performance on the competitive examination and requires the Commissioner to select each appointee from among those standing within the first five on the list, i. e., the so-called rule of five.

During each oral group examination in January 1978, four applicants, selected at random from those being tested, watched four three-minute video-taped episodes of police intervention. Then, a member of the Commission staff, acting as the discussion leader, asked questions of, and encouraged discussion among, the four applicants (CDX 4 at 7), for about fifteen minutes after each episode. Each such discussion was observed by two police officers and a Commission staff member, all chosen at random. A total of 12 different such raters or examiners participated in the January 1978 oral examinations, i. e., five police sergeants, four police lieutenants and three Commission staff persons.

96. Thirty-one percent of police jurisdictions around the country used Test No. 10 in 1973 (Tr. 85). Apparently, the grade of 70 was the passing score on Test No. 10 during the years its use by defendants is challenged.

97. Plaintiffs seemingly attack the use of the test for the years 1972 and 1973 as well as the years 1974–76. Defendants did not maintain statistics by race for those earlier years.

98. The written component of the 1977 entry-level examination was designed for use "as a qualifying hurdle which would give some reasonable assurance that job applicants could complete the police training at the academy." (CDX 4 at 5).

99. The passing point was established at approximately 1.5 standard deviations below the mean score. The application of that standard required those who took the December 15, 1977 test to answer correctly 65 out of 105 questions in order to obtain a passing grade (CDX 4 at 8).

100. The "oral group examination" component of the 1977 entry-level examination should not be confused with the oral interview panel used in the selection procedure during the years from 1974 through 1976. The record does not reveal whether the use of oral interview panels was discontinued in 1977.

On the basis of the observed discussions in January 1978, each rater graded each applicant on the applicant's ability to (1) express ideas, (2) establish satisfactory relationships with others in the group, (3) observe and recall events in the episode and (4) reason clearly and make sound practical judgments (CDX 4 at 6).[101]

In order to pass the oral group examination, each applicant needed to achieve a predetermined score of 36 out of a possible 60. Scores of 1, 3 or 5 were awarded each applicant by each rater on each factor. Applicants who scored a minimum of 36 points on the oral component of the entry-level examination went on to the next step of the selection process.

### Promotional Examinations

Plaintiffs attack the written promotional examinations for sergeant, lieutenant and captain.[102] All of those promotional examinations were prepared by the Commission utilizing certain information provided by the Department with regard to job duties and specifications (DX 7). During and apparently after 1975, detailed job analyses were prepared by the Commission with regard to the positions of sergeant and lieutenant. Starting in 1976, the Commission did the same with regard to captain. Prior to the 1974–75 period, the sergeant and lieutenant examinations were prepared by the Commission, using references and texts made available to it by the Department. (PX 99 at 6–7; PX 152). Seemingly, over the years, a "bank" of questions was developed from which particular exam items were drawn. *Id.*

Beginning in 1975–76, all exam questions (except those pertaining to handling and evaluating subordinates) have apparently been based on materials available to and/or used on a regular basis by police officers, including, *inter alia*, General Orders, Departmental Rules and Regulations, the Manual of Procedures, a Digest of Criminal Law and Procedures and certain commercially available materials.[103] (CDX 5, 8, 9).

The Department's uniform practice both before and after the 1975–76 period with regard to all promotional examinations has been to establish a predetermined, apparently arbitrary passing score. Each candidate who passes the written examination is given seniority points and an efficiency rating. Then, those three items, *i. e.*, passing examination score, seniority points and efficiency rating, are considered together so as to establish a composite score which is weighted 40%, 5% and 15% on the basis of the written exam, seniority and efficiency rating, respectively. Thereafter, the Department's standing practice has been to place on promotion interview lists the applicants in the order of the composite scores and to interview 80, 40 and 25 candidates for sergeant, lieutenant and captain, respectively.[104] The oral interviews of promotional candidates are conducted by supervisory police personnel from other police jurisdictions without the state of Maryland. Each interviewee is given an oral interview score which is weighted 40%. The pre-interview composite score is weighted 60%. The candidates are then ranked in accordance with their final scores and promotions are made from that final list, within the rule of five.

### Experts

In support of their allegations that the entry level and promotional examinations

---

**101.** Each of the above four factors was accompanied by behavioral anchors in a rating form (CDX 4 at 6, Attachment F).

Seemingly, the raters evaluated each applicant on the basis of a total of an hour's discussion, *i. e.*, a fifteen-minute discussion followed each of the four three-minute films. *See* CDX 4 at 6 and 7.

**102.** Specifically, plaintiffs challenge the sergeant examinations administered in 1972, 1973, 1974, 1976 and 1977 (no promotional examination for sergeant was administered in 1975);

the lieutenant promotional examinations administered in 1973, 1974, 1975 and 1976; and the captain promotional examinations administered in 1972–74 and in 1976.

**103.** The record does not disclose precisely which of those materials were used in the construction of the written promotional examinations in the years before the 1975–76 period.

**104.** CDX's 5, 8 and 9 at 12.

have discriminatorily impacted upon blacks, plaintiffs have adduced substantial statistical evidence in the form of exhibits and expert testimony.

Doctors Richard S. Barrett and Alan Gittelsohn testified as experts on behalf of plaintiffs. Dr. Barrett is a recognized authority in the field of psychometrics and has testified in numerous cases which have involved the effect on minorities of examinations used as employee selection devices. Dr. Gittelsohn has held faculty positions at numerous universities and colleges and is currently and has been since 1966 a professor of biostatistics at Johns Hopkins University.

Dr. Barrett analyzed the results of Test No. 10 in 1974, 1975 and 1976; the results of the sergeant promotional examinations in 1972, 1973 and 1974; the results of the lieutenant promotional examinations in 1973, 1974, 1975 and 1976; and the results of the caption promotional examination administered in 1972–74 and in 1976.

Dr. Gittelsohn testified concerning the scores obtained by a group of blacks and whites on Test No. 10 in 1976; pass/fail data on the written component of the entry-level examination administered in 1977; and pass/fail data on the sergeant promotional examinations in 1976 and 1977. Dr. Gittelsohn further testified concerning the appointment rate for blacks and whites to entry-level police officer positions in 1976.

### Entry-Level Statistics

As to 1974, 1975 and 1976, Dr. Barrett compared the relative pass rates of black and white applicants. According to figures provided by the Commission, Dr. Barrett found that blacks taking Test No. 10 in 1974 had a pass rate that was 64% of that of whites. In 1975, black applicants passed at a rate that was 44% of the rate for whites, and in 1976, blacks taking Test No. 10 had a pass rate which was 49% of that of their white counterparts.

To test the significance of the differential pass rates of black and white applicants for entry-level and other positions in the Department, plaintiffs' experts utilized standard statistical techniques. Dr. Barrett found that the results of Test No. 10 in each of the years 1974, 1975 and 1976 were statistically highly significant. He testified that the probability of obtaining such results was less than one in 10,000,000 for each of the examinations. Dr. Gittelsohn testified that on one of the occasions, i. e., on December 15, 1976, 234 whites scored an average of 10.8 points higher than 140 blacks on Test No. 10.[105] Dr. Gittelsohn concluded that this difference was statistically significant at the .001 level. With regard to the written component of the entry-level examination administered on December 15, 1977, Dr. Gittelsohn testified that 27 of 112 or 24.11% of the black applicants failed the written component whereas 8 of 262 or 3.05% of the white applicants failed the written component. Dr. Gittelsohn testified that the difference was highly significant at the .001 level of significance.

### Sergeant Statistics

The pass rates for blacks on the sergeant promotional examination was 68% of that for whites in 1972, less than 1% of that for whites in 1973 and 57% of that for whites in 1974. Dr. Barrett found statistical significance in the results of the sergeant's examination, namely, that in 1972 the level of significance was .00003, in 1973 .0002, and in 1974 .02. As to the 1976 sergeant examination, 79 of 600 whites, or 13.17%, passed but only 2 of 129 blacks, or 1.55%, passed. As to the 1977 sergeant examination, 172 of 714 whites or 24.09% passed and only 8 of 141 blacks or 5.67% passed. Dr. Gittelsohn's opinion was that the differences reflected in the results for 1976 and 1977 were of high statistical significance at the .001 level.

### Lieutenant Statistics

Dr. Barrett made similar statistical analyses of the lieutenant promotional examinations. The results thereof differ

---

**105.** The record indicates that Test No. 10 was administered on at least four separate occa-sions during 1976: March 11, May 10, June 8 and December 15.

from those obtained from his analysis of the entry-level and sergeant examinations. In 1973, two out of twelve black candidates for promotion to lieutenant passed the written examination, a rate that was only 39% of the rate of success enjoyed by white candidates for promotion. Dr. Barrett found that that difference in pass rates was not statistically significant at the .05 level of significance. In 1974, 7 of 13 blacks passed the lieutenant·promotional examination, a rate that was almost 50% greater than the rate of white candidates. In 1975, the ratio of the black pass rate to the white pass rate was 36%. Dr. Barrett found that difference not statistically significant at the .05 level of significance. Finally, in 1976, 2 of 17 blacks passed. The pass ratio in 1976 for black as against white candidates was 40%. No statistical significance was attached to the 1976 statistics by Dr. Barrett.

Plaintiffs seek to aggregate the results of the lieutenant promotional examinations for the years 1973–76 and contend that the results of such aggregation show that blacks passed the lieutenant's examination for those years considered together at only 66% of the rate at which whites passed the examinations. However, no statistical significance is attached thereto by plaintiffs' experts.

### Captain Statistics

Plaintiffs' expert studied the results of the written captain promotional examination administered from 1972 through 1974. Using aggregate figures for those three years, plaintiffs contend that blacks passed the said examination at a rate of only 73% of that of white candidates. No statistical significance has been attached to that difference by plaintiffs' experts.[106] In 1976, blacks passed the captain's promotional examination at a greater rate than did whites.

Plaintiffs may have abandoned all claims deriving from the alleged discriminatory impact of the captain's examination. In any event, plaintiffs have failed to establish such impact.

### General Statistics

Plaintiffs produced evidence showing, according to United States Census data, that the black population of Baltimore City in 1970 was 420,210 and the white population was 479,837.[107] Between December 31, 1972 and June 28, 1978, one month before the trial in this case, the percentage of black sworn personnel in the Department rose from 13.12% to 14.39%.[108]

As of June 28, 1978, there were 19 black (5.39%) and 333 white sergeants in the Department; 6 (5.5%) black and 103 white lieutenants and 2 (12.5%) black and 14 white captains.

In addition to plaintiffs' evidence regarding the 1972–75 appointments, Dr. Gittel-

106. In 1972, both of the two blacks who took the exam passed; in 1973, both of the two blacks who took the exam failed; and in 1974, two of the three blacks who took it passed. Dr. Barrett testified that the insufficient number of black candidates who took the captain examination in 1972, 1973 and 1974 did not provide meaningful statistics for those years.

107. Data extracted from plaintiffs' exhibits Nos. 108 and 110 indicate that blacks (male and female) constituted 47.3% of the population of Baltimore City between ages 20–34 in 1970 and that blacks (male and female) constituted 28.25% of the population of the "Baltimore Urbanized Area" (that area is seemingly not defined in those exhibits) between the ages of 20–34 in 1970. Blacks (male and female) between the ages of 20–34 constituted 47% of the population in 1970 in the Baltimore Standard Metropolitan Statistical Area. See also Doc. No. 32 in Bosworth.

108. The following shows the breakdown by race of appointments to police officer and cadet positions with the Department from 1972 through 1975:

| | Appointments | | | |
|---|---|---|---|---|
| | Police Officer | | Cadet | |
| Year | Black | White | Black | White |
| 1972 | 73 | 258 | 4 | 14 |
| 1973 | 67 | 253 | 4 | 8 |
| 1974 | 56 | 265 | 10 | 10 |
| 1975 | 56 | 237 | 15 | 5 |

(PX 81–84). Cadets are high school graduates between 18 and 21 who perform police-related functions for pay and who, it is hoped, will go on to qualify for employment as, and become, entry-level officers, upon attainment of the age of twenty-one. Seemingly, a hiring freeze was in effect during all or parts of 1976 and 1977.

sohn testified that in 1976, of a total of 146 complete Civil Service applications submitted by black males, thirteen blacks or 8.9% were favorably considered and were appointed. Of a total of 467 completed applications submitted by white males, 87 or 18.6% of those applications resulted in appointments to the Department. Thus, in 1976, the appointment rate for black applicants was less than half that of white applicants.

With one exception, defendants adduced no evidence tending to cast serious doubt on the accuracy of or reliability of any of plaintiffs' calculations.[109] That exception relates to a substantial conflict in the evidence with regard to the total number of blacks who took the written component of the 1977 entry-level examination.[110] However, the resolution of that conflict is, as discussed *infra* at p. 726, not of controlling import.

### Impact

A review of all of the evidence requires the conclusion that plaintiffs have established a prima facie case of racial discrimination with regard to the use by defendants of Test No. 10—the entry-level test—from 1974 through 1976 and with regard to the written sergeant promotional examination used from 1972 through 1977. However, plaintiffs have not established a prima facie case of racial discrimination with regard to the use by defendants of the written promotional examinations for lieutenant or captain, or with regard to the 1977 entry-level examination.

### Captain Impact

As indicated *supra*, plaintiffs may have abandoned all claims relating to captains. In any event, the statistical results do not establish a prima facie case. *See* Guidelines § 4(D).[111] While it can be argued that other allegedly discriminatory examinations affected the number of blacks eligible to take the captain examination, the statistical scarcity itself causes a lack of evidence of discriminatory impact.

### Lieutenant Impact

For the years 1973–76, the black pass rate was only 66% of the white pass rate, thereby constituting "adverse impact" under the 80% rule of thumb recognized in section 4(D) of the Guidelines.[112] Nevertheless, even plaintiffs' experts attached no statistical significance thereto, since the lieutenant's data, as was the captain's data discussed *supra*, involved numbers too small upon which to rest an affirmative determination of discriminatory impact.

### Sergeant Impact

To the contrary, plaintiffs have established a prima facie case of employment discrimination by their showing of the disparate impact upon blacks of the written sergeant promotional examinations in the years 1972 through 1977 and the under-rep-

109. *See*, by way of contrast, *Guardians Ass'n of N. Y. City v. Civil Service Commission*, 431 F.Supp. 526, 541 (E.D.N.Y.1977).

110. *Compare* CDX 4 at 8 *with* PX 165 at 2. *See* the discussion at p. 726 *infra*.

111. Section 4(D), Uniform Guidelines on Employee Selection Procedures (1978), 43 Fed. Reg. 38290 (Aug. 25, 1978) ("Guidelines") provides, in pertinent part:
 A selection rate for any race, sex, or ethnic group which is less than four-fifths (⁴/₅) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact. Smaller differences in selec-

tion rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, or ethnic group. *Greater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant,* or where special recruiting or other programs cause the pool of minority or female candidates to be atypical of the normal pool of applicants from that group. * * * [Emphasis added.]
 *See* pp. 727–731 *infra* for a discussion of the role of those Guidelines in these cases.

112. *See* note 111 *supra*.

resentation of blacks within the rank of sergeant in the Department. The relevant and material facts going to the establishment by plaintiffs of the prima facie case with regard to the sergeant examination are unrebutted. Defendants, therefore, must demonstrate the job relatedness of the written examinations used during those years. That latter issue is discussed *infra*.

### 1974–76 Entry-Level Impact

■ The evidence that Test No. 10 had a disparate impact on blacks during the years 1974 to 1976 is overwhelming. That evidence includes the appointment rates of black police applicants, the applicable census figures of the black population in the Baltimore area, and the relative rates of success on the test between black and white applicants for the job of entry-level police officer with the Department. Thus, defendants must show the job relatedness of that test. That issue is also discussed *infra*.

### 1977 Entry-Level Impact

Defendants ceased by December 15, 1977 their use of Test No. 10 and began the use of a new test. As indicated *supra* at p. 725, the parties' statistics differ as to the number of blacks who took the written entry-level exam in 1977.[113] Defendants' statistics show the 1977 examination pass rate of blacks compared with the pass rate of whites at 82.7% or within the 80% rule of thumb measure of adverse impact recognized in the Guidelines.

The relative pass rates of blacks to whites on the *oral* component of the new (1977) test, according to defendants' statistics, is 76.8%, slightly below the 80% rule of thumb measure. Defendants' statistics reveal that "the relative passing rate of blacks with respect to whites for the entire exam [written and oral] is 64%."[114] But in compiling

those statistics, defendants apparently included 46 whites and 22 blacks who seemingly passed the written examination and were invited to take the oral examination, but who apparently did not appear for the oral examination.[115] Defendants do not state the reasons for the nonappearance of any of those applicants. In any event, however, applicants who did not take the oral component of the two-part entry-level examination should not be counted as though they took the oral examination and failed. Thus, the record does not contain entirely satisfactory statistics on the first use of the new 1977 entry-level examination considered as a whole. Additionally, complete statistics as to the relative appointment rates for blacks and whites who satisfactorily completed the application process in 1977 are not yet available. At the time of the conclusion of the trial of the race discrimination issues in these cases in late July 1978, a total of only 48 persons had been appointed to the Department[116] since the new test procedures were implemented in December 1977.

The use of the 1977 exam was commenced after considerable study and consideration. Analysis of the job of police officer in Baltimore City began as early as 1974. Several investigative techniques were used in that analysis. Regular meetings between Commission staff and police personnel were held; Commission staff members accompanied officers on the latter's patrol duties; staff members interviewed officers in non-patrol divisions; the Commission prepared and distributed questionnaires to police officers;[117] and police supervisory personnel verified the findings resulting from the questionnaires.

Prior to 1977, the written entry-level examination had not been constructed for the purpose of predicting an applicant's success

---

113. *Compare* PX 163 *with* CDX 4 at 8 and Appendix H of CDX 4.

114. *See* CDX 4 at 8.

115. *Id.*

116. *Id.* at 10.

117. 1353 questionnaires (of 2200 distributed) were returned to the Commission in which police officers indicated what they believed were the skills, abilities and the knowledge required for successful performance of the duties of a Baltimore City police officer.

at the police training academy. The new 1977 test was so constructed. In *Washington v. Davis, supra,* Mr. Justice White wrote (at 249–52, 96 S.Ct. at 2052, 2053):

The submission of the defendants in the District Court was that Test 21 complied with all applicable statutory as well as constitutional requirements; and they appear not to have disputed that under the statutes and regulations governing their conduct standards similar to those obtaining under Title VII had to be satisfied. The District Court also assumed that Title VII standards were to control the case, identified the determinative issue as whether Test 21 was sufficiently job related and proceeded to uphold use of the test because it was "directly related to a determination of whether the applicant possesses sufficient skills requisite to the demands of the curriculum a recruit must master at the police academy." 348 F.Supp. at 17. The Court of Appeals reversed because the relationship between Test 21 and training school success, if demonstrated at all, did not satisfy what it deemed to be the crucial requirement of a direct relationship between performance on Test 21 and performance on the policeman's job.

We agree with petitioners and the federal parties that this was error. The advisability of the police recruit training course informing the recruit about his upcoming job, acquainting him with its demands, and attempting to impart a modicum of required skills seems conceded. It is also apparent to us, as it was to the District Judge, that some minimum verbal and communicative skill would be very useful, if not essential, to satisfactory progress in the training regimen. Based on the evidence before him, the District Judge concluded that Test 21 was directly related to the requirements of the police training program and that a positive relationship between the test and training-course performance was sufficient to validate the former, wholly aside from its possible relationship to actual

performance as a police officer. This conclusion of the District Judge that training-program validation may itself be sufficient is supported by regulations of the Civil Service Commission, by the opinion evidence placed before the District Judge, and by the current views of the Civil Service Commissioners who were parties to the case. Nor is the conclusion foreclosed by either *Griggs* or *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); and it seems to us the much more sensible construction of the job-relatedness requirement.

The District Court's accompanying conclusion that Test 21 was in fact directly related to the requirements of the police training program was supported by a validation study, as well as by other evidence of record; and we are not convinced that this conclusion was erroneous. [Footnotes omitted.]

The 1977 entry-level examination had not, when trial of this case was completed several months ago, been long in use. Its impact is still not entirely discernible, and the Commission is presently engaged in studying its validity. While plaintiffs question its validity, they have not demonstrated that it has had any serious discriminatory impact. Accordingly, it would appear sensible for this Court to tread softly and to permit the parties to present, if they desire, further evidence and argument with regard to that test, at a later date, after more experience has been gained in connection with its use.

### Job-Relatedness of Entry-Level Test No. 10

 In the light of this Court's determination that entry-level Test No. 10 (the pre-1977 test) and the sergeant's promotional exam both had discriminatory impacts,[118] defendants have the burden of validating each of those tests by establishing their respective job-relatedness by convincing evidence. In a test context, Judge Newcomer wrote in *Dickerson v. United States Steel,* 472 F.Supp. 1304, 1322 (E.D.Pa.1978):

**118.** *See* pp. 725–726, *supra.*

Not only does defendant have the burden of proving that its testing procedure is job-related, by conducting validity studies, but that burden is a heavy one. Ever since *Albermarle* [sic] *Paper,* courts have closely scrutinized validity studies to ensure that they were conducted properly and fairly in all respects. In *Richardson v. Penna. Dept. of Health,* 561 F.2d [489] at 491, this Circuit's appellate court said: "(S)uch validation requires a *probing judicial review* of the choices made by those responsible for the test." (Emphasis added.) The Seventh Circuit Court stated that defendant has the burden of showing that the test has a "manifest relation" to the job in question. *United States v. City of Chicago,* 549 F.2d at 427, citing *Griggs,* 401 U.S. at 432 [91 S.Ct. 849]. That court required "convincing proof" before accepting a study or expert testimony. 549 F.2d at 432. [Emphases in original.]

A determination as to whether any test is job-related requires consideration of the applicable EEOC guidelines.

In *Griggs v. Duke Power Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 the Chief Justice wrote (at 433–34, 91 S.Ct. at 855):

The Equal Employment Opportunity Commission, having enforcement responsibility, has issued guidelines interpreting § 703(h) to permit only the use of job-related tests. The administrative interpretation of the Act by the enforcing agency is entitled to great deference. * * * Since the Act and its legislative history support the Commission's construction, this affords good reason to treat the guidelines as expressing the will of Congress. [Citations and footnote omitted.]

*See also Albemarle Paper Company v. Moody,* 422 U.S. 405, 431, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *United States v. City of Chicago,* 573 F.2d 416 (7th Cir. 1977).

In *United States v. Georgia Power Company,* 474 F.2d 906, 915 (5th Cir. 1973), Judge Tuttle observed:

[Guidelines issued by enforcement agencies] must not be interpreted or applied so rigidly as to cease functioning as a guide and become an absolute mandate or proscription. * * *

Earlier in his opinion, Judge Tuttle had stated (at 913):

We do not read Griggs as requiring compliance by every employer with each technical form of validation procedure set out in 29 C.F.R., Part 1607. Nevertheless, these guidelines undeniably provide a valid framework for determining whether a validation study manifests that a particular test predicts reasonable job suitability. Their guidance value is such that we hold they should be followed absent a showing that some cogent reason exists for noncompliance.

In *Albemarle Paper Company v. Moody, supra,* a class of current and former black employees at defendant's paper mill attacked, *inter alia,* defendant's program of employment testing under Title VII. Mr. Justice Stewart, noting that the District Court had found that the tests in issue "have undergone validation studies and have been proven to be job related," wrote (at 430–31, 95 S.Ct. at 2378):

The EEOC has issued "Guidelines" for employers seeking to determine, through professional validation studies, whether their employment tests are job related. 29 CFR Part 1607. These Guidelines draw upon and make reference to professional standards of test validation established by the American Psychological Association. The EEOC Guidelines are not administrative "regulations" promulgated pursuant to formal procedures established by the Congress. But, as this Court has heretofore noted, they do constitute "[t]he administrative interpretation of the Act by the enforcing agency," and consequently they are "entitled to great deference." *Griggs v. Duke Power Co.,* 401 U.S. at 433–434, 91 S.Ct. 849, 28 L.Ed.2d 158. See also *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973).

The message of these Guidelines is the same as that of the *Griggs* case—that discriminatory tests are impermissible un-

less shown, by professionally acceptable methods, to be "predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." 29 CFR § 1607.4(c).

Measured against the Guidelines, Albemarle's validation study is materially defective in several respects:

\* \* \* \* \* \*

In the course of so holding, and of disagreeing with the District Court, Mr. Justice Stewart specifically concluded that the studies in *Albemarle* failed their purposes because they—

(1) did not validate tests for all of the job groupings, resulting in an "odd patchwork of results" (at 432, 95 S.Ct. 2362);

(2) did not include carefully elicited and precisely articulated job performance measures (at 433, 95 S.Ct. 2362);

(3) did not determine whether, despite "[t]he fact that the best of those employees working near the top of a [job grouping] score[d] well \* \* \* that test, or some particular cutoff score on the test, is a permissible measure of the minimal qualifications of new workers entering lower level jobs" (at 434, 95 S.Ct. at 2379, 2380);

(4) did not validate the tests for new, inexperienced and nonwhite workers, but rather, validated the tests only for "job-experienced, white workers" (at 435, 95 S.Ct. 2362),

all in derogation of the mandates of the then existing EEOC Guidelines. Mr. Justice Stewart also observed (at 433 n.32, 95 S.Ct. at 2379 n.32):

It cannot escape notice that Albemarle's study was conducted by plant officials, without neutral, on-the-scene oversight, at a time when this litigation was about to come to trial. Studies so closely controlled by an interested party in litigation must be examined with great care.

In *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), Mr. Justice Rehnquist held that a private employer did not violate Title VII by adopting a disability plan which compensated employees for all temporary disabilities except those related to pregnancy. As to contrary guidelines of the EEOC,[119] Mr. Justice Rehnquist wrote (at 141–42, 97 S.Ct. at 411):

\* \* \* The most comprehensive statement of the role of interpretative rulings such as the EEOC guidelines is found in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), where the Court said:

"We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the counts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."

The EEOC guideline in question does not fare well under these standards. \* \* \*

*General Electric* does not of course stand for the proposition that none of the EEOC guidelines are of import. Rather, *General*

---

**119.** Disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth, and recovery therefrom are, for all job-related purposes, temporary disabilities and should be treated as such under any health or temporary disability insurance or sick leave plan available in connection with employment. . . . [Benefits] shall be applied to disability due to pregnancy or childbirth on the same terms and conditions as they are applied to other temporary disabilities. [29 CFR § 1604.10(b) (1975).]

*But see Nashville Gas Co. v. Satty*, 434 U.S. 136, 142 n.4, 98 S.Ct. 347, 410, 54 L.Ed.2d 356 (1977).

*Electric* simply represents an application of the previously stated standards in *Griggs* and *Albemarle* that, in order for particular parts of the EEOC or any other guidelines to be of controlling or substantial effect, they must in and of themselves correctly interpret the statutorily enacted law. The thought is expressed on the other side of the coin by Chief Judge Fairchild in *United States v. City of Chicago,* 573 F.2d 416, 427 (7th Cir. 1978), in which he wrote that "[c]ompliance with [EEOC] Guidelines is generally required absent some showing that a cogent reason exists for non-compliance."[120]

In *Washington v. Davis,* 426 U.S. 229, 248 n.13, 96 S.Ct. 2040, 2051, 48 L.Ed.2d 597, Mr. Justice White commented:

It appears beyond doubt by now that there is no single method for appropriately validating employment tests for their relationship to job performance. Professiona standards developed by the American Psychological Association in its Standards for Educational and Psychological Tests and Manuals (1966), accept three basic methods of validation: "empirical" or "criterion" validity (demonstrated by identifying criteria that indicate successful job performance and then correlating test scores and the criteria so identified, "construct" validity (demonstrated by examinations structured to measure the degree to which job applicants have identifiable characteristics that have been determined to be important in successful job performance); and "content" validity (demonstrated by tests whose content closely approximates tasks to be performed on the job by the applicant). These standards have been relied upon by the Equal Employment Opportunity Commission in fashioning its Guidelines on Employee Selection Procedures, 29 C.F.R. pt. 1607 (1975), and have been judicially noted in cases where validation of employment tests has been in issue. See, e. g., *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 431, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Douglas v. Hampton,* 168 U.S.App.D.C. [62] at 70, 512 F.2d [976] at 984; *Vulcan Society v. Civil Service Comm'n,* 490 F.2d 387, 394 (C.A.2 1973).

On August 25, 1978, approximately one month after the conclusion of trial in these cases, the EEOC, the U.S. Department of Justice, the U.S. Department of Labor, and the U.S. Civil Service Commission published Uniform Guidelines on Employee Selection Procedures (1978), 43 F.R. 38290 (August 25, 1978) which became effective on September 25, 1978. Those Guidelines, with a few modifications and clarifications, were the same as the proposed Guidelines published before trial in these cases. 42 F.R. 65543 (December 30, 1977). Defendants have stressed that their evidence of job-relatedness under the *Griggs-Albemarle* standards is related to those Guidelines.

Defendants have not themselves conducted any validity study. Nor have they stated any reason why they did not do so.[121] However, defendants' expert, Mr. Bemis, introduced documentary evidence[122] and testified concerning validity studies conducted in other police departments in other locales. Defendants seek to borrow or, to use the professional jargon, to "transport" such other studies to Baltimore City. In *Dickerson, et al. v. United States Steel Corp., et al.,* 472 F.Supp. 1304 Civil Action

---

**120.** *See also Allen v. City of Mobile,* 464 F.Supp. 433 (S.D.Ala.1978) (applying the present EEOC Guidelines).

**121.** Section 15(A)(3)(a)(v) of the Guidelines provides that users of selection devices may, in lieu of presenting documentation of validity evidence, present evidence "showing why a validity study cannot or need not be performed and why continued use of the procedure is consistent with federal law." In *Washington v. Davis, supra,* a validation study of the District of Columbia police force entry-level test was performed in accordance with *Griggs-Albemarle* standards. It revealed a significant correlation between scores attained by applicants on that examination, on the one hand, and success in the department's police academy, on the other hand. The District Court relied, *inter alia,* on that study in entering summary judgment for defendants. The Supreme Court affirmed.

**122.** *See* CDX 2, 3.

Nos. 73–1292, 74–2689 (E.D.Pa. Aug. 2, 1978),[123] one of three validation studies introduced by the corporate defendant with regard to the plant in issue in that case was apparently "borrowed" from another of defendant's plants in a different area of the country. After noting that defendant offered that borrowed study "only as corroborative" (at 60) of the two studies which defendant had conducted at the plant in issue, the District Court declined to rely (at 61–62) upon the borrowed study because of its failure to comply with then existing EEOC guidelines relating to "transportability." In *Dickerson,* the two studies at the plant under attack were undertaken after the litigation commenced; the borrowed study was conducted and completed prior to that litigation in order to provide guidance to defendant at the other plants. In the cases at bar, defendants themselves conducted no validation studies. Of the studies of others which defendants seek to "transport," some were undertaken prior to commencement of the within litigation, while others took place thereafter. In any event, any study, regardless of how, why, when or by whom made, is of little support to defendants because the record fails to disclose that any such study was itself conducted in accordance with the appropriate guidelines. Further, even if the said other studies relied upon by defendants were conducted in accordance with such guidelines, they are of little aid to defendants unless their transportability is established pursuant to the guidelines.

Mr. Bemis testified that the test scores on Test No. 10 given in six other locales [124] correlated with success in police academies. However, no validity study of any police department's use of Test No. 10 was itself introduced into evidence in these cases. Nor did Mr. Bemis, who did not bring any validity studies to the trial courtroom with him, reveal *any* details of any of such studies.

Section 9A of the Guidelines provides:

*No assumption of validity.—*

Unacceptable substitutes for evidence of validity. Under no circumstances will the *general reputation* of a test or other selection procedures, its author or its publisher, or *casual reports* of its validity be accepted in lieu of evidence of validity. Specifically ruled out are: assumptions of validity based on a procedure's name or descriptive labels; all forms of promotional literature; data bearing on the frequency of a procedure's usage; testimonial statements and credentials of sellers, users, or consultants; and other nonempirical or anecdotal accounts of selection practices or selection outcomes. [Emphasis added.]

On cross-examination, Mr. Bemis was referred to that guideline and engaged in the following colloquies with plaintiffs' counsel:

Q. Now, do you also agree under those circumstances, general repetition [sic] of tests, what have you, won't be used as (A) points out?

A. As a sole criteria, yes, sir. [Tr. 402].

\* \* \* \* \* \*

Q. My question to you, sir, and I don't want to belabor this, do you know of any written authority, any of the guidelines that we have mentioned today that you have supplemented or anything else that would permit you to do that: that is take other experts' opinions and use them as a portion to form your own conclusions?

A. I think it is an acceptable procedure.

Q. By whom, where?

A. If you want to take a break and allow me to review the standards and so forth, perhaps I could find some wording that would support that. [Tr. 453].

Mr. Bemis also testified along these lines as follows (Tr. 438):

As it should be clear from the report, there was job descriptive information

---

**123.** *See* p. 727, *supra.*

**124.** Those locales are Columbus, Ohio; Denver, Colo.; New Orleans, La.; Wayne, Mich.; State of Minnesota and one unidentified police jurisdiction. *See* CDX 2, 3.

available from only one of those jurisdictions and there was not complete evidence to make a transportability study of validity for those jurisdictions. I think there is evidence of job relatedness when the body of studies are taken together, but I certainly would agree with the implication that the information available here by itself is not sufficient from those jurisdictions to transport the validity. That is not my statement, however, with regard to the other study reported [the neighboring jurisdiction study discussed *infra*].

One of the exhibits introduced by City defendants,[125] and testified to by Mr. Bemis, describes still another study, this one conducted during 1972–73 by the Selection Consulting Center in Sacramento, California. That 1972–73 study involved 83 jurisdictions in the states of California and Nevada. Mr. Bemis described it as "comprehensive" but said little in detail about it. Defendants emphasize, however, that persons from the nonprofit organization which originated and published Test No. 10 themselves participated in the California-Nevada study. Mr. Bemis stated that "[o]ne of the two tests that were found to be very predictive of police officer success was developed specifically for the [California-Nevada] project by the publisher of Test No. 10." Again, details are lacking. The same is unfortunately true of a validation study referred to by Mr. Bemis which was undertaken by persons at the University of Chicago. The City of Baltimore participated in that study with San Diego, California; El Paso, Texas; Indianapolis, Indiana and Washington, D. C. and state police agencies in Maryland, Alabama, Arizona, Illinois and New Mexico. No other information is provided; indeed it is not entirely clear that the Chicago study was undertaken for purposes of evaluating Test No. 10 [126] and the record does not disclose when it was made.

Testimony by an expert that Test No. 10 is in wide use within this country, together with conclusory expressions of opinion by an expert witness, is insufficient to establish validity and job-relatedness. *Cf. Albemarle Paper Company v. Moody, supra* 422 U.S. at 428 n.23, 95 S.Ct. 2362; *United States v. City of Chicago,* 549 F.2d 415, 432 (7th Cir. 1977), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1978); *Watkins v. Scott Paper Co.,* 530 F.2d 1159, 1188 (5th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976); *Friend v. Leidinger,* 446 F.Supp. 361, 369 (E.D.Va.1977), *aff'd,* 588 F.2d 61 (4th Cir. 1978).

Defendants also rely upon one additional study,[127] namely one conducted by psychologists connected with the University of Maryland relating to the validity of Test No. 10 for use in a police jurisdiction in Maryland located not far from Baltimore City. That study was seemingly conducted in two parts. The first related to 443 police officers who were hired, at least in part, on results based on Test No. 10. The second part seemingly involved between 72 and 74 [128] trainees, 48 white and 24 black, which allegedly demonstrated significant correlations between Test No. 10 scores and, apparently performance at the academy. Plaintiffs stress that the study, or at least one part of it, involved job-experienced police officers, and contend that that part of the study is a concurrent validity study. Defendants argue, to the contrary, that both parts of the study are predictive criterion-related studies. Those terms have been explicated as follows in the American Psychological Association's Standards for Educational & Psychological Tests [129] (at 26):

---

125. CDX 2 at 5.

126. Mr. Bemis testified that data from the Chicago study has been collected and that the results would be available shortly. However, no such results have been submitted to date to this Court.

127. Counsel, by agreement among themselves, have disclosed the name of the jurisdiction involved, only on a sealed basis for use of this Court and any appellate Court having jurisdiction in connection with these cases.

128. *See* CDX 3 at 6.

129. PX 158–C.

Criterion-related validities apply when one wishes to infer from a test score an individual's most probable standing on some other variable called a criterion. Statements of predictive validity indicate the extent to which an individual's future level on the criterion can be predicted from a knowledge of prior test performance; statements of concurrent validity indicate the extent to which the test may be used to estimate an individual's present standing on the criterion. The distinction is important. Predictive validity involves a time interval during which something may happen (e. g., people are trained, or gain experience, or are subjected to some treatment). Concurrent validity reflects only the status quo at a particular time. Under appropriate circumstances, data obtained in a concurrent study may be used to estimate the predictive validity of a test. However, concurrent validity should not be used as a substitute for predictive validity without an appropriate supporting rationale.

Both parts of the study would appear to be predictive criterion related ones. However, in any event, the study considered as a whole or in two separate parts would not seem to measure up to the standards promulgated by the Guidelines.

Section 14(B)(4) of the Guidelines require that "sample subjects should insofar as feasible be representative of the candidates normally available in the relevant labor market for the job or group of jobs in question and should insofar as feasible include the races, sexes, and ethnic groups normally available in the relevant job market." In section 15(B)(6), the Guidelines require that the following information on the sample be provided:

A description of how the research sample was identified and selected should be included (essential). The race, sex, and ethnic composition of the sample, including those groups set forth in section 4A above, should be described (essential). This description should include the size of each subgroup (essential). A description of *how the research sample compares*

*with the relevant labor market or work force,* the method by which the relevant labor market or work force was defined, and a discussion of the likely effects on validity of differences between the sample and the relevant labor market or work force, are also desirable. Descriptions of educational levels, length of service, *and age are also desirable.* (Emphasis added)

Section 14(B)(3) (Criterion measures) of the Guidelines state:

Proper safeguards should be taken to insure that scores on selection procedures do not enter into any judgments of employee adequacy that are to be used as criterion measures. Whatever criteria are used should represent important or critical work behavior(s) or work outcomes. Certain criteria may be used without a full job analysis if the user can show the importance of the criteria to the particular employment context. These criteria include but are not limited to production rate, error rate, tardiness, absenteeism, and length of service. A standardized rating of overall work performance may be used where a study of the job shows that it is an appropriate criterion. Where performance in training is used as a criterion, success in training should be properly measured and the relevance of the training should be shown either through a comparison of the content of the training program with the critical or important work behavior(s) of the job(s), or through a demonstration of the relationship between measures of performance in training and measures of job performance. Measures of relative success in training include but are not limited to instructor evaluations, performance samples, or tests. Criterion measures consisting of paper and pencil tests will be closely reviewed for job relevance.

Section 15(B)(5) states:

The bases for the selection of the criterion measures should be provided, together with references to the evidence considered in making the selection of criteri-

on measures (essential). A full description of all criteria on which data were collected and means by which they were observed, recorded, evaluated, and quantified, should be provided (essential). If rating techniques are used as criterion measures the appraisal form(s) and instructions to the rater(s) should be included as part of the validation evidence, or should be explicitly described and available (essential). All steps taken to insure that criterion measures are free from factors which would unfairly alter the scores of members of any group should be described (essential).

Mr. Bemis did not identity the information that demonstrates " * * * the basis on which the [job] behaviors were determined to be important"—a requirement which the Guidelines describe as essential. § 15(B)(3).[130] Further, neither Mr. Bemis' written nor his oral testimony provides any information with regard to the labor pool available in the neighboring jurisdiction.

Mr. Bemis did state that in 1975, 28% of the candidates for the neighboring jurisdiction's Police Department were black and that in 1977, 38% of the candidates taking the Baltimore City police examination were black. Mr. Bemis did reveal the criteria used in the study in the neighboring jurisdiction.[131] However, "the basis for the selection of the criterion measures," see Guidelines § 15(B)(5), quoted supra, is not revealed.

Seemingly, the criteria used were combined and correlations were based on the relationship of the test scores and those combined criteria. However, the evidence does not reveal the rationale for the underlying combinations or whether individual criterion measures were appropriately weighted in the composites.

Commissioner Pomerleau's testimony does not provide " * * * the bases for the selection of the criterion measures." See Guidelines § 15(B)(5), quoted supra. Indeed, Pomerleau's testimony only points

**130.** Section 15(B)(3) provides, in relevant part:

Where a job analysis is required a complete description of the work behavior(s) or work outcome(s), and measures of their criticality or importance should be provided (Essential). The report should describe the basis on which the behavior(s) or outcome(s) were determined to be critical or important, such as the proportion of time spent on the respective behaviors, their level of difficulty, their frequency of performance, the consequences of error, or other appropriate factors (Essential). * * *

**131.** Those criteria were:

A. Police Rating Scale Item—This is a trait rating scale utilized by the police department for its periodic evaluations. The first rating after becoming an officer was utilized. The traits covered by this rating scale are knowledge, effect on workers, promptness, responsibility, accuracy, quality, initiative, application, promotion, and dealing with public.

B. Commendations—This criterion consisted of a count of the number of commendation letters to the officer from the chief of police.

C. Awards of Merit—These are presented to some officers for particularly outstanding behavior.

D. Complaints—This is a count from the complaint file within the personal folder of the number of different complaints filed against the officer regardless of the disposition of the complaint.

E. Number of Penalties—This is a count of the number of penalties such as fine, suspension, loss of leave, assessed for violations of departmental policy or regulation.

F. The Final Training Grade—This is the score determined by the training division of the police department based upon an average score for a number of sub-tests given throughout the course, a comprehensive final examination, and physical fitness. The sub-tests received a rating of .80 and the final exam a factor of .20.

G. Accidents—This is a count of the number of police related vehicle accidents.

H. Forced Choice Rating Scale—This scale was developed specifically for the research project and it resulted from the extensive job analysis done as described above.

I. Checklist Rating Scale—This rating scale also resulted from the extensive job analysis described above, and the reader is asked to read a phrase describing an officer and indicates how well it fits the officer being rated.

J. Ratings of Field-Training Officer—Field-training officers who have the responsibility for working with the recruit once he finishes academy school rated the officers on the forced choice and checklist ratings described above.

CDX 3 at 9–10.

up the critical need to exercise care in the selection of the criteria.[132]

Mr. Bemis testified (Tr. 92) that the authors of the neighboring jurisdiction study examined Test No. 10 for fairness. Guidelines § 15(B)(8).[133] However, no evidence of test fairness, i. e., in this instance, comparison of test scores of blacks and whites versus their respective job performances, was presented other than Mr. Bemis' stamp of seeming approval upon the conclusion of the psychologists who conducted the study that Test No. 10 was fair. As related supra,[134] the cutoff score on Test No. 10 was 70%. The record fails to reveal the relevance of that cutoff point either to the neighboring jurisdiction or to Baltimore City. See Guidelines § 15(B)(10).[135]

In sum, the evidence presented with regard to the neighboring jurisdiction study, both considered separately and together with all other evidence, does not constitute a showing by defendants of the job-relatedness of Test No. 10. Accordingly, that test, because of its discriminatory impact, was utilized by defendants in violation of Title VII.

### Job-Relatedness of Sergeant Promotional Examination

Defendants have sought to demonstrate the job-relatedness of the sergeant examination by content validation. See Washington v. Davis, 426 U.S. 229, 248 n.13, 96 S.Ct. 2040, 48 L.Ed.2d 597, quoted supra at p. 730. In United States v. City of Chicago, 573 F.2d 416 (7th Cir. 1978), Chief Judge Fairchild, in remanding to the District Court, wrote (at 425-26):

What is required on remand is for the district court to ascertain from the job analysis the various functions of the job of captain and then analyze the captain's exam to determine whether these various functions are tested in proportion to their importance. It is not enough, therefore, that the various functions of a captain are tested—there must be a correlation between the importance of a job function as determined by the job analysis and the weight given to this function on the examination. Without such findings comparing the job analysis to the test itself, no decisions can be made on whether the captain's examination is content valid.

In Firefighters Institute for Racial Equality v. City of St. Louis, 549 F.2d 506 (8th Cir. 1977), cert. denied, 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1978), Judge Ross, after referring to the Supreme Court's express approval in Washington v. Davis, supra at n.13, of all three methods of professionally validating written examinations,

132. By Mr. Winik [counsel for City]:
Q. Commissioner, you heard Steven Bemis testify earlier about validity studies and measures of success of police officers and I would just now like to ask you whether you have an opinion—and if counsel will indulge me what that opinion is—as to whether or not the following things I am going to ask are reasonable measures of success for police personnel. The first would be supervisor's evaluations. Is that a reasonable measure of success?
A. It is an essential part of it.
Q. All right. The presence of commendations; is that a reasonable measure of success?
A. It is material to the issue.
Q. The absence of complaints?
A. Very important provided the individual has any level of productivity.
Q. Right.
The absence of motor vehicle accidents?
A. That depends on which deputy commissioner you talk to. It is material, but not significantly so.
Q. All right. Awards of Merit?

A. Material, very material.
Q. The absence of penalties or disciplinary actions?
A. That is extremely important. * * *
[Emphases added.]

133. That section of the Guidelines provides, in pertinent part:
Studies of test fairness should be included where [technically feasible] (essential). These studies should include the rationale by which a selection procedure was determined to be fair to the group(s) in question. * * *

134. At p. 721 n.96.

135. Section 15(B)(10) provides, in pertinent part:
If the selection procedure is used with a cutoff score, the user should describe the way in which normal expectations of proficiency within the work force were determined and the way in which the cutoff score was determined (essential).

stated that, when properly done, a content validity approach is acceptable to show job-relatedness of a fire captain's promotional examination. As is true with regard to the position of sergeant in this case, the fire captain position at issue in the Eighth Circuit case was a first-level supervisory job. 549 F.2d, *supra* at 509. Judge Ross upheld the lower court's finding that the job analysis conducted by defendants' expert was adequate, but reversed (at 511) the district court's ultimate finding that the examination was job-related because the examination failed to test "the one *major* job attribute that separates a firefighter from a fire captain, that of supervisory ability" (emphasis in original). The evidence produced in the district court in the St. Louis case showed that "43% of a fire captain's time was spent in supervision, a higher percentage of time than on any other single element." Id. at 511. Judge Ross concluded by noting (at 512):

> The job analysis here may have appeared impressive in relation to those challenged in other cases, but a good analysis in any situation is of little use when the examination fails to reflect what is found in the job analysis. The test is not *content* valid. In short, even a common sense concept of content validity, aside from EEOC and APA Standards, requires that an important and distinguishing attribute be tested in some manner to find the best qualified applicants. Here, where the exam failed to test a job component comprising over 40 percent of the employee's time, the inference of discrimination has not been rebutted with a finding of the exam's "job-relatedness."

In *Bridgeport Guardians, et al. v. Bridgeport Police Department,* 431 F.Supp. 931, 936–940 (D.Conn.1977), Judge Newman scrutinized a professionally conducted content validity study and subsequent examination construction and concluded that the examination used as a selection device for detectives in the Bridgeport, Connecticut Police Department was content valid. The job analysis in that study identified (at 936) "twenty categories of tasks, within each of which 10 to 20 specific tasks" were detailed. A subject matter checklist was completed, and of the 52 subject matter areas, "14 were selected as being most pertinent to the duties of Bridgeport detectives, and percentages (5, 10, 15, or 20) were assigned to each of the selected areas to reflect the percent of exam questions to be devoted to each area." Id. The percentages were determined based on a consideration of "time spent at the several tasks and their importance." Id. at 936. Questions were carefully selected from a bank of 4,000 police examination questions based on considerations of the size of the community involved and the difficulty of the questions "as evidenced by results of prior use in other communities." Id. Finally, "a reading index developed by a recognized language expert to determine the degree of reading difficulty," id., was applied to both the exam and the exam instructions.

In the *Bridgeport* case, 431 F.Supp., *supra* at 934, the applicable governmental rules established a passing score of 75%. In view of that, the experts who constructed the examination structured the test in such a way that a candidate who obtained the required score, "at least in theory . . . would have scored at least seven points [136] better than the national average of detective candidates tested on the same questions." Id. at 939. The Court approved (at 940) that approach after comparing it to approaches in cases in which cutoff scores based on (1) the highest level permitted by law, (2) a level to meet known needs and (3) arbitrary selection, were criticized. Id. at 940.

One such case was *Officers for Justice v. Civil Service Commission of the City and County of San Francisco,* 371 F.Supp. 1328 (N.D.Cal.1973) in which Judge Peckham concluded that defendants' use of a written promotional examination for sergeant in

---

**136.** Defendants' expert testified in the *Bridgeport* case that the "seven-point margin above the national average is needed to provide a 'reasonable likelihood' of success on the job." Id. at 939.

the San Francisco Police Department violated plaintiffs' constitutional rights, and wrote (at 1338):

In terms of content validation, defendants had made some efforts to relate examination questions to information presumably related to successful performance of the sergeant position. Police captains selected a number of books on police practices and formulated questions for the promotion-level examinations based on the contents of the books. The police department supplied candidates with a bibliography of the works from which examination questions were drawn. Essentially, the examinations are achievement tests, measuring the ability of the candidates to read and remember material from volumes on police work, sociology, and related fields. Defendants contend that these procedures equal a job analysis guaranteeing content validity. They argue that the police officials responsible for constructing the examinations evaluated the requirements of the job positions and attempted to select materials directly related to those requirements.

Defendants contentions are erroneous on at least three grounds. First, the police did not engage in a thorough job analysis in the correct sense of the term. Their informal studies do not satisfy the provisions of the EEOC Guidelines, see 29 C.F.R. § 1607.5, and, in the opinion of the court's expert, do not provide sufficient basis for any type of validity study. Second, the construction of the examination does not reveal the careful attention to the selection of questions necessary to insure that the examination accurately tested candidates' knowledge, skills, or attitudes. The police officials followed no consistent methodology in selecting material for the examination. The court's expert testified that he could not ascertain the psychometric justification for presenting certain questions concerning specific areas of social science knowledge. He joined with plaintiffs' experts in the conclusion that the types of skills measured by the questions on the examination, including reading ability and rote memorization ability, do not include all or most of the skills that empirical studies have found relevant to the performance of police work. In effect, the sergeant examination simply requires a detailed knowledge of the contents of less than a dozen books. In contrast, successful performance of the sergeant position demands a variety of skills and traits which the sergeant examination fails to consider. Third, defendants provide no evidence that the cut-off score for passing the examination has any relation to job performance. Defendants' witnesses testified the score was selected arbitrarily. The Court's and plaintiffs' experts agreed that many of the candidates who "failed" the examination might still be qualified for a supervisory position. Without a proper job analysis and a validity study, it is simply impossible to determine what kind of examination and what cut-off score would truly separate the qualified from the unqualified. In this respect, the promotion-level sergeant examination violates the explicit standard of the EEOC Guidelines. See 29 C.F.R. § 1607.6. Clearly, the promotion-level sergeant examination has not been established as a validated test.

Analysis and study of the sergeant's promotional tests at issue herein and related documents reveal that two staff members of the Baltimore Civil Service Commission conducted interviews with nine incumbent sergeants to gather information about the job of sergeant. The interviewees identified the required knowledges, skills and abilities and the duties involved. Knowledges required by the job were classed as "basic, good, thorough or extensive." Abilities and skills were simply listed. Members of the Commission's staff prepared a "content validity chart" in which the identified knowledges, skills and abilities are linked to the duties. Nine sergeants, nine lieutenants and nine commanders from the Department reviewed the "content validity chart" (CDX 5, App. II) to determine (1) what knowledge, skill and/or ability must be possessed at the time an officer is pro-

moted to sergeant; (2) whether those knowledges, skills and/or abilities should be included in a written test; (3) the weight to accord to each of those knowledges, skills and/or abilities; [137] and, finally (4) the importance of "every element * * * for identifying superior workers." That information is recorded in the "Job Element Rating Form" (CDX 5, App. IV). Additionally, there was a further review by Baltimore City Police officials with the rank of major or above. Thereafter,

> [u]sing the results of the "Job Element Rating Form" all knowledges, skills, and abilities identified by the police sergeants were rated as to their relative importance by the test analysts using a three point scale of (1) critical, (2) intermediate, and (3) insignificant. All material considered for inclusion in the test is related to those knowledges, skills, or abilities that were identified as being critical to satisfactory performance of the police sergeant job.[138]

However, the record does not appear to include any description of "the results of the 'Job Element Rating Form.'" That form does not speak for itself. Neither of the two Commission staff persons who conducted the job analysis,[139] nor any of the 27 police officials who completed the form itself, testified at trial; nor did Mr. Bemis, who was not a participant in the job analysis, explain "the results of the 'Job Element Rating Form.'" Column one shows that the 27 police officials who completed the form were not in total agreement as to whether certain particular knowledges,

skills or abilities were necessary "at the time of promotion to Sergeant." Thus, for example, all 27 officers believed that a "good knowledge of General Orders" was necessary, but only 16 of them believed that a candidate for promotion to sergeant needed the "ability to compile crime statistics" at the time of promotion. Column two of the "Job Element Rating Form" required each respondent to indicate whether the column one knowledges, skills and abilities should be tested on a written examination. The number of responses in column two were fewer for each of the 41 knowledges, skills and abilities included on the form than the number of responses in column one. In column three, the respondent assigned a "relative weight" to the items from column two ("should be tested"). The weights were numerical scores from 1–10. Seemingly, the only instruction given to the officers who completed the form was to "give the highest weight to those elements which you feel should be given the most emphasis in a test, then weight [sic] other elements proportionately." Seemingly, the weights so assigned were added together and averaged, although neither the form nor the narrative description in the body of City defendants' exhibit 5 states that that is what was done. Thus, for example, it appears that although all 27 respondents thought that a "good knowledge of general orders" was necessary for promotion to sergeant, only 25 (column two) thought this knowledge should be tested on the examination, and those 25 assigned an average weight to this knowledge of "8." Similarly,

137. A numerical weight of from 1 to 10 was assigned to each of those knowledges, skills and/or abilities.

138. CDX 5 at 4.

139. Plaintiffs' exhibits Nos. 98 and 100 are the depositions of the two staff persons from the Commission who conducted the job analysis for the sergeant examinations. One of those persons graduated from college in 1934 with an undergraduate degree in Music. She testified on deposition that she had one course at the University of Maryland in 1956 or 1957 dealing with tests and test measurements and in addition certain unspecified training courses. PX 100. The other staff person became a permanent employee of the Commission in July 1975.

At the time of the job analysis for sergeant in February 1975, he was employed by the Commission "in the public service employee program." PX 98 at 2. He did not start working "in the testing area" until July 1975. Prior to that time he had no experience in testing. He received his bachelor's degree (in History) from Columbia University in January or February 1975, after leaving the University in 1971 at the completion of his first three years there. In the summer of 1975, he attended a number of training sessions, which apparently lasted one day each and which dealt with the development of multiple-choice test questions. He attended one other day-long session "in testing." PX 98 at 6.

of the 16 respondents who thought a candidate for promotion to sergeant should have the "ability to compile crime statistics," only two thought this ability should be tested and the average weight was determined to be 5.66. However, it appears that the 5.66 average weight for the ability to compile crime statistics was the product of nine, rather than the expected *two,* responses to column three. Thus, for 29 of the 41 knowledges, skills and abilities listed on the form, the number of the 27 respondents who completed the form and assigned a weight to a particular knowledge, skill or ability exceeded the number of respondents who, in column two, indicated that that particular knowledge, skill or ability should be on the test in the first place. Indeed, for one knowledge, "First Aid," 23 of the 27 respondents thought the knowledge was necessary for promotion to sergeant (column one), and only 21 thought that that knowledge should be tested in the first place. Nevertheless, 24 of the 27 assigned some weight to that knowledge. The average weight so assigned by the 24 is shown as 5.70.

Only nine of the respondents indicated in column two that the examination should test for the "ability to work effectively with a wide range of people." However, 12 of the officers weighted that ability for emphasis on the test, the average weight so assigned being 8.41.

Column four of the "Job Element Rating Form" required the respondents to "indicate how important every element listed below is for identifying superior workers." While much of column four cannot be read because of the poor copy of the exhibit, it appears that the analysts simply counted the number of respondents who believed that the particular knowledge, skill or ability was either "Essential," "Useful" or "Does not distinguish."

In sum, the job analysis procedures used in connection with the "Job Element Rating Form" are questionable. Equally troubling in regard to the "job analysis" is the content validity chart itself. The job analysts rated the "relative importance" of the knowledges, skills and abilities as (1) critical, (2) intermediate and (3) insignificant. However, the content validity chart lists as "(1) critical" *all* of the knowledges, skills and abilities that the analysts concluded were necessary to the performance of the corresponding duties of police sergeants. It appears that the *only* knowledge, skill or ability *not* included in the written test was the "ability to drive defensively." The examination did test for the "ability to function well in stressful situations." Review of the form and of the chart would not seem to demonstrate clearly the relationship between the "results of the Job Element Rating Form" and the "Content Validity Chart." The job analysis procedures described *supra* formed the basis for the preparation of the sergeant's promotional examination. The job analysts themselves wrote the exam questions based on the material provided to them by the Department.[140] Questions were classified to fit into one of the following categories: Patrol Operations, Investigations, Supervision and Administration, Criminal Law, and Handling and Evaluating Subordinates.[141] Only one part of the test is an actual sample of work on the job: report reviewing.[142] After each examination, a panel of police majors and captains held a meeting to enable the examinees to criticize allegedly "bad questions." Such "protest" meetings may have been organized for and attended only by blacks.

The original underlying documentation for the above-described job analysis and test construction procedures was accomplished in 1975. Defendants assert that "[t]he approach used in 1972, 1973, and 1974 to put together a Sergeant's promotional

---

**140.** *See* n.103 *supra.*

**141.** No indication appears in the record as to the source of the test material covering Handling and Evaluating Subordinates.

**142.** In 1975, six of 110 questions covered report reviewing. In eacn of 1976 and 1977, five of the 110 did so. Two such questions in the 1976 sergeant examination were not scored.

examination for the City of Baltimore police is the same as was used in 1975, 1976, and 1977." [143] The record does not disclose whether separate job analyses were completed prior to the administration of any sergeant promotional test in any year other than 1975. The record does disclose, however, that the sergeant test for each such year was separately constructed.

Mr. Bemis presented, in City defendants' exhibits 5 and 6 at 4, a separate job analysis for 1972 ("verified" job analysis) and for 1978 ("confirmed" job analysis). Mr. Bemis states that he met with the three police officials who performed the verification function with regard to the 1972–74 period in early July 1978, about two weeks prior to the commencement of the trial of the race issues in these cases, "to determine whether it would be reasonable to conclude that the statements made * * * for the years 1975, 1976 and 1977 might reasonably be extended to the earlier years." CDX 6 at 1. On that same day, Mr. Bemis also met with those same three officials together with three additional officials. Those six officials performed the 1978 confirmation functions referred to *supra*. Mr. Bemis has referred to all six as "subject matter experts." With certain "additions and modifications," the "subject matter experts" concluded that the job of sergeant had changed little between 1972 and 1975, and 1975 and 1978. Mr. Bemis, in City defendants' exhibits 5 and 6, ranked, in their order of importance, the job duties and the corresponding knowledges, skills and abilities for the year 1972 and also for the year 1978. Mr. Bemis compiled those rankings from the ratings of the job duties and corresponding knowledges, skills and abilities made by the three "verifiers" and the six "confirmers." Mr. Bemis computed a rank order correlation between the 1972 ratings of duties and the 1978 ratings of duties.[144]

Mr. Bemis' conclusion was that "there was not a great deal of change in the relative importance of duties of Baltimore City Police Sergeants over the years 1972 and 1978" and that "the ranking of the relative importance of the knowledges, skills, and abilities for 1972 and 1978 was identical." [145] No study was made of the relationship between the duties identified in 1975, when the actual job analysis was undertaken, and the duties identified either in 1972 or 1978. Also, the 1972 "verifiers" and the 1978 "confirmers" added the following four duties to the list of duties for 1972 and 1978, respectively:

| Duty | Importance | Major Reason(s) |
|---|---|---|
| Checks to see that Police are not becoming involved with personal hazards of the job (crime, women). | 1.3 | Consequences of error |
| Evaluates and documents Officer's fitness to work, checking for any emotional stress that would interfere with job. | 1.3 | Consequences of error |
| Counsels Officer's family/ marital problems. | 1.3 | Consequences of error, Difficulty, Time |
| Assures compliance with directives/laws. | 1 | Time |

Under Mr. Bemis' rating scales, 1 = most important, 2 = very important, 3 = important and X = little or no importance. Thus, it would appear that the four duties which, according to Mr. Bemis' "confirmed" job analysis for 1978 and "verified" job analysis for 1972, are and were among the most critical of all of a sergeant's duties, were not identified in the 1975 job analysis and do not appear on the content validity chart from which the sergeant promotional examinations have allegedly been developed. The significance of that deficiency is indicated by the fact that in the 1972 "veri-

---

143. CDX 6 at 1.

144. The "verifiers" and "confirmers" seemingly rated each 1975 duty, knowledge, skill and ability for 1972 and 1978, respectively, based on four factors: time, difficulty, frequency and consequences of errors. Those indicia of importance apparently are taken from § 15(B)(3) of the Guidelines which is quoted *supra* n.130.

As discussed *supra*, the neighboring jurisdiction criterion-related study does not disclose measures of criticality or importance. Further, the rating system used in the 1972 "verification" and in the 1978 "confirmation" are to be contrasted with the procedures actually used in 1975.

145. CDX 6 at 2.

fication," only four of the remaining 23 duties were rated at 1.3 or higher, and in the 1978 "confirmation," only one of the remaining 22 duties was so rated. No linkages were demonstrated by defendants between those added duties identified by Mr. Bemis in his confirmation and verifications on the one hand, and corresponding knowledges, skills or abilities on the other hand. It would therefore appear that none of the sergeant promotional examinations at issue tested the promotional candidates for the relative presence of any of the unidentified knowledges, skills and abilities.

There remains for discussion insofar as the sergeant's test is concerned, the use and choice of the cutoff score of 70. City defendants explain that score as merely "a need to winnow the number of candidates taking the examination down to a manageable number. . . ."[146] However, the applicable Guideline states in pertinent part at § 15(C)(7):

> * * * If the selection procedure is used with a cutoff score, the user should describe the way in which normal expectations of proficiency within the work force were determined and the way in which the cutoff score was determined (essential). In addition, if the selection procedure is to be used for ranking, the user should specify the evidence showing that a higher score on the selection procedure is likely to result in better job performance.

Plaintiffs' expert, Dr. Barrett, in rebuttal testimony, criticized at length defendants' approach to content validity and the adequacy of the job analysis which formed the basis of the sergeant examinations.[147] He noted the importance of knowing "not only what is done [on the job] but . . . the importance of what is done and the [required] skill level."[148] Indeed, Dr. Barrett challenged the employment by defendants of the content validity approach. In so doing, he pointed out that the Guidelines caution against reliance upon content valid-

ity under certain circumstances, and state, in part, at § 14(C)(1):

> A selection procedure based upon inferences about mental processes cannot be supported solely or primarily on the basis of content validity. Thus a content strategy is not appropriate for demonstrating the validity of selection procedures which purport to measure traits or constructs, such as intelligence, aptitude, personality, commonsense, judgment, leadership, and spatial ability. Content validity is also not an appropriate strategy when the selection procedure involves knowledges, skills, or abilities which an employee will be expected to learn on the job.

Dr. Barrett's criticism in those regards seems to suggest that what one shows one knows by correctly answering a question on a written examination is not an adequate demonstration that one's behavior will be appropriate in practice and also that the opportunity to learn a job while doing the job makes overemphasis upon a content validity approach a poor basis for establishing validity of a selection device for a position such as Sergeant. Dr. Barrett suggested the need to minimize the "inferential leap" from knowledge to performance. That view is seemingly shared, at least in part, by the drafters of the Guidelines. In comments appearing with the published guidelines, the drafters have written:

> 8. *Content validity.* The Division of Industrial and Organizational Psychology of A.P.A. correctly perceived that the provisions of the draft guidelines concerning content validity, with their emphasis on observable work behaviors or work products, were "greatly concerned with minimizing the inferential leap between test and performance." That division expressed the view that the draft guidelines neglected situations where a knowledge, skill or ability is necessary to an outcome but where the work behavior cannot be replicated in a test. They recommended that the section be revised.

**146.** CDX 5 at 12.

**147.** Tr. at 483–496.

**148.** Tr. at 486.

We believe that the emphasis on observable work behaviors or observable work products is appropriate; and that in order to show content validity, the gap between the test and performance on the job should be a small one. We recognize, however, that content validity may be appropriate to support a test which measures a knowledge, skill, or ability which is a necessary prerequisite to the performance of the job, even though the test might not be close enough to the work behavior to be considered a work sample, and the guidelines have been revised appropriately. On the other hand, tests of mental processes which are not directly observable and which may be difficult to determine on the basis of observable work behaviors or work products should not be supported by content validity.

Thus, the Principles for the Validation and Use of Personnel Selection Procedures (Division of Industrial and Organizational Psychology, American Psychological Association, 1975, p. 10), discuss the use of content validity to support tests of "specific items of knowledge, or specific job skills," but call attention to the inappropriateness of attempting to justify tests for traits or constructs on a content validity basis.

Nevertheless, the content validity approach is one which Mr. Justice White in *Washington v. Davis, supra* at 248 n.13, 96 S.Ct. 2040, found acceptable. Accordingly, defendants' reliance upon it would not seem in and of itself to be misplaced, though defendants' stress upon it, under the circumstances, hardly rebuts all of the other evidence in these cases which negates the job-relatedness of the sergeant promotional examination. In short, defendants have not established such job-relatedness. Accordingly, since defendants' actions have had a racially discriminatory impact upon black applicants for the position of sergeant,[149] those in that subclass are entitled to Title VII relief in these cases.

*Examinations—Constitutional Violations*

■ The question remains whether plaintiffs have demonstrated that defendants' use of any tests, including the entry-level and sergeant promotional examination, constitute intentional discrimination and thus violations of plaintiffs' constitutional rights. Plaintiffs' expert, Dr. Barrett, testified that he found no evidence of purposeful or intentional discrimination as to any of the tests in issue. It is of course true that the raw data which discloses the racially discriminatory impact of the entry-level and sergeant tests was in the records of the defendants and clearly available to them. It is also true that defendants could have more vigorously inquired about certain of the tests and that careful scrutiny of the results of those tests should have alerted defendants to have checked further and to have discovered the extent of their racially discriminatory impact. But under *Washington v. Davis,* that without more, does not show intentional discrimination. Additionally, in this case, there is some specific evidence which negatives a conclusion that defendants acted intentionally racially to discriminate. Intent is always hard to prove. None of us can look inside of the other person's mind.[150] But in these cases, there is some evidence, with regard to promotions of sergeants and others, that defendants took other affirmative steps, such as the holding of special study sessions and other actions,[151] to increase the number of blacks to be promoted. There is also evidence that defendants did in good faith believe in the propriety of all examinations used by them. Finally, unlike the imposition of the height-weight requirements discussed *supra,* defendants' use of the written examinations was substantially related to defendants' dual objectives: to select qualified persons *and* to do so nondiscriminatorily. Indeed, there is evidence—some of it related more specifically *infra*—that there was an overall good faith determination by the Commissioner and other top-ranking

---

149. *See* p. 725 *supra.*

150. *Cf.* 1 Devitt & Blackmar § 14.13.

151. *See* pp. 750, 751 *infra.*

Department officials to increase black Police Department employment at all levels and to eliminate racial discrimination. In sum, plaintiffs have not established that defendants intentionally engaged in any discriminatory conduct, either through the use of examinations or otherwise, and thus have not proven conduct violative of the federal Constitution. There follows a review of non-examination racial discrimination alleged by plaintiffs, but not, in this Court's opinion, proven herein.

### Intentional Race Discrimination

Deputy Commissioner Robinson, a black, called to the witness stand by defendants, testified, in part, as follows (Tr. at 346–47):

By Mr. Rubenstein [counsel for State defendants]:

Q. Commissioner Robinson, you are not telling the Court today that all is well in the Baltimore Police Department, are you?

A. No, I am not saying all is well in the Baltimore Police Department. There is room for improvement.

Q. But has an effort been made?

A. In my opinion more improvement has been made in the Baltimore Police Department since 1966—I entered the department when it was blatantly segregated.

THE COURT: That was when again?

THE WITNESS: That was 1952. When I entered the police department blacks were required to work in restricted areas, that is, predominantly black areas. I was not allowed to be assigned to a radio car. We were restricted as far as transfers as well. I never realized—having not been allowed to ride in a radio car—that I would command all of them at one time, that I would ascend through the organization to a rank where I would command all of the radio cars in the service having not been allowed to ride in one when I came here.

There were racial epithets made openly on the floor at roll call. I went through a great deal of turmoil. It was not easy. I paid my dues, I should say, but I never gave up. I always aspired to promotion. As a result of that motivation, I suspect itself motivated achievement, I was able to ascend through the ranks. I earned every rank by merit. I never went to anybody for any favors. I passed all the promotional examinations with a great deal of self-sacrifice and study and it paid in the end because I was in fact promoted to each and every rank within the department. Now I am the only black in the department to have achieved the rank I hold, and I cannot be promoted any further.

THE COURT: Now, you have mentioned the date you started with the Baltimore City Police Department, back in 1952.

THE WITNESS: Yes, Sir.

THE COURT: We are now in '78.

THE WITNESS: Yes, Sir.

THE COURT: You have also mentioned the date 1966.

THE WITNESS: Yes, Sir.

THE COURT: Would you comment with regard to the period 1962 to 1973 and then the period 1973 to 1978 and tell me whether you, in the light of the comments that you have just made in the last three or four or five minutes—I believe, that there are differences between the '66 and '73 period and the '73 to '78 period, and if so, what they are?

THE WITNESS: Well, number one, from '62 to '66—

MR. RUBENSTEIN: Your Honor, I am sorry, you used two different dates. I am not sure whether you did it consciously.

THE COURT: I said '53. If I did I misspoke. The four dates I meant to use: '52, the year you started, right, '52 to '66, and I used that because that is the date Commissioner Pomerleau testified that he started; '73, I use that because that is when two of the three cases that are before the Court were filed; and '78 because that is where we are now. If I misspoke, please consider the question in the light of this last explanation I am just completing.

THE WITNESS: I understand. Referring to the period 1952 to 1966 I have indicated that discrimination against blacks during that period was rather blatant, rather open.

THE COURT: Did it change much during that period?

THE WITNESS: There were minor changes as we progressed. When I came into the department in '52 there were approximately 50 or 60 black officers. As we progressed into the 60's a few more blacks came into the department and there were three blacks transferred in 1954 I believe to Detective Bureau at that time. That sort of opened the door for blacks to work in other areas other than the districts.

Around 1957 there was a black appointed a Sector Sergeant who is now deceased. He assigned blacks to radio cars. I think it has already been testified to that one of the officers assigned to a radio car in another district, but not by that particular individual, was the first to work a radio car. So it was around 1957 or shortly thereafter that blacks began to be assigned in various units throughout the police department but were still not assigned to all of the units within the department.

Shortly thereafter, a black man was assigned to the Traffic Section, and then on a gradual basis blacks began to be assigned to various units. Somewhere in that particular area one black was promoted to Lieutenant and he was assigned to the Detectives, and we had our one black Sergeant assigned to a district; that is to supervise a sector.

Then a black man was promoted to Captain, the first black was promoted to Captain I believe prior to 1966, and he headed the Western District. As we then progressed from '66 to seven—of course in '66 we acquired a black Major, a lateral entry. He headed the newly created Community Relations Division. Then we gained a little impetus, I would say, after 1966. I had been promoted to Sergeant in '64. Of course, by '66 I suspect we had about half a dozen black Sergeants. A few of whom were assigned to districts. I was assigned to the Narcotics Squad at that time as a supervisor.

After 1966 Mr. Pomerleau came, and I requested to be transferred to the Training Division. I had an audience with Mr. Pomerleau at that time. We had never had an audience with the police commissioner up to that date and there was an objection to that transfer to the Training Division by the Director of the Training Division at that time.

THE COURT: What was your rank?

THE WITNESS: I was a Sergeant. I laid my qualifications on the table and they matched the qualifications of anyone assigned to the Training Division and Commissioner Pomerleau ordered me to be assigned there. So I was the first black to be assigned to the Education and Training Division as an instructor. That came about in 1967.

I remained in the Training Division then until '69 when I was promoted to Lieutenant and was permitted to remain there as Assistant Director. Now, during that time we acquired another black Major who was Director of the Youth Section. We had also acquired at the time I was promoted—we acquired two, three blacks who were promoted to Lieutenant at the same time. We still had one black Captain at that time and maybe three or four Lieutenants and several Sergeants. Blacks then began to be assigned to various other divisions which had not been open to them in more numbers than ever before. So by 1971 when I was promoted to Captain I was the second black in the history of the police department to be promoted to that rank.

By that time we had two black District Captains, and shortly thereafter another black was promoted to Captain and we had a total of three, so by '71 or the latter part of '71 or early part of '72 we had three black Captains, a number of Lieutenants, Sergeants, and blacks were assigned to almost, but not all, units within

the agency. The only units at that time to which blacks were not assigned was the Inspectional Services Division, which I recommended a black be assigned there and it was, and maybe one or two other units, smaller units, but in the larger units blacks were assigned as well as civilians were assigned to all units, the majority of units within the agency maybe with the exception of one or two.

Then I would suspect that our momentum—our greatest momentum occurred between the years '69 and '73 because in '73 or shortly before '73 we had a black promoted to Lieutenant Colonel. He had the Traffic Division. That was in '73, as a matter of fact.

By Mr. Rubenstein:

Q. If I may interrupt, is that the gentlemen that Commissioner Pomerleau testified that was "stolen by the government"?

A. Yes.

Q. Go ahead.

A. Then in 1974 I suspect at that time we made our greatest strides in that there were at that time two black District Commanders, the Director of Community Relations was black, the Director—there was a black Deputy Chief of Patrol and I was promoted to Chief of Patrol, so I suspect during the period from 1971 to 1974 we had made our greatest strides. Then from '74 to '78, we accomplished a bit more in that two other blacks have now been promoted to the rank of Captain. There are only four blacks in the history of the police department who have been promoted to Captain and that is the highest Civil Service rank. In 1968, of course, I was promoted to Deputy Police Commissioner which is the highest rank ever held by a black, so the majority of those promotions were brought about during the period 1966 to 1978. Prior to 1966 there were probably only about ten blacks in supervisory positions. Today I suspect the number is around 30.

Q. Commissioner, the Court had asked you—if I may interpret the Court's question—whether or not these promotions or this increased involvement of blacks from '73 to '78 had to do with the filing of this suit?

THE COURT: I didn't ask that question, but I had that in mind.

By Mr. Rubenstein:

Q. I think I read the Court correctly. Could you comment on what you think was the cause of the promotions made from '73 to '78?

A. I would not have any knowledge to that effect.

THE COURT: Do you have any opinion to that effect?

THE WITNESS: My opinion would be that the promotions made from 1973 to date I would suspect were made on merit.

THE COURT: But have you noticed any differences in either policies, practices, attitudes or the like since this—the first of these three cases was filed on or about November 12, '73?

THE WITNESS: I think policies have been expanded, but the policy originally was non-discriminatory; that is from '66 to present, but I suspect that those policies have been expanded during that period.

THE COURT: Have they been expanded more rapidly since '73 than before or has it been a steady progression from '66 to '78? In other words, has the upward climb line been more rapid and straight up from '73 than it was from '66 to '73, or would you say the line had been a steady line from '66?

A. I would say it has been a steady line, but I would have to qualify that. It has been steady in that the Commissioner's policy has been one of career development. It was reiterated to me that there are certain individuals within the agency with managerial potential that I desire to develop, so these individuals had to be spotted in various assignments to allow them to grow within the organization and develop the managerial ability to assume higher managerial ability, so in that light I would say it is a steady growth, but by

the time you reach 1973, there are more blacks now qualified to assume higher positions and I would suspect that would be the impetus for the more rapid ascension of blacks during that period of time.

Robinson also testified at some length concerning changes which occurred subsequent to Pomerleau's becoming Commissioner, and described specific and concrete programs and policies instituted subsequent thereto (Tr. 354, 359–61, 367). Nevertheless, it is not possible to conclude that there are presently no residual effects remaining from the pre-1966 discriminatory policies. The importance of those effects, when weighed against "a history of past discrimination,"[152] cannot be ignored. But the steps which have been taken since 1966 and continue to be taken by defendants would appear to be appropriately and sufficiently designed and implemented to bring the Department within the requirements of law insofar as intent and purpose are concerned.

In *Harper v. Mayor*, 359 F.Supp. 1187 (D.Md.), *modified and aff'd*, 486 F.2d 1134 (4th Cir. 1973), Judge Young concluded that the effects of racial discrimination in the Baltimore City Fire Department continued long after the official discriminatory policies had ended and noted (at 1203) that the Fire Department had continued to factor seniority as 10% of the candidate's composite score and that the Fire Department had also continued to require that a firefighter, in order to be eligible to take the promotional examination for lieutenant, have served five years in the Department. Each successive step above the grade of lieutenant required two years, as opposed to five years, in grade in the next lower position. Thus, those who joined the ranks of the Fire Department after the earlier discrimi-

natory policies ended, found that those on board ahead of them continued to have a large edge insofar as promotional opportunities were concerned. By contrast, in the Police Department, a police officer, who like a firefighter is at entry-level, is eligible for promotion to the next grade (sergeant) after three years of service[153] and then from sergeant to lieutenant and from lieutenant to captain after one year in grade (Tr. 293). Also, by contrast, in the Police Department, seniority is factored in at no more than 5% (1% per year) for promotion to any grade up to captain. Further, six months "in grade" in the Police Department is counted as ½ of 1% up to the maximum factor of 5%. Thus, each ½ year gives to a person on board less than five years an extra ½% per half-year. That enables the gap to be closed more rapidly than would be the case if adjustments occurred only annually.

In sum, the Police Department places less stress upon seniority than did the Fire Department at the time of *Harper*.[154] The stress that the Police Department does place upon seniority would not appear out of line at this time.

### Officers in Charge

■ Plaintiffs also attack the practice known within the Department as "Officers-in-Charge" or "O.I.C." An O.I.C. performs the duties of a sergeant, a lieutenant or a captain when the sergeant, lieutenant or captain has a day off. (Tr. 259–62). Under Departmental policy, a sergeant, a lieutenant or a captain is held responsible and accountable for the actions of the men under his command while he is off-duty and for the selection of an officer to act in his place, i. e., the O.I.C. (Tr. 262–63).[155]

---

**152.** Quoted from *United States v. Dillon Supply Company*, 429 F.2d 800, 804 (4th Cir. 1970).

**153.** The three-year period, established by Pomerleau, superseded an earlier five-year requirement (Tr. 293). The fact that a police officer must be in grade for three years before he can be eligible for promotion to sergeant means that each candidate for promotion to sergeant starts with at least a 3% seniority factor.

**154.** As to seniority, *see generally Patterson v. American Tobacco Co.*, 586 F.2d 300 (4th Cir. 1978) and its discussion of *Teamsters* and other Supreme Court opinions.

**155.** State defendants exhibit Nos. 6 and 7 are the General Orders in which the official Departmental policy regarding O.I.C. practices is set forth. Exhibit 7, General Order No. 69–77, was issued on December 2, 1977 and superseded General Order No. 71–13, which was issued on

Plaintiff Nesbit, a named plaintiff in *Vanguard* and a black, was selected as O.I.C. only "four times in almost ten years" (Tr. 180). Nesbit testified that he filed a written grievance (Tr. 181) against his sergeant in July 1972 after his sergeant consistently selected another officer as O.I.C. Seemingly, a meeting was held, between Nesbit, his sergeant and the shift commander, to discuss the sergeant's O.I.C. practices. However, before anything was done, the shift commander was promoted and transferred and the issue was apparently dropped. Nesbit testified that thereafter he was selected as O.I.C. "maybe once every four, five, six months, something like that."

Nesbit also stated that notwithstanding policy standards to the contrary,[156] there were permanent, rather than rotating, O.I. C.'s in his squad. Nesbit conceded, however, that of the twenty or twenty-five black officers in his district, four of them acted regularly as O.I.C.'s (Tr. 182–83).

Pomerleau, defending existing O.I.C. policy (Tr. 259–63), stressed that two important Departmental objectives are served by the O.I.C. policy which he instituted: (1) reduction of the need for a larger number of supervisors (Tr. 260); and (2) provision of supervisory experience to enable persons to ready themselves for promotion (SDX 7). Pomerleau also noted that "there is nothing mandatory" (Tr. 261) about the directive that "OIC assignments may and should be rotated among personnel when practical." (SDX 7). Robinson testified on cross-examination that he had received two complaints regarding the operation of the O.I.C. system and that both of those complaints had been satisfactorily resolved (Tr. 377). There is little or no evidence, direct, statistical or other, that blacks are systematically or routinely excluded from selection as O.I.C. At most, there is some evidence that individual black police officers believe that they have been discriminatorily denied opportunities to act as O.I.C. When such black officers have lodged such complaints, those complaints have been fairly processed and handled (Tr. 377; SDX 7).

June 22, 1971. The two General Orders are substantially identical in content.

General Order 69–77 states in pertinent part:

REQUIRED ACTION

I. Commanding Officers shall have the mandated responsibility to comply with the following guidelines when selecting personnel under their commands to be assigned as an OIC.

A. The opportunity to work in an OIC capacity shall be open to all qualified officers. Qualified officers shall be interpreted to mean the individual: ·

Has displayed leadership qualities.

Is able to organize his work and competently complete assignments.

Has demonstrated sufficient job knowledge.

Expresses a desire to do the job.

B. OIC assignments may and should be rotated among personnel when practical, to include but not be limited to those persons on active promotional lists.

II. Immediate supervisors shall have the mandated responsibility of developing subordinates to assume the role of OIC. The following concepts shall be considered by immediate supervisors in this process:

A. The transition from subordinate to supervisor is not automatic.

B. Do not assume by virtue of the fact subordinates are performing satisfactorily at their present assignment that this is an indication of their capacity to perform in the same manner as an OIC. Subordinates may lack those attributes essential to be an effective supervisor.

C. By your own example attempt to develop supervisory attributes in all of your subordinates.

D. When a subordinate has demonstrated that he will be able to assume supervisory responsibilities, the immediate supervisor shall:

Give that subordinate the opportunity to perform as an OIC.

Tell the subordinate what is expected of him in his assignment as an OIC.

Encourage the subordinate to seek your advice.

Check the subordinate's performance regularly and review his performance as an OIC and inform the subordinate of how he is performing.

Record the amount of time spent as an OIC so that it will be accounted for and assessed in the subordinate's Performance Evaluation and Promotional Potential Reports.

III. Where possible the immediate supervisor may and should rotate OIC assignments among his most capable officers to avoid developing an indispensable officer by concentrating on only one individual.

156. *See* the General Order set forth in n.155 *supra*.

### Promotions Above Captain

■ There remain questions concerning promotions to rank above captain—promotions which are totally tied to subjective determinations. The problem inherent in any subjective hiring and promotion criteria has oft been recognized. Thus, writing in *Barnett v. W. T. Grant Company,* 518 F.2d 543, 549–50 (4th Cir. 1975), Judge Craven noted: "Nonobjective hiring standards are always suspect because of their capacity for masking racial basis [sic]."

However, that comment was surely not intended to establish an absolute standard. In *Rogers v. International Paper Company,* 510 F.2d 1340, 1345–46 (8th Cir.), *vacated on other grounds,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975), Judge Ross observed:

Greater possibilities for abuse, however, are inherent in subjective definitions of employment selection and promotion criteria. *Yet they are not to be condemned as unlawful per se, for in all fairness to applicants and employers alike, decisions about hiring and promotion in supervisory and managerial jobs cannot realistically be made using objective standards alone.* Thus, it is especially important for courts to be sensitive to possible bias in the hiring and promotion process arising from such subjective definition of employment criteria. The EEOC guidelines, the Executive Order program, and the courts have all established the requirement of, and in most cases a measure for, examining subjective hiring and promotion criteria. At the very least, it is necessary to identify the goals underlying the subjective criteria through a job analysis. Examination of those goals might reveal underlying personal biases or discriminatory stereotype classifications. *See, e. g.,* EEOC Dec. No. 72–0721 (Dec. 27, 1971). 4 FEP Cases 439 (1972). It may additionally appear that subjective preference is accorded factors which are discriminatory, as for example, education accomplishment when such is not shown to be related to job performance, a history of arrest records, a history

of wage garnishment, or personal references that are nepotistic or culturally biased. If there is any evidence of a discriminatory policy, courts have in the past closely circumscribed and even rejected practices of personal interviews, supervisory recommendations, and other subjective hiring criteria.

(Footnotes omitted; emphasis added).

Citing *Rogers* with approval, Judge Tuttle, sitting by designation in *Sweeney v. Board of Trustees of Keene State College,* 569 F.2d 169, 176 n.14 (1st Cir.), *vacated on other grounds,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) wrote:

In "blue collar" employment situations courts have tended to view subjective criteria with suspicion. For example, in *Rowe v. General Motors Corp.,* 457 F.2d 348 (5th Cir. 1972), a black employee complained that his promotion hinged on receiving a favorable recommendation from a foreman, all of whom were white. The Court of Appeals for the Fifth Circuit recognized that subjective criteria contain "no safeguards . . . to avert discriminatory practices" and provide "a ready mechanism for discrimination . . much of which can be covertly concealed." *Id.* at 359. * * *

Of course, subjective evaluations are essential in certain positions. *See Rogers v. International Paper Co.,* 510 F.2d 1340 (8th Cir. 1975) (subjective criteria not unlawful per se). Judicial tolerance of subjective criteria seems to increase with the complexity of the job involved. * * *

Pomerleau's authority to appoint persons to "exempt" positions in the Department derives from Code §§ 16–7(3) and 16–10(d).[157] Those provisions were unchanged by 1976 Md.Laws ch. 920.

On cross-examination, Pomerleau testified that when he selects a top-rank officer, he looks for

A man demonstrating ability, willingness to work, general overall good character, one that is not looking for something that is going to be handed to him, an

---

**157.** *See* n.49, *supra* at 690–691 and p. 692.

individual that has good family background, generally can reflect in the Department professionalism, not have any problems in his background that surfaces after I select him as a high-ranking official to run the agency and one that knows the particular discipline that I am looking for.

(Tr. 281).

When Pomerleau assumed control of the Department in 1966, he increased the number of exempt positions from nine to twenty-one (Tr. 279). Before 1966, there were no blacks among those nine persons. Between 1966 and 1970, two blacks were appointed to exempt positions. (Tr. 280–81, PX 56). By 1972, three blacks had been so appointed, three remained in 1974 and, by 1975, five blacks were among the then thirty incumbents in exempt positions. (PX 57–60). Although several of the white persons appointed to exempt positions by Pomerleau were hired from outside the Department, all of the blacks so appointed were promoted from within the Department. Indeed, in one instance, Pomerleau promoted a black lieutenant to an exempt position, skipping him over the rank of captain (Tr. 280–81).

Bearing well in mind Judge Craven's admonition in *Barnett* to make as certain as possible that nonobjective standards do not mask a racial purpose or result, there is little or no evidence that Pomerleau has exercised his broad discretionary powers to select officers above the rank of captain on anything other than a basis of merit.[158]

Not one single individual has complained that he was discriminatorily denied an exempt position. Nor has any such individual been named or identified.

Judge Stapleton observed in *Scott v. University of Delaware,* 455 F.Supp. 1102, 1129–30 (D.Del.1978):

Lending further support to the hypothesis that the hiring procedures in the post-Act period have not been tainted with racial bias is a very significant gap in plaintiff's evidence. Despite the voluminous testimony in this case, not one individual has been identified who claims to have been discriminated against in the hiring process on grounds of race, and, as earlier indicated, at least one of plaintiff's witnesses familiar with the University scene over a substantial period of time testified that he knew of no black who had been interested in employment with the University and who had been unfairly denied a job opportunity. While I realize that a plaintiff in a disparate impact case is entitled to rely solely on statistics, the absence of any identified victim is nevertheless significant.

Plaintiffs have not shown any racial discrimination in connection with the selection or selection practices relating to grades above captain.

### Initial Assignments

■ Plaintiffs have raised but seemingly have not vigorously pressed claims of discriminatory initial assignments. In that regard, plaintiffs introduced a series of Personnel Orders (PX 137–51) upon which black graduates of the police training are identified by asterisks. However, plaintiffs have not offered any statistical or other analysis of those exhibits, which themselves do not seem to reveal any discernible pattern of discriminatory racial assignments. One officer, Lieutenant Freeman, testified that the Department did not discriminate in its initial assignment of personnel (Tr. 162). While Nesbit did testify that more black officers are assigned to certain districts than to certain other districts (Tr. 206), plaintiffs fall far short of proving discriminatory entry-level assignments.

### Transfers and Reassignments

■ Two witnesses testified concerning alleged discriminatory transfer and assignment practices in the Department. Nesbit testified that he filed a formal request for a transfer on five different occasions without success (Tr. 184). Barnett Brooks, a former officer with the Department and now a practicing attorney in Maryland, also com-

---

**158.** *See, e. g.,* plaintiffs' exhibit numbers 57–60, 67, 68, 70, 72, 74.

plained about having been denied a transfer because of race.

Plaintiffs also point out that up to the time the *Vanguard* case was filed on November 12, 1973, there had been no blacks assigned to the fugitive unit, the helicopter unit, the background investigation unit, the arson squad and the staff inspection section of the Inspection Division. Defendants controverted these contentions by the testimony of Deputy Commissioner Robinson that only three units, staff inspection, helicopter and arson squad, had no blacks in 1973. According to Robinson, transfer requests are reviewed by the commander of the unit to which the individual requesting the transfer desires to be reassigned and, generally, according to Robinson, those requests are granted provided the individual meets the "standards and qualifications" of the officer to whom the request is directed and provided a "suitable replacement" is available (Tr. 360). That testimony would appear to vary somewhat from General Order 66--12 issued August 26, 1966 (PX 86) which sets forth the transfer policy and procedures in existence at the time Pomerleau become Commissioner.[159] However, there was no testimony that the procedures applicable in 1966 are currently in force.

A review of the entire record discloses that the Department's official policy, whether as stated in plaintiffs' exhibit No. 86 or as described at trial by Robinson, is neutral on its face and applies to blacks and whites alike. Robinson testified that he personally has interceded in a number of instances for blacks who made known to him their dissatisfaction with the handling of a transfer request, and that those inquiries have convinced him that none of those transfer request denials were based upon race (Tr. 379). Plaintiffs assert, relying on Nesbit's testimony, that transfer denials, ostensibly because of lack of "suitable replacement," have been based upon a practice of transferring blacks on a one-to-one basis (Tr. 185), *i. e.*, a black could only be transferred provided another black was available to replace the officer requesting the transfer. Robinson, however, flatly refuted that claim (Tr. 360) which would appear conclusory and unproven in this case. Pomerleau testified that he assigned Lieutenant Melvin Freeman when the latter was a sergeant to the Education and Training Division so that Freeman, by himself teaching classes of trainees, could better prepare himself for the challenge presented by the next written promotional examination for lieutenant (Tr. 255–56). Freeman, in his testimony, acknowledged the beneficial effects on his career of certain reassignments he obtained (Tr. 163–64).

Similarly, Barnett Brooks received certain desirable reassignments in the course of his career with the Department but not all of the reassignments he requested. Brooks took particular issue with (1) the failure of the Department to transfer him to the Education and Training Division or to the Legal Affairs Division after he received his law degree and (2) the action of

---

**159.** General Order 66–12 (PX 86) states:

During this transitional period of reorganization, routine requests for transfer should be held to a minimum, and priority must be given to those transfers which will assist in the reorganization of the department.

Requests for transfer should be made to the Commanding Officer of the individual desiring a transfer, and this should be forwarded with the comments of the Commanding Officer to the Deputy Commissioner of the respective Bureau in which the individual requesting transfer is presently assignêd. After the Deputy Commissioner of that Bureau has noted his comment, the request will be sent to the Commanding Officer of the Unit to which the transfer is requested for comment, and then to the Deputy Commissioner of that Bureau.

When the requests has been reviewed and commented upon by the aforementioned supervisory personnel, it will be sent to the Deputy Commissioner of the Administrative Bureau for processing. All requests will receive a reply based upon the comments of supervisory personnel concerned. This will be done by the Director of Personnel. Requests will not be held at any level more than five working days.

If transfers cannot be made at this time because of the requirements of reorganization, it will be the duty of the Personnel Division to keep an index of such requests so that insofar as possible, future reassignments and transfers can be made in accordance with the requests of personnel.

the Department in transferring him to a patrol unit from the detective unit after he received his law degree. (Tr. 333–37; PX 166, 167). According to Brooks, the Department's actions were contrary to the Commissioner's stated policy of encouraging and rewarding those officers who pursued formal education while at the Department.

However, Brooks was the beneficiary of numerous Departmental policies during his tenure. Thus, Brooks was reimbursed, pursuant to Department policy, for a part of his expenses in obtaining his law degree. Brooks also was given the opportunity to utilize that degree by working with the Commissioner's legal advisor in proceedings before the state legislature (Tr. 554), although he (Brooks) estimated that less than 10% of such work was legal in nature (Tr. 555). Brooks was also given time off in excess of the normal compensatory time rate for the time he spent working with the Commissioner's legal advisor (Tr. 556) so that he could use such time off to prepare for the bar examination (Tr. 556). Brooks' performance in the Department was seemingly laudable with one exception, which he candidly testified about at trial. That exception concerned an incident with a citizen while Brooks was driving to work one morning. (PX 169; Tr. 567). Brooks' contention on direct examination that he never received responses to his formal requests for transfers to the Education and Training Division and to the Legal Affairs Division was reluctantly modified by him when he was confronted on cross-examination with certain documents from his personnel file (Tr. 550–53). In sum, the weight of the evidence does not disclose racial discrimination against Brooks. Nor have plaintiffs otherwise proved any prevailing discriminatory policies or practices involving any given individual, or generally, insofar as transfers and reassignments are concerned.

*Recruitment*

■ Plaintiffs claim that there would be more blacks in the Department if defendants' efforts at recruitment were truly made in good faith. However, the only support for that contention is Lieutenant Freeman's negative opinion concerning the placement of a recruiting station in an inner city neighborhood inhabited "mainly by unwed mothers and children," rather than in "better places" (Tr. 128–29). On the other hand, Pomerleau described in detail the Department's recruiting efforts including:

(1) the creation of a Recruitment Unit within the Department (Tr. 234); (2) media advertising aimed at the black community (Tr. 233); (3) the creation of a "buddy system," pursuant to which a black who is recruited by another black already working for the Department is assigned to the same unit as his recruiter; (4) the attendance of black officers at College Career Days (Tr. 233–34, 236; SDX 4); (5) appeals to black leaders (Tr. 231) and to the Vanguard Justice Society, one of plaintiffs herein, for assistance in recruiting (Tr. 223, 224); (6) creation of a "bounty system" pursuant to which any officer, black or white, who successfully recruits an applicant, was paid fifty dollars; and (7) the imposition of a quota system for the employment of cadets pursuant to which blacks were hired on a one-to-one ratio with whites.[160] Those efforts support defendants' contentions that the Department has been making bona fide attempts to increase the number of black police officers.

*Psychological Testing*

■ Other than the deposition of Dr. Kenneth Sachs,[161] there is no evidence concerning the effects of the psychological testing on the hiring of blacks.[162] Accord-

---

**160.** *See* n. 108 *supra.*

**161.** PX 107. Dr. Sachs, an employee of Psychology Consultants Associated, conducts psychological tests on entry-level applicants and police officers for the Department. As to psychological testing, *see generally McKenna v. Fargo,* 451 F.Supp. 1355 (D.N.J.1978).

**162.** Plaintiffs' exhibits Nos. 77, 78, 79 and 80 reflect figures for 1972, 1973, 1974 and 1975, respectively, concerning the number of black and white persons who completed the civil service application and the number of black and white applicants passing the physical examination, etc.

ingly, no unlawful conduct of defendants has been shown with regard to psychological testing.

### Background Investigation

Plaintiffs generally criticize the background investigation component of the hiring process. However, the evidence in that regard is sparse or nonexistent and discloses no unlawful conduct.

### Educational Requirements

Plaintiffs have presented no evidence of how educational requirements adversely affect the employment opportunities of blacks. Accordingly, even if plaintiffs have not abandoned that claim, it presents no basis for relief.

### Relief

For reasons set forth *supra*, female plaintiffs who fall within the class of female applicants adversely affected by the height-weight requirement and black plaintiffs who fall within the class of male and female applicants adversely affected by the 1974–76 entry-level tests and by the sergeant's exams, are entitled to appropriate relief. While this Court bifurcated for trial the issues of liability and relief,[163] and will hear such additional testimony and argument as is appropriate with regard to relief, counsel have already presented memoranda concerning back pay and attorney's fees.

**163.** *Cf. Sledge v. J. P. Stevens & Co.*, 585 F.2d 625, 637–38 n. 25 (4th Cir. 1978).

**164.** That provision states:

(g) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date

Accordingly, questions relating thereto will be discussed at this time.

### Back Pay

Pursuant to 42 U.S.C. § 2000e–5(g) (1974),[164] a federal district court is empowered to grant back pay as an element of the equitable relief generally provided for under Title VII.

In *City of Los Angeles, Department of Water and Power v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), Mr. Justice Stevens, on behalf of himself and six other members of the Court, wrote (at 719, 98 S.Ct. at 1381):

> In *Albemarle Paper Co. v. Moody*, 422 U.S. 405 [95 S.Ct. 2362, 45 L.Ed.2d 280], the Court reviewed the scope of a district court's discretion to fashion appropriate remedies for a Title VII violation and concluded that "back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." Id., at 421 [95 S.Ct. 2362]. Applying that standard, the Court ruled that an award of backpay should not be conditioned on a showing of bad faith. Id., at 422–423 [95 S.Ct. 2362]. But the *Albemarle* Court also held that backpay was not to be awarded automatically in every case.

more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e–3(a) of this title.

The *Albemarle* presumption in favor of retroactive liability can seldom be overcome, but it does not make meaningless the district courts' duty to determine that such relief is appropriate. * * * [165] [Footnote omitted.]

*Manhart* involved allegations by women employees of a Los Angeles municipal department that sex-based differential pension fund contributions violated their rights under Title VII. Although the Supreme Court (at 717, 98 S.Ct. 1370) affirmed the lower court's conclusion that the practice violated Title VII, it vacated (at 723, 98 S.Ct. 1370) the lower court's decree of retroactive monetary relief which had been awarded in the form of refunds of contributions. In so doing, Mr. Justice Stevens stressed that equitable considerations counseled heavily against such an award in *Manhart.* Specifically, he noted (at 720, 98 S.Ct. at 1381) that

conscientious and intelligent administrators of pension funds, who did not have the benefit of the extensive briefs and arguments presented to us, may well have assumed that a program like the Department's was entirely lawful.

Additionally, Mr. Justice Stevens wrote:

Nor can we ignore the potential impact which changes in rules affecting insurance and pension plans may have on the economy. * * * [at 721]
* * * Retroactive liability could be devastating for a pension fund * * *. [at 722] [Footnote omitted.]

The applicability of *Albemarle* and *Manhart,* and the issue of whether back pay should be awarded herein to any females for Title VII and/or constitutional violations, and/or to any blacks for Title VII violations will be the subject of further consideration and later determination in these cases.

### Attorney's Fees

In *Alyeska Pipeline Service Company v. The Wilderness Society,* 421 U.S. 240, 260,

95 S.Ct. 1612, 1623, 44 L.Ed.2d 141 (1975), the Supreme Court held that attorney's fees are to be awarded only in instances in which the Congress has provided for the same "under selected federal statutes granting or protecting various federal rights." In these cases, plaintiffs have prevailed in certain important regards pursuant to the provisions of Title VII and of section 1983. Congress has expressly authorized the award of attorney's fees to prevailing parties in private suits brought under Title VII. 42 U.S.C. § 2000e–5(k) (1974). Section 2000e–5(k) provides:

In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

■ Section 1988 of Title 42, as amended by the Civil Rights Attorney's Fees Awards Act of 1976 ("1976 Act"), also provides, in relevant part:

In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

That 1976 amendment applies in cases pending on the effective date of enactment. *Wheeler v. The Durham City Board of Education,* 585 F.2d 618, 621 (4th Cir. 1978); *Burt v. Abel,* 585 F.2d 613, 617 (4th Cir. 1978).

In these cases, some of the defendants are state officials sued in their official ca-

---

**165.** *Albemarle* is also cited and discussed in *Patterson v. American Tobacco Co.,* 535 F.2d 257, 269 (4th Cir.), *cert. denied,* 429 U.S. 920 (1976), in which Judge Butzner discussed concepts of back pay in a Title VII–1981 case.

pacities. In *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), holding that an award of attorney's fees under Title VII against a state treasury was not barred by the Eleventh Amendment, 427 U.S. at 456–57, 96 S.Ct. 2666, Mr. Justice Rehnquist wrote that, since the Congress had acted under section 5 of the Fourteenth Amendment in expressly providing for awards of attorney's fees in Title VII cases, the state could not interpose its Eleventh Amendment immunity against such an award.

Like Title VII, the Civil Rights Attorney's Fees Awards Act of 1976 was also an exercise by Congress of its enforcement powers under section 5 of the Fourteenth Amendment. "The combination of *Fitzpatrick* and the Civil Rights Attorney's Fees Awards Act of 1976 establishes that the Eleventh Amendment is no longer a bar to the award of attorney's fees against a state" in Title VII and section 1983 cases. *Rainey v. Jackson State College,* 551 F.2d 672, 675 (5th Cir. 1977).

 One of counsel for plaintiffs in these cases, Ann F. Hoffman, Esq., has announced her intention to contribute her share of any attorney's fees awarded to plaintiffs to the Women's Law Center, a nonprofit litigating organization which has provided counsel to plaintiffs herein. It would not appear that Ms. Hoffman's said intention should cause this Court to reduce the amount, if any, of attorney's fees which it would otherwise award in these cases. *See Tillman v. Wheaton-Haven Recreation Association, Inc.,* 517 F.2d 1141, 1147–48 (4th Cir. 1975) (Butzner, J.), involving section 1983; *see also Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968), involving neither section 1983 nor Title VII, but Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a–3(b); *Burt v. The Board of Trustees of Edgefield County School District,* 521 F.2d 1201, 1206–07 (4th Cir. 1975), involving section 1983.

 The determination of reasonable attorney's fees in cases such as these rests within the discretion of the District Court. 42 U.S.C. § 2000e–5(k); 42 U.S.C. § 1988. *See Lea v. Cone Mills Corporation,* 467 F.2d 277 (4th Cir. 1972); *Wheeler v. The Durham City Board of Education,* 585 F.2d, *supra* at 624. The factors to be "considered and given weight" are those set forth by Judge Winter in *Walston v. School Board of City of Suffolk,* 566 F.2d 1201, 1204–05 (4th Cir. 1977). *And see Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir. 1974). The standards for awarding attorney's fees under section 1988 are the same as under the fee provisions of Title VII. *See Wharton v. Knefel,* 562 F.2d 550, 557 (8th Cir. 1977).

### *Further Proceedings*

Counsel for all parties are hereby afforded the opportunity simultaneously to submit to this Court, on or before April 17, 1979, any additional views pertaining to back pay, attorney's fees, litigation expenses,[166] any other relief sought by plaintiffs herein, and apportionment of all monetary recoveries among defendants, and to inform this Court within that time period if any of the parties desire to present any further evidence with regard thereto, or desire any further opportunity for oral argument.

---

**166.** *See Wheeler v. The Durham City Board of Education, supra,* 585 F.2d at 623–24.